THE O'MARA LAW FIRM, P.C.
DAVID C. OMARA
(Nevada Bar No. 8599)
311 East Liberty Street
Reno, NV 89501
P: (775) 323-1321
F: (775) 323-4082
E: david@omaralaw.net

THE DIGUISEPPE LAW FIRM, P.C.
RAYMOND M. DIGUISEPPE*
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

FIREARMS POLICY COALITION
ADAM KRAUT*
WILLIAM SACK*
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 596-3492
E: akraut@fpclaw.org
E: wsack@fpclaw.org

*Will comply with LR IA 11-2 within 14 days*

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

ROGER PALMER; CHAD MOXLEY;
and, FIREARMS POLICY COALITION,
INC.,

Plaintiffs,

v.

STEPHEN SISOLAK,
   Governor of Nevada;
AARON FORD,
   Attorney General of Nevada;
GEORGE TOGLIATTI,
   Director of the Nevada Department of
   Public Safety;
MINDY MCKAY,
   Administrator of the Records,
   Communications, and Compliance,
   Division of the Nevada, Department of
   Public Safety;

Case No.:

**COMPLAINT FOR DECLARATORY,
INJUNCTIVE, OR OTHER RELIEF**

**42 U.S.C. § 1983**

JOSEPH LOMBARDO,
  Sheriff of Clark County, Nevada;
STEVEN WOLFSON,
  District Attorney of Clark County,
  Nevada;
DANIEL COVERLEY,
  Sheriff of Douglas County, Nevada;
and, MARK JACKSON,
  District Attorney of Douglas County,
  Nevada,

                Defendants.

COME NOW Plaintiffs Roger Palmer, Chad Moxley, and Firearms Policy Coalition, Inc., by and through their attorneys, and complain of Defendants and alleges:

## **INTRODUCTION**

1.      The Supreme Court "has held that the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding," *Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016), quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008), and that this "Second Amendment right is fully applicable to the States," *id*. (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 750 (2010)).

2.      In spite of the text of the Constitution and binding Supreme Court precedents, on June 7, 2021, Defendant Governor Stephen Sisolak signed into law Assembly Bill 286 ("AB 286").

3.      AB 286 radically expands the State of Nevada's statutes to unconstitutionally and categorically ban, under pain of severe criminal sanctions, the possession, receipt, manufacturing, and sales of Non-Firearm Objects ("NFOs"), and further bans both the possession of previously self-manufactured firearms as well as, prospectively, any further self-manufacturing of firearms (hereinafter referred to as the "Ban" and "Nevada's Ban").

4.      Indeed, under the new statutes established by AB 286, the Defendants are

charged with and are enforcing laws that:

     a.    Completely prohibit a person from possessing, purchasing, transporting, or receiving NFOs that some use to machine, print, or otherwise self-manufacture firearms (Sec. 3);

     b.    Completely prohibit a person from selling, offering to sell, or transferring NFOs (Sec. 3.5);

     c.    Completely prohibit a person from manufacturing, causing to be manufactured, assembling, or causing to be assembled a firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law (Sec. 4);

     d.    Completely prohibit a person from possessing, selling, offering to sell, transferring, purchasing, transporting, or receiving a firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law (Sec. 5); and,

     e.    Establish an expansive, inherently vague definition of an "[u]finished frame or receiver," encompassing virtually all conceivable forms and types of NFOs and non-firearm predecessor materials.

5.    The Ban's restrictions are nothing less than a broad and unconstitutional ban on constitutionally protected conduct and instruments in direct violation of the fundamental individual right to keep and bear arms.

6.    The Ban generally took effect immediately when Defendant Sisolak signed AB 286 into law, and Sections 3 and 5 of the Act become effective on January 1, 2022—leaving thousands of individuals and countless local businesses mere months to dispossess themselves of all lawfully owned property in the State affected by the Ban and putting all residents at risk of enforcement and prosecution for proscribed conduct on and after January 1.

7.    And the State has not even attempted to show any of the numerous law-

abiding citizens directly targeted by this law has ever misused, much less committed any crime of violence with, any unserialized firearm or firearm component, so as to justify this dispossession and ban being imposed against them.

8.     Rather than tailor its laws as the Constitution requires, the State elected to take an overbroad, categorical approach that unquestionably infringes on the rights of Nevada residents, businesses, and visitors, and empowers Defendants to use criminal sanctions and force to impose the State's policy preferences on Nevada's law-abiding residents, denying them access to and the exercise of their right to keep and bear protected arms.

9.     "But the enshrinement of constitutional rights necessarily takes certain policy choices"—including these—"off the table." *Heller*, 554 U.S. at 636.

10.    Throughout American history and our nation's traditions of robustly exercising the right to keep and bear arms, people have been free to personally manufacture, construct, and/or assemble arms for lawful purposes, including self-defense in the home.

11.    "The *Heller* test is a test that any citizen can understand. *Heller* asks whether a law bans a firearm that is commonly owned by law-abiding citizens for lawful purposes. It is a hardware test." *Miller v. Bonta*, No. 19-cv-1537-BEN (JLB), 2021 U.S. Dist. LEXIS 105640, at *16 (S.D. Cal. June 4, 2021). If the arm is commonly owned by law-abiding citizens for lawful purposes, then it is protected by the Constitution, full stop.

12.    But Nevada's Ban completely and categorically prohibits individuals not prohibited from exercising their Second Amendment rights from possessing, acquiring, and self-manufacturing firearms that are of types, functions, and designs, and are themselves, commonly owned and possessed firearms—self-made firearms that do not bear a manufacturer's serial number—by law-abiding citizens for lawful purposes.

13.    Plaintiffs therefore bring this challenge because they unquestionably face "a realistic danger of sustaining a direct injury as a result of the law's operation or enforcement," *Skyline Wesleyan Church v. Cal. Dep't of Managed Health Care*, 968 F.3d

738, 747 (9th Cir. 2020), seek to vindicate their rights, and to immediately and permanently enjoin enforcement of Nevada's Ban as required to conform the law to the Constitution's text, our Nation's history and tradition, and the Supreme Court's binding *Heller*, *McDonald*, and *Caetano* decisions.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, which confer original jurisdiction on federal district courts to hear suits alleging the violation of rights and privileges under the United States Constitution. To the extent that the court determines that Plaintiffs are asserting state law claims, this court has supplemental jurisdiction under 28 U.S.C. § 1367(a).

15.     This action, based on a violation of Plaintiffs' constitutional rights, is brought under 42 U.S.C. § 1983 and seeks declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

16.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in the District of Nevada.

## PARTIES

17.     Plaintiff Palmer is a natural person and a citizen of the State of Nevada, residing in Clark County, Nevada.

18.     Plaintiff Moxley is a natural person and a citizen of the State of Nevada, residing in Douglas County, Nevada.

19.     Plaintiff Firearms Policy Coalition, Inc. ("FPC") is a 501(c)(4) non-profit organization incorporated under the laws of Delaware with a place of business in Clark County, Nevada.

20.     Defendant Stephen Sisolak is vested with the "supreme executive power" of the State. As the Governor of Nevada, Nev. Const., Art. 5, Sec. 1, Defendant Sisolak is required under the State Constitution to "see that the laws are faithfully executed," *id*. Sec.

7, and is thus wholly or partially responsible for overseeing, implementing, and enforcing Nevada's Ban, regulatory programs, and related policies, practices, and customs designed to propagate the same. Defendant Sisolak is sued in his official capacity.

21.     Defendant Aaron Ford is the Attorney General of the Nevada and is wholly or partially responsible in such capacity for overseeing, implementing, and enforcing Nevada's Ban, including the State's statutes, regulations, and related policies, practices, and customs designed to propagate the same. Defendant Ford oversees "[s]pecial investigators" who "have the powers of a peace officer." NRS 289.170. Defendant Ford is sued in his official capacity.

22.     Defendant George Togliatti is the Director of Public Safety ("DPS"), based in Carson City, Nevada. Defendant Togliatti has the powers of a peace officer, NRS 289.270. 1.(a), and oversees "[t]he sworn personnel of the Department of Public Safety," who also have the powers of a peace officer, NRS 289.270.1.(d). Defendant Togliatti is wholly or partially responsible for overseeing, implementing, and enforcing Nevada's Ban, regulatory programs, and related policies, practices, and customs designed to propagate the same. Defendant Togliatti is sued in his official capacity.

23.     Defendant Mindy McKay is the Division Administrator for the DPS Records, Communications and Compliance Division. Defendant McKay has the powers of a peace officer. NRS 289.170. 1.(b). She is wholly or partially responsible for overseeing, implementing, and enforcing Nevada's Ban, regulatory programs, and related policies, practices, and customs designed to propagate the same.[1] Defendant McKay is sued in her official capacity.

24.     Defendant Joseph Lombardo is sued in his official capacity as Sheriff of

---

[1] See, e.g., "Governor's Recommended Budget" for "Budget Accounts 4702, 4709 2022/2023," (Department of Public Safety, Records, Communications and Compliance Division), dated March 9, 2021, online at https://www.leg.state.nv.us/App/NELIS/REL/81st2021/ExhibitDocument/OpenExhibitDocument?exhibitId=48182&fileDownloadName=BA 4709 and BA 4702_Department of Public Safety_Presentation.pdf (last accessed June 10, 2021).

Clark County, Nevada. As Sheriff of that county, he has the duty to "keep and preserve the peace" in his county and "apprehend[] or secur[e] any person for felony, or breach of the peace …" in the county. NRS  § 248.090. Defendant Lombardo's ongoing enforcement of the Nevada Ban against Clark County residents places Plaintiff Palmer under imminent threat of arrest should he violate any of its restrictions, thereby depriving him of his fundamental constitutional right to keep, bear, and self-manufacture protected arms under the Second Amendment to the United States Constitution, as alleged herein.

25.    Defendant Steven Wolfson is sued in his official capacity as District Attorney of Clark County, Nevada. As District Attorney of that county, he is the "public prosecutor," NRS § 252.090, with the duty to "[a]ttend the district courts in his … county, for the transaction of criminal business," *id.* at 252.90(1), "[a]ttend justice courts in his … county, when required by justices of the peace, and conduct all prosecutions on behalf of the people for public offenses," *id.* at 252.90(2). Defendant Wolfson's ongoing enforcement of the Nevada Ban against Clark County residents, through the discharge of his duty to prosecute alleged violations of the Ban, places Plaintiff Palmer under imminent threat of prosecution and criminal sanction should he violate any of its restrictions, thereby depriving him of his fundamental constitutional right to keep, bear, and self-manufacture arms under the Second Amendment to the United States Constitution, as alleged herein.

26.    Defendant Daniel Coverly is sued in his official capacity as Sheriff of Douglas County, Nevada. As Sheriff of that county, he has the duty to "keep and preserve the peace" in his county and "apprehend[] or secur[e] any person for felony, or breach of the peace …" in the county. NRS  § 248.090. Defendant Coverly's ongoing enforcement of the Nevada Ban against Douglas County residents places Plaintiff Moxley under imminent threat of arrest should he violate any of its restrictions, thereby depriving him of his fundamental constitutional right to keep, bear, and self-manufacture arms under the Second Amendment to the United States Constitution, as alleged herein.

27.    Defendant Mark Jackson is sued in his official capacity as District Attorney

of Douglas County, Nevada. As District Attorney of that county, he is the "public prosecutor," NRS § 252.090, with the duty to "[a]ttend the district courts in his … county, for the transaction of criminal business," *id.* at 252.90(1), "[a]ttend justice courts in his … county, when required by justices of the peace, and conduct all prosecutions on behalf of the people for public offenses," *id.* at 252.90(2). Defendant Jackson's ongoing enforcement of the Nevada Ban against Douglas County residents, through the discharge of his duty to prosecute alleged violations of the Ban, places Plaintiff Moxley under imminent threat of prosecution and criminal sanction should he violate any of its restrictions, thereby depriving him of his fundamental constitutional right to keep, bear, and self-manufacture arms under the Second Amendment to the United States Constitution, as alleged herein.

## THE RIGHTS AT STAKE

### *The Right to Keep and Bear Arms*

28.     The Second Amendment to the United States Constitution provides (italics added): "A well-regulated Militia being necessary to the security of a free State, the right of the people to keep and bear Arms *shall not* be infringed."

29.     Incorporated against the states through the due process clause of the Fourteenth Amendment, *McDonald*, 561 U.S. at 767, the Second Amendment guarantees "an individual right to keep and bear arms," *Heller*, 554 U.S. at 595. It is "a fundamental constitutional right guaranteed to the people," *id.*, which is and always has been key to "our scheme of ordered liberty," *McDonald* at 767-68.

30.     The "central" holding of the Supreme Court in *Heller* is "that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*, 561 U.S. at 780. It "guarantee[s] the individual right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592.

31.     "The very enumeration of the right takes out of the hands of government— even the Third Branch of Government—the power to decide on a case-by-case basis

whether the right is really worth insisting upon." *Heller*, 554 U.S. at 634. The Second Amendment "elevates above all other interests"—including any interest in targeting the so-called "ghost guns" commonly available and used for lawful purposes—"the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id* at 635.

32.     The Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees," *McDonald*, 561 U.S. at 780, and it cannot "be singled out for special—and specially unfavorable—treatment," *id.* at 778–79. Even purported "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment[.]" *United States v. Marzzarella*, 614 F.3d 85, 92, n. 8 (3d Cir. 2010). Indeed, "prohibiting the commercial sale of firearms . . . would be untenable under *Heller*." *Id.*

33.     Instead, "[j]ust as the First Amendment protects modern forms of communications, … and the Fourth Amendment applies to modern forms of search, … the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582 (internal citations omitted); *accord Caetano*, 577 U.S. at 416 (Alito, J., concurring).

34.     Thus, the Second Amendment "guarantees the right to carry weapons '*typically possessed* by law-abiding citizens for lawful purposes,'" *Caetano*, 577 U.S. at 416 (quoting *Heller*, 554 U.S. at 625) (italics added), and its protection extends to all firearms currently in common use that are not both "dangerous per se" and "unusual," *id.* at 417 ("A weapon may not be banned unless it is both dangerous *and* unusual.").

35.     "Dangerous *per se*" does not mean the mere inherent propensity of a firearm to cause injury. *Caetano*, 577 U.S. at 418 ("firearms cannot be categorically prohibited just because they are dangerous"). In fact, "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Id.* "*Heller* defined the 'Arms' *covered by* the Second Amendment to include " 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike

another.' " *Id.* (quoting *Heller*, 554 U.S. at 581) (quoting 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)) (italics original in *Caetano*).

36.     An arm is not "unusual" so as to fall outside the ambit of this protection so long as it is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Caetano*, 577 U.S. at 420 (italics original). For example, modern handguns, including many of the popular makes and models targeted by the Nevada ban, are not only not "unusual" in this country but are recognized as "the quintessential self-defense weapon" "overwhelmingly chosen by American society" for lawful self-defense. *Heller*, 554 U.S. at 628-29; *see also Miller v. Bonta*, __ F.Supp.3d __, 2021 WL 2284132 * 45 ("To give full life to the core right of self-defense, every law-abiding responsible individual citizen has a constitutionally protected right to keep and bear firearms commonly owned and kept for lawful purposes.").

37.     Indeed, Nevada's ban does not merely prohibit dangerous convicted felons from the conduct of keeping and making firearms, nor does it impose a pre-possession or pre-construction requirement that persons seeking to acquire NFOs and materials, or self-manufacture firearms, must pass a background check. Rather than attempt to regulate the channel in a targeted manner, the State simply bans all conduct and possession *in toto*, forcing all law-abiding people to purchase pre-manufactured commercial firearms, often more expensive than what can be constructed with a 3D printer or small CNC machine at home.

38.     In the First Amendment context, individuals have a right that includes the ability to build one's own printing and communications devices, print one's own fliers, and utilize largely unregulated channels of speech. In that context, the government cannot narrow the channels for exercising the right to freely speak by having limited, government-approved gatekeepers who create or provide speech and its means of distribution for a beholden populace.

39.     Likewise, in the Second Amendment context, the government cannot narrow

the channels for exercising the right to keep and bear arms by limiting one's access to the essential instruments of that right to limited, government-approved manufacturers of firearms and firearm predecessor materials.

40.     The Second Amendment right necessarily includes and thus guarantees the ability of ordinary law-abiding citizens to self-manufacture firearms commonly owned, possessed, and used for self-defense and other lawful purposes.

41.     Perhaps, understanding that a ban such as Nevada's would be unconstitutional, the State of California—hardly reticent when it comes to regulating firearms—took a different approach. In that state, a person can (and is required to) "[a]pply to the Department of Justice for a unique serial number or other mark of identification" prior to constructing a firearm, Cal. Penal Code § 29180(b)(1). Before the Department issues the serial number to an applicant, it conducts a background check. Cal. Penal Code § 29182(b)(1). And if the applicant is not disqualified, the Department "shall grant" such an application "in the form of serial numbers pursuant to Section 23910 to, persons who wish to manufacture or assemble firearms pursuant to subdivision (b) of Section 29180." Cal. Penal Code § 29182(a)(1).

42.     The ability to self-manufacture arms has always been part of the Second Amendment right, as well as American history and tradition.

43.     The colonists in the first permanent English settlements had the express right to import arms and the items necessary to make them. Binding his "Heirs and Successors," King James I in 1606 granted the "Southern Colony" (Virginia) the right to import from Great Britain "the Goods, Chattels, Armour, Munition, and Furniture, needful to be used by them, for their said Apparel, Food, Defence or otherwise." 7 FEDERAL AND STATE CONSTITUTIONS: COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3787–88 (Francis Thorpe ed., 1909). And the 1620 Charter of New England granted colonists the right "to take, load, carry, and transports in . . . Shipping, Armour,

Weapons, Ordinances, Munition, Powder, Shott, Victuals, and all Manner of Cloathing, Implements, Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the said Plantation, and for their Use and Defense, and for Trade with the People there." 3 FEDERAL AND STATE CONSTITUTIONS: COLONIAL CHARTERS, AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES, AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 1834–35 (Francis Thorpe ed., 1909). And "[f]rom the earliest periods American gunsmiths had made and repaired military firearms." Harold L. Peterson, ARMS AND ARMOR IN COLONIAL AMERICA 178 (1956).

44.     "The influence of the gunsmith and the production of firearms on nearly every aspect of colonial endeavor in North America cannot be overstated, and that pervasive influence continuously escalated following the colonial era." M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY 1492-1792, at 149 (1980).

45.     As historian Charles Winthrop Sawyer explained, "in the smaller shops which formed the great majority—mere cabins on the outskirts of the wilderness—one man with or without an apprentice did every part of the work." 1 Charles Winthrop Sawyer, FIREARMS IN AMERICAN HISTORY 145 (1910). Moreover, many gunsmiths worked primarily in other trades and built or repaired firearms as a hobby. *See* James Whisker, THE GUNSMITH'S TRADE 145–63 (1992).

46.     During the Revolutionary War, many colonies relied on and incentivized people outside of the firearms industry to produce firearms. For example, on August 2, 1775, a Committee appointed by Maryland's Provincial Convention "to enquire into the practicability of establishing a manufactory of Arms within this Province" determined that "Arms may be furnished sooner, and at less expense by engaging immediately all Gun Smiths, *and others concerned in carrying on that business*." Journal of the Maryland Convention July 26 – August 14, 1775, at 64–65 (William Hand Browne ed. 1892) (italics added).

47.     In January 1776, the New Hampshire House of Representatives passed a resolution to pay each person who "made" a firearm to certain specifications. "[E]very good firearm Manufactured in this Colony" was rewarded with "three pounds for each." *8 Documents and Records Relating to the State of New-Hampshire During the Period of the American Revolution, From 1776 to 1783*, at 15–16 (Nathaniel Bouton ed., 1874).

48.     In March 1776, a committee of New York's Provincial Congress published notice "in all the publick Newspapers in this Colony" that "this Committee are ready to receive proposals from & treat with any Person or Persons who are willing to engage in manufacturing good Muskets, or the Locks, Barrels, or any necessary parts thereof." *5 American Archives, Fourth Series*, 1418 (Peter Force ed. 1844). The Provincial Congress offered rewards for the manufacturers who could produce the greatest number of arms for the colony, but excluded "any person with whom the Congress or Committee of Safety have already contracted"—thus incentivizing those capable of manufacturing arms but not necessarily in the firearms business.

49.     A month later, the North Carolina Provincial Congress called for "all Gunsmiths, and other mechanicks, who have been accustomed to make, or assist in making Muskets" to be recruited to manufacture arms for the colony. *5 American Archives, Fourth Series*, 1338 (Peter Force ed. 1844). And further, "that they be furnished, at the expense of this Colony, with tools, implements and utensils, and materials for carrying on the said work." *Id.*

50.     Certainly, the ratifiers of the Bill of Rights remembered that the young country depended on the manufacture of firearms by those outside of the firearms industry for survival and intended to protect such activity through the Second Amendment. Indeed, building firearms was entirely unregulated during the colonial and founding eras in America. And there were no restrictions on who could be a gunsmith or make guns.

51.     "Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Secretary of State Thomas Jefferson,

letter to George Hammond, British Ambassador to the U.S., May 15, 1793, in 7 THE WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904).

52.    Thus, no history or precedent exists for extinguishing citizens' ability to self-manufacture firearms for self-defense or other lawful purposes—and rightly so, since the Second Amendment, through its text and as it is informed by history and tradition, is intended to guarantee this right as part of the fundamental liberty it secures.

### The Right to Due Process of Law and Just Compensation

53.    The fundamental right to due process of law is also at stake in this case in light of the mandate that all ordinary law-abiding Nevadans dispossess themselves of all unserialized "unfinished frames or receivers" (and the many other NFOs that fall within the Ban's sweepingly broad definition of this term) as well as all unserialized firearms, without any compensation for the destruction of their valuable property rights.

54.    The Fifth Amendment to the United States Constitution states, in pertinent part, "No person shall . . . be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

55.    The Fourteenth Amendment to United States Constitution states, in pertinent part, ". . . nor shall any State deprive any person of life, liberty, or property, without due process of law."

56.    The Nevada Constitution similarly provides: "No person shall be deprived of life, liberty, or property, without due process of law," and "[p]rivate property shall not be taken for public use without just compensation having been first made, or secured, except in cases of war, riot, fire, or great public peril, in which case compensation shall be afterward made." Nev. Const., art. I, § 8.

57.    "[W]here government requires an owner to suffer a permanent physical invasion of her property—however minor—it must provide just compensation." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005). "A second categorical rule applies to regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her

property." *Id.* (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992)).

58.     Beyond these recognized categories of "takings *per se*," any other "regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain" require compensation to the property owner. *Lingle*, 544 U.S. at 539. This is measured by "the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests," where "the complete elimination of a property's value" or other "permanent physical invasion" of the property is a "determinative factor." *Id.*

## THE CHALLENGED BAN

59.     Through AB 286, the Nevada Legislature amended Chapter 202 of the Nevada Revised Statutes (NRS) by adding the following provisions, categorized as Sections 3, 4, 5, and 5.5 of the Bill, which force ordinary law-abiding citizens to dispossess themselves of all unserialized "unfinished frames or receivers" (and the many other NFOs that fall within this sweepingly broad definition) as well as unserialized, self-manufactured firearms by no later than January 1, 2022, and thereafter ban the same as criminal objects whenever in the hands of such individuals.

60.     Effective immediately, Section 6 of AB 286 amended NRS 202.253 to add the term "[u]nfinished frame or receiver," defining it to mean:

> a blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined.

### Section 3 of AB 286
***The Forced Dispossession of All Existing "Unfinished Frames or Receivers" by January 1, 2022, and Total Ban Thereafter***

61.     Effective January 1, 2022, it is a crime for anyone in Nevada to "possess, purchase, transport or receive an unfinished frame or receiver," unless "[t]he person is a firearms importer or manufacturer" or "[t]he unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by a firearms importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number." AB 286, § 3(1)(a)-(b); *id.* at §10(2) (establishing January 1, 2022 as the effective date of this section); *id.* at §5.5 (providing that "[n]othing in the provisions of sections 3 to 5, inclusive, of this act shall be deemed to prohibit the sale of an unfinished frame or receiver or firearm that is not imprinted with a serial number to a firearms importer or manufacturer or a licensed dealer before January 1, 2022").

62.     "Firearms importer or manufacturer" is defined as "a person licensed to import or manufacture firearms pursuant to 18 U.S.C. Chapter 44." AB 286, § 6(5). "Unfinished frame or receiver" is broadly and vaguely defined as follows, so as to sweep into its net virtually all conceivable forms and types of NFOs and non-firearm predecessor materials: "a blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined." *Id.* at § 6(9). "Firearm" is defined as: "any device designed to be used as a weapon from which a projectile may be expelled through the barrel by the force of any explosion or other form of combustion." *Id.* at § 6(3).

63.     Obtaining serialization of such components after the fact is not an option, as federal law only requires that any necessary serialization be completed *before* the firearm reaches the consumer and that the final product is indeed a *firearm*. *See* 27 C.F.R. §

478.92(a)(1) & (a)(2) (firearms importers and manufacturers "must legibly identify each firearm manufactured or imported" and identify "as required by this section" any "firearm frame or receiver that is not a component part of a complete weapon at the time it is sold, shipped, or otherwise disposed"); *see also* 18 U.S.C. § 921(a)(3) (defining "firearm").

64.    Indeed, it is clear that the Nevada lawmakers fully anticipate and intend dispossession as the sole means of complying with this law. *See* Notes of Assemblywoman Jauregui (AB 286's sponsor) to the amendments of AB 286 on May 11, 2021 (stating that the limited sales exception is designed "to ensure that those in possession of an unserialized firearm or frame/receiver have time and ablity [*sic*] to sell their parts to federally licensed firearms dealers" and that the later effective date "will allow those possession of an unserialized firearm or frame/receiver have [*sic*] until January 1, 2022 to sell or dispose of them").[2]

65.    Consequently, all ordinary law-abiding citizens (i.e., everyone except firearms importers and manufacturers) must dispossess themselves of all unserialized "unfinished frames or receivers" and other NFOs that fall within this definition by no later than January 1, 2022.

66.    Further, no ordinary law-abiding citizen may ever again lawfully possess, purchase, transport, or receive any such unserialized frames, receivers, or NFOs on or after January 1, 2022, which effectively means no ordinary law-abiding Nevadan may thereafter lawfully manufacturer or assemble a firearm of any type using just about any NFO; no firearms can be lawfully self-built with any such products in the State unless and until (1) federal law or regulations require serialization of such component parts separately from serialization of fully assembled firearms and (2) the components are in fact serialized and

_____

[2] The document is publicly available online at https://www.leg.state.nv.us/App/NELIS/REL/81st2021/ExhibitDocument/OpenExhibitDocument?exhibitId=53667&fileDownloadName=AB%20286_Work%20Session%20Document_Patrick%20Guinan_Policy%20Analyst_Research%20Division_LCB.pdf (last accessed June 10, 2021).

then transferred in accordance with those laws or regulations before being incorporated into any firearm self-built by the ordinary person.

### Section 3.5 of AB 286
***The Immediate Ban on the Sale and Transfer of***
***All Unserialized "Unfinished Frames or Receivers"***

67.     Effective immediately, it is a crime for anyone in Nevada to "sell, offer to sell or transfer an unfinished frame or receiver," unless (1) the person is (a) a firearms importer or manufacturer *and* (b) "the recipient of the unfinished frame or receiver is a firearms importer or manufacturer," or (2) "[t]he unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by an importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number"—subject to the limited exception for sales permitted under section 5.5. AB 286, § 3.5(1)(a)-(b); *id.* at §10(1) (this section "becomes effective upon passage and approval").

68.     Thus, this section shuts the door on any future sale or transfer of any unserialized "unfinished frame or receiver" to or by any ordinary law-abiding citizen, by immediately criminalizing all such sales or transfers, except for sales conducted for purposes of complying with the mandatory dispossession of frames, receivers, and other NFOs falling within this definition by the dispossession deadline of January 1, 2022.

### Section 4 of AB 286
***The Immediate Ban on Self-Manufacturing of All Modern Operable Firearms***

69.     Effective immediately, it is a crime for anyone in Nevada to "manufacture or cause to be manufactured or assemble or cause to be assembled a firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law and any regulations adopted thereunder," unless the firearm "[h]as been rendered permanently inoperable," "[i]s an antique firearm," or "[h]as been determined to be a collector's item pursuant to 26 U.S.C. Chapter 53 or a curio or relic pursuant to 18 U.S.C. Chapter 44." AB 286, § 4(1)(a)-(c); *id.* at §10(1) (establishing this section "becomes effective upon passage and approval"). "Assemble" means "to fit together component

parts," and "manufacture" means "to fabricate, make, form, produce or construct by manual labor or machinery." *Id.* at § 4(3)(a)-(b).

70.   Because the serialization requirement of this manufacturing prohibition mandates that the firearm's serial number be "*issued by* a firearms importer or manufacturer," the prohibition effectively bans all self-manufacturing by ordinary law-abiding citizens of any modern operable firearms.

## Section 5 of AB 286
### *The Forced Dispossession of All Unserialized, Operable, Modern Firearms by January 1, 2022, and Total Ban Against All Such Firearms Thereafter*

71.   Effective January 1, 2022, it is a crime for anyone in Nevada to "possess, sell, offer to sell, transfer, purchase, transport or receive a firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law and any regulations adopted thereunder," unless (1) the person is a law enforcement agency or a firearms importer or manufacturer, or (2) the firearm has been rendered permanently inoperable, was manufactured before 1969, is an antique firearm, or has been determined to be a collector's item pursuant to 26 U.S.C. Chapter 53 or a curio or relic pursuant to 18 U.S.C. Chapter 44. AB 286, § 5(1)(b)-(b); *id.* at §10(2) (establishing an effective date of January 1, 2022); *id.* at §5.5 (providing the sales exception for purposes of complying with the mandated dispossession of such frames and receivers by January 1, 2022).

72.   This section targets existing unserialized firearms of ordinary law-abiding Nevadans, banning as of January 1, 2022 the possession, sale, transfer, transport, or receipt of all such modern and operable firearms manufactured after 1969. As noted, federal law requires that any necessary serialization of firearms and related components be completed *before* they reach the consumer, such that obtaining serialization after the fact for pre-existing unserialized firearms is no option. *See* 27 C.F.R. § 478.92(a)(1) & (a)(2). Consequently, all ordinary law-abiding citizens must dispossess themselves of all such firearms no later than January 1, 2022, in order not to be in violation of this prohibition. *See*

Notes of Assemblywoman Jauregui to the amendments of AB 286 on May 11, 2021. And, as of January 1, 2022, no ordinary law-abiding citizen may ever again lawfully possess, sell, transfer, purchase, transport, or receive any unserialized modern and operable firearm, further nailing the coffin on any future self-manufacturing of firearms by such ordinary law-abiding people.

### The Criminal Sanctions for Violating Nevada's Ban

73.     Nevada's Ban scheme imposes significant criminal sanctions for a violation of any of the new regulatory provisions enacted in AB 286: The first offense constitutes a gross misdemeanor, punishable by imprisonment in county jail for up to 364 days, a fine up to $2,000, or both. AB 286, §§ 3(2), 3.5(2), 4(2), 5(2); NRS § 193.140. Any second or subsequent violation constitutes a category D felony, punishable by imprisonment in state prison for at least one year and up to four years, in addition to a fine of up to $5,000. *Id.*; NRS § 193.130(d). Any second or subsequent violation would also result in a lifetime ban on an individual's right to keep and bear arms. *See* 18 U.S.C. § 922(g)(1).

### FACTS AS TO THE PLAINTIFFS AND THE BAN'S IMPACTS ON THEM

#### *Facts Relating to Roger Palmer*

74.     The foregoing paragraphs are incorporated herein as if set forth in full.

75.     Plaintiff Palmer is a resident of Clark County, Nevada.

76.     Plaintiff Palmer is a responsible, peaceable citizen not disqualified from exercising his right to possess firearms and ammunition.

77.     Plaintiff Palmer holds a Nevada Concealed Carry Permit.

78.     Plaintiff Palmer is a retired law enforcement officer who has also served as a firearms instructor, concealed carry instructor, and a state security guard instructor.

79.     Plaintiff Palmer is currently a full-time private investigator.

80.     Plaintiff Palmer is not a licensed firearms manufacturer, importer, or dealer.

81.     Plaintiff Palmer is a member of Plaintiff FPC.

82.     Plaintiff Palmer lawfully owns and possesses multiple unserialized firearms,

both handguns and rifles, that he previously self-manufactured lawfully with unserialized component parts, including Polymer80[3] NFOs, one or more of which would fall within the new definition of and prohibition against unserialized "unfinished frames or receivers" under Nevada's Ban. Because these firearms were self-manufactured, the completed firearms themselves necessarily lack "a serial number issued by a firearms importer or manufacturer," thus falling within the Ban's prohibition against all modern, operable unserialized firearms under Section 5 of AB 286.

83.    Plaintiff Palmer also owns and possesses multiple uncompleted NFOs and firearm building kits, which he lawfully acquired before enactment of the Ban. One or more of these components would fall within the new definition of and prohibition against unserialized "unfinished frames or receivers" under Nevada's Ban, which now mandates dispossession of such firearms components by January 1, 2022, and thereafter outlaws possession of any such components and any unserialized firearms assembled with such components under Sections 3 and 5, and immediately bans any further self-manufacturing of such firearms under Section 4 of AB 286.

84.    Plaintiff Palmer's lawfully self-manufactured, unserialized firearms are of a type commonly possessed by law-abiding citizens for lawful purposes today; specifically, handguns manufactured with Polymer80 kits and AR-15 rifles manufactured with precursor NFOs. Indeed, handguns are recognized as "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629. The unserialized NFOs are also commonly possessed by law-abiding citizens in the exercise of their right to self-manufacture such firearms for self-defense and other lawful purposes.

---

[3] "About Polymer80," online at https://www.polymer80.com/about-us: "Polymer80, Inc. designs and develops innovative firearms and after-market accessories that provide ways for our customer to participate in the build process, while expressing their right to bear arms. This provides a fun learning experience and a greater sense of pride in their completed firearm, strengthening our brand loyalty. We summarize this with our motto of 'Engage Your Freedom.'" (last accessed June 10, 2021). Polymer80, Inc., is presently located in Dayton, Nevada.

85.     However, Plaintiff Palmer is mandated to dispossess himself of the unserialized NFOs, and to dispossess himself of the unserialized firearms he self-built (or render them "permanently inoperable") by January 1, 2022, or face criminal prosecution under Sections 3 and 5 of AB 286.

86.     Plaintiff Palmer desires to continue to own and possess his lawfully self-manufactured unserialized firearms and NFOs for self-defense and other lawful purposes, and not sell or otherwise dispose of them, but he reasonably fears criminal sanction in light of the statutorily mandated dispossession established under Nevada's Ban.

87.     Plaintiff Palmer also desires to acquire additional NFOs commonly used in the self-manufacturing of firearms for self-defense and other lawful purposes, including those that fall within the definition of "unfinished frames or receivers" under Nevada's Ban, and he desires to self-manufacture additional operable firearms for self-defense and other lawful purposes. However, he is currently prohibited from purchasing or otherwise acquiring any such NFOs under the Ban, he is currently prohibited from self-manufacturing any operable unserialized firearms under Section 4, and he is prohibited from ever again possessing, purchasing, transporting, or receiving any such firearms or NFOs any time on or after January 1, 2022.

88.     Based on the threat of criminal prosecution by and through Nevada's Ban that Defendants are actively enforcing and will continue to enforce, Plaintiff Palmer is and has been prevented from acquiring, possessing, transporting, or receiving NFOs, and from self-manufacturing any additional operable firearms from NFOs, for self-defense and other lawful purposes.

89.     Defendants' active administration, implementation, and enforcement of the Ban, and the related regulations, policies, practices, and customs designed to implement and enforce the same, has violated and will continue to violate unless and until enjoined, the fundamental individual right to keep and bear arms guaranteed under the Second and Fourteenth Amendments to Plaintiff Palmer and all similarly situated Nevada resident FPC

members, in addition to the right of Plaintiff Palmer and all such similarly situated individuals to receive just compensation of under the due process clauses of the Fifth and Fourteenth Amendments for the destruction of their property interests being exacted by the dispossession mandate.

### *Facts Relating to Plaintiff Moxley*

90.     The foregoing paragraphs are incorporated herein as if set forth in full.

91.     Plaintiff Moxley is a resident of Douglas County, Nevada.

92.     Plaintiff Moxley is a responsible, peaceable citizen not disqualified from exercising his right to possess firearms and ammunition.

93.     Plaintiff Moxley is a retired firefighter.

94.     Plaintiff Moxley is a member of Plaintiff FPC.

95.     Plaintiff Moxley currently holds a valid Federal Firearms License ("FFL") and a Nevada Concealed Carry Permit.

96.     Plaintiff Moxley conducts sales of firearms and constituent firearm parts at local gun shows through his sole proprietorship, Strategic Supplies, in compliance with all applicable state and federal laws and regulations.

97.     On average, Plaintiff Moxley attends two gun shows per month and sells between five and forty unfinished receiver kits that would fall within the new definition of and prohibition against the sale of unserialized "unfinished receivers" under Sections 3 and 3.5 of the new Nevada's Ban.

98.     Before the enactment of Nevada's Ban, Plaintiff Moxley had already planned and made arrangements to attend at least six more gun shows before the end of the year, at which he would have otherwise made available for sale and sold firearm components now prohibited from commercial sale under the Ban.

99.     Plaintiff Moxley desires to continue making available for sale and would make available for sale to ordinary law-abiding citizens the unserialized firearms

component parts and other NFOs targeted by Nevada's Ban, but he is now prohibited from doing so under Section 3.5's ban against any such sales or transfers.

100. Based on this threat of criminal prosecution by and through the Nevada Ban that Defendants are actively enforcing, Plaintiff Moxley is now abstaining from and must continue to abstain from any attempt to sell or transfer any "unfinished frames or receivers" (and all other NFOs that fall within this broad definition) to any ordinary, law-abiding citizen. Consequently, he is forced to suffer lost sales, revenue, and goodwill in his business, and his would-be consumers, who include individuals just like the other individual plaintiffs in this case, are concomitantly denied the ability to acquire from him such constituent firearms components in the exercise of their right to self-manufacture firearms for self-defense and other lawful purposes.

101. Further, Plaintiff Moxley lawfully owns and possesses multiple firearms, both handguns and rifles, that he previously self-manufactured lawfully with unserialized component parts, including Polymer80 kits, precursor AR-15 lower receivers, and/or other NFOs, one or more of which would fall within the new definition of and prohibition against unserialized "unfinished frames or receivers" under Section 3 of Nevada's Ban. Because these firearms were self-manufactured, the completed firearms themselves lack necessarily lack "a serial number issued by a firearms importer or manufacturer," thus falling within the Ban's prohibition against all modern, operable unserialized firearms under Section 5 of AB 286.

102. Plaintiff Moxley's lawfully self-manufactured unserialized firearms are of a type commonly possessed by law-abiding citizens for self-defense and other lawful purposes today. As with Plaintiff Palmer, these self-manufactured firearms include handguns, "the most popular weapon chosen by Americans for self-defense in the home." *Heller*, 554 U.S. at 629.

103. However, Plaintiff Moxley is mandated to dispossess himself of all unserialized firearms he has self-built (or render them "permanently inoperable") by

January 1, 2022, or face criminal prosecution under Sections 3 and 5 of AB 286.

104.     Plaintiff Moxley desires to continue to own and possess his lawfully self-manufactured unserialized firearm for self-defense and other lawful purposes, and not sell or otherwise dispose of them, but he reasonably fears criminal sanction in light of the statutorily mandated dispossession established under Section 5 of Nevada's Ban.

105.     Plaintiff Moxley also desires to self-manufacture additional operable firearms for self-defense and other lawful purposes. However, he is currently prohibited from self-manufacturing any operable unserialized firearms under Section 4, and he is prohibited from ever again possessing, purchasing, transporting, or receiving any such firearms under Section 5 any time on or after January 1, 2022.

106.     Based on this threat of criminal prosecution by and through Nevada's Ban that Defendants are actively enforcing and will continue to enforce, Plaintiff Moxley is and has been prevented from acquiring, possessing, transporting, or receiving NFOs, and from self-manufacturing any additional operable firearms from NFOs, for personal self-defense and other lawful purposes.

107.     Individual Plaintiffs Palmer and Moxley are bringing this action on behalf of themselves, and as representatives of the class of similarly situated Nevada resident FPC members who are being forced to dispossess themselves of the firearms and constituent firearm parts prohibited by the Nevada Ban, who are banned from lawfully possessing or using any other such firearms and constituent parts, and who are banned from self-manufacturing any such firearms. Further, as a seller of now-banned NFOs, Plaintiff Moxley is bringing this action on behalf of his customers who seek to purchase NFOs for lawful purposes and whose Second Amendment rights are being violated by the Ban.

108.     Defendants' active administration, implementation, and enforcement the Nevada Ban, and the related regulations, policies, practices, and customs designed to implement and enforce the same, has violated and will continue to violate unless and until enjoined, the fundamental individual right to keep and bear arms under the Second

Amendment guaranteed to the Plaintiffs and all similarly situated Nevada resident FPC members, in addition to the right of Plaintiffs and all such similarly situated individuals to receive just compensation under the due process clauses of the Fifth and Fourteenth Amendments for the destruction of their property interests being exacted by the dispossession mandate.

### Facts Relating to
### Plaintiff Firearms Policy Coalition

109.    The foregoing paragraphs are incorporated herein as if set forth in full.

110.    The purposes of Plaintiff FPC include defending and promoting the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms—advancing individual liberty, and restoring freedom.

111.    Plaintiff FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs.

112.    Plaintiff FPC's members reside both within and outside Nevada.

113.    Plaintiff FPC represents its Nevada resident members—who include gun owners, prospective gun owners and self-manufacturers, retailers of NFOs, parts, and firearms, and others—and brings this action on behalf of its Nevada resident members, including the named Plaintiffs herein.

114.    Plaintiff FPC's Nevada resident members, including the individual Plaintiffs in this case, have been and will continue to be adversely and directly harmed by Defendants' administration, implementation, and enforcement of the laws, and related regulations, policies, practices, and customs challenged herein and will otherwise remain so adversely and directly affected under the Nevada Ban.

115.    Many of Plaintiff FPC's Nevada resident members lawfully acquired unserialized firearm components are commonly possessed by law-abiding citizens in the exercise of their right to self-manufacture such firearms for self-defense and other lawful

purposes.

116.    However, those Nevada resident members are mandated to dispossess themselves of the unserialized firearm components, by January 1, 2022, or face criminal prosecution under Section 3 of Nevada's Ban.

117.    Many of Plaintiff FPC's Nevada resident members desire to continue to own and possess its firearm components for lawful purposes, and to not sell or otherwise dispose of them, but they reasonably fear criminal sanction in light of the statutorily mandated dispossession established under Section 3 of Nevada's Ban.

118.    Many of Plaintiff FPC's Nevada resident members also desire to acquire additional NFOs otherwise commonly available for purchase and commonly used in the self-manufacturing of firearms for self-defense and other lawful purposes, including those that fall within the definition of "unfinished frames or receivers" under Nevada's Ban, and further desire to self-manufacture additional operable firearms for self-defense or other lawful purposes. However, they are currently prohibited from purchasing or otherwise acquiring any such unfinished receivers or frames under Section 3.5 of the Ban, currently prohibited from self-manufacturing any operable unserialized firearms under Section 4, and prohibited from ever again possessing, purchasing, transporting, or receiving any such firearms or NFOs parts under Sections 3 and 5 any time on or after January 1, 2022.

119.    Based on this threat of criminal prosecution by and through the Nevada Ban that Defendants are actively enforcing, Plaintiff FPC's Nevada resident members have been prevented from acquiring, possessing, transporting, or receiving NFOs, and from self-manufacturing any additional operable firearms from NFOs, for self-defense and other lawful purposes.

120.    Plaintiff FPC reasonably fears the prosecution of its Nevada resident members by and through Defendants' administration, implementation, and enforcement of the laws, regulations, policies, practices, and customs challenged herein.

121.    As to all claims made in a representative capacity herein, there are common

questions of law and fact that substantially affect the rights, duties, and liabilities of numerous FPC Nevada resident members who knowingly or unknowingly are subject to the Nevada Ban. The relief sought in this action is declaratory and injunctive in nature, and is a matter of substantial public interest.

122.    Defendants' active administration, implementation, and enforcement the Nevada Ban, and the related regulations, policies, practices, and customs designed to implement and enforce the same, has violated and will continue to violate unless and until enjoined, the fundamental individual right to keep and bear arms under the Second Amendment guaranteed to the Nevada resident members of FPC, including the Plaintiffs in this case, in addition to the right of such individuals to receive just compensation of under the due process clauses of the Fifth and Fourteenth Amendments for the destruction of their property interests being exacted by the Ban's dispossession mandate.

**COUNT I: VIOLATION OF THE SECOND AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**
**Facial and As-Applied to Plaintiffs**
**(All Plaintiffs v. All Defendants)**

123.    The foregoing paragraphs are hereby incorporated herein as if set forth in full.

124.    Under federal law, "a license is not required to make a firearm solely for personal use." https://www.atf.gov/firearms/qa/does-individual-need-license-make-firearm-personal-use. And that is true if the firearm is based on an NFO, a 3D printed unserialized frame or receiver, machined from a block of raw materials, or stamped from a piece of sheet metal.

125.    And under federal law, it is "unlawful for any person to manufacture, import, sell, ship, deliver, possess, transfer, or receive any firearm—[¶] (A) that, after removal of grips, stocks, and magazines, is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar; or [¶] (B) any major component of which, when subjected to inspection by the types of x-ray machines

commonly used at airports, does not generate an image that accurately depicts the shape of the component. Barium sulfate or other compounds may be used in the fabrication of the component." 18 U.S.C. § 922(p).

126.    Thus, law already requires that self-manufactured firearms are not "undetectable." Nor would they be, since pressure-bearing and mechanically reciprocating parts are made of detectable metals.

127.    Nevada's Ban imposes a blanket prohibition against a broad class of protected arms in common use for self-defense and other lawful purposes by ordinary law-abiding citizens like the Plaintiffs in this case: all modern operable firearms of any type (all handguns and all long guns) *in addition* to component parts integral to their manufacture which lack "a serial number issued by a firearms importer or manufacturer." The Ban mandates that all ordinary law-abiding citizens *dispossess* themselves of all such firearms, related components, and NFOs on or before January 1, 2022, totally bans all such individuals from possessing or using them on and after that date, *immediately* bans any further sales or transfers of "unfinished frames or receivers" involving these individuals, and *immediately* bans them from any further self-manufacturing of firearms.

128.    The Second Amendment guarantees ordinary law-abiding citizens the right to acquire, possess, use, and self-manufacture *all* firearms in common use for self-defense and other lawful purposes. *Caetano*, 577 U.S. at 420. Because the Nevada Ban outlaws numerous such arms by deeming their possession and use, and their manufacture, to be crime for any ordinary law-abiding person, the Ban is categorically unconstitutional and must be enjoined as such. *Young v. Hawaii*, 992 F.3d 765, 784 (9th Cir. 2021) (quoting *Silvester v. Harris*, 843 F.3d 816, 824 (9th Cir. 2016) ("If a regulation 'amounts to a destruction of the Second Amendment right,' it is unconstitutional under any level of scrutiny.").

129.    If any tiers-of-scrutiny analysis were to apply, only the highest level, strict scrutiny, could be applied since the Ban unquestionably '"implicates the core of the Second

Amendment right and severely burdens that right.'" *Young*, 992 F.3d at 784 (quoting *Silvester*, 843 F.3d at 824). And whatever public safety interest the State may claim in enacting this ban, there has been no effort to tailor it so as to minimize imposing unnecessary or overly broad restraints—much less to establish "the least restrictive means" of achieving any "compelling" interests—which is the essence of the strict scrutiny test. *Miller v. Johnson*, 515 U.S. 900, 920 (1995).

130.    There has been no showing that *any* of the countless law-abiding Nevadans targeted under this Ban has had any involvement in any crime associated with any unserialized firearm or any unserialized firearm component, much less any significant number of these individuals, so as to somehow justify dispossessing them of all such firearms and firearm parts and prohibiting them from exercising their fundamental right to possess, use, and self-manufacture protected arms in common use for self-defense and lawful purposes.

131.    The lack of meaningful tailoring in this broad prohibition renders the Ban unconstitutional even under intermediate scrutiny, because that test requires at least "a means narrowly tailored to achieve the desired objective." *Bd. of Trustees of State Univ. of New York*, 492 U.S. 468, 480 (1989).

132.    The answers to the questions of law in this case require a textual and historical inquiry into original meaning of the Second Amendment, *Heller*, 554 U.S. at 634-35, because "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."

133.    The Ninth Circuit "and other federal courts of appeals have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017).

134.    Plaintiffs have a right to self-manufacture arms for protection and all lawful

1    purposes, including those arms and precursor materials, including but not limited to NFOs,

2    prohibited under Nevada's Ban.

3         135.    Nevada's Ban prohibits law-abiding citizens from acquiring materials and

4    supplies necessary to self-manufacture, construct, and/or assemble constitutionally

5    protected arms of designs and functions—including but not limited to AR-15[4] semi-

6    automatic rifles, and Glock-compatible designs[5] and other common semi-automatic

7    handguns—that are commonly possessed and used for self-defense and other lawful

8    purposes in the vast majority of states.

9         136.    Nevada's Ban prohibits law-abiding citizens from self-manufacturing,

10   constructing, and/or assembling constitutionally protected arms of designs and functions,

11   including but not limited to AR-15 semi-automatic rifles and Glock-platform based designs

12   and other common semi-automatic handguns, that are commonly possessed and used for

13   self-defense and other lawful purposes in the vast majority of states.

14        137.    Nevada's Ban prohibits law-abiding citizens from possessing self-

15   manufactured constitutionally protected arms of designs and functions, including but not

16   limited to AR-15-platform semi-automatic rifles and Glock-platform based designs and

17   other common semi-automatic handguns, that are commonly possessed and used for self-

18   defense and other lawful purposes in the vast majority of states.

19        138.    The AR-15 is an incredibly common and constitutionally protected firearm.

20   And this fact isn't a recent development. Over 25 years ago, the Supreme Court recognized

21   _____

22   [4] See, e.g., https://www.polymer80.com/RL556v3-80-AR15-Lower-black (NFO is "Mil-
     spec," allowing self-manufacturers to parts compatible with the open source AR-15 design)
23   (last accessed June 10, 2021).

24   [5]   See, e.g., https://www.polymer80.com/PF940v2-80-Full-Size-Frame-Kit- ("The
     PF940v2™ is compatible with components for 3-pin 9mm [Glock®] G17, 34, 17L;
25   .40S&W G22, 35, 24; and .357Sig G31.") (last accessed June 10, 2021);
     https://www.polymer80.com/PF940C-80-Compact-Pistol-Frame-Kit-Black            (has
26   "compatibility with Glock® 19/23 Gen3 components") (last accessed June 10, 2021). These
     Glock-platform handguns are some of the most common in the United States, and *Heller*'s
27   "hardware test" is not limited to the original designer or a specific manufacturer.

28

the AR-15 as a common firearm possessed by *regular individuals* (not military or law enforcement) when it held: "The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon." *Staples v. United States*, 511 U.S. 600, 603 (1994). Even in 1994, it was widely known that the common AR-15 was a firearm commonly possessed for lawful purposes by non-government "civilian" individuals.

139.   "The AR-15 platform in particular, is an 'open source' design … with countless variations and adaptations. In fact, the platform's ability to accept modifications with ready-made retail parts without the need for specialized tools or expertise, is part of what makes these rifles popular." *Miller,* 2021 U.S. Dist. LEXIS 105640, at *12-14. "Furthermore, the modularity and standardization of the AR-15, its ubiquity, commonality, and widespread ownership in common ammunition sizes such as .223 and 5.56 x 45mm, and the interchangeability of parts, including magazines, makes it ideal." *Id.*, at *108.

140.   Because it is "open source" in nature, has a large volume of [constitutionally protected] educational materials on manufacturing and construction dedicated to it and found on the Internet, is relatively easily constructed, has excellent availability of parts, and a modular design ready and able to be configured in countless lawful ways for many lawful purposes, "the popular AR-15 rifle is a perfect combination of home defense weapon and homeland defense equipment. Good for both home and battle, the AR-15 is the kind of versatile gun that lies at the intersection of the kinds of firearms protected under *District of Columbia v. Heller* and *United States v[.] Miller*," *Id.*, at *2 (internal citations omitted).

141.   Nevada's Ban inflicts irreparable harm on Plaintiffs by prohibiting property and conduct protected under the Second Amendment individual right to keep and bear arms. Plaintiffs lack an adequate remedy at law for this burden on their Second Amendment right, and the harm Plaintiffs would suffer from denial of an injunction exceeds any legally cognizable harm an injunction may inflict upon Defendants. The public interest favors enjoining unconstitutional statutes such as Nevada's Ban.

142.   Therefore, as a direct and proximate result of the above infringement of and

impermissible burden on the rights of Plaintiffs protected under the Second and Fourteenth Amendments, Plaintiffs and all similarly situated Nevada resident members of FPC have suffered an unlawful deprivation of their fundamental constitutional right to keep and bear arms, and they will continue to suffer such injury unless and until granted the relief they seek herein.

**COUNT II: VIOLATION THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION**
**Facial and As-Applied to Plaintiffs**
**(All Plaintiffs v. All Defendants)**

143. The foregoing paragraphs are hereby incorporated herein as if set forth in full.

144. The numerous unserialized modern operable firearms, and the unserialized unfinished frames, receivers, and NFOs possessed as constituent parts of the same, which were previously owned, possessed, used, and manufactured for self-defense and other lawful purposes, but which are now subject to dispossession or permanently disabling by no later than January 1, 2022, under Nevada's Ban, have substantial value as property interests to all the ordinary law-abiding forced to comply with this mandate, including Plaintiffs and all similarly situated Nevada resident FPC members who have relied on them for such constitutionally-protected purposes, including for defense of hearth and home. Thus, the manner in which Plaintiffs and the represented class have kept, bore, and possessed such property represents a substantial, constitutionally-protected liberty interest.

145. Indeed, while Nevada has suspended the criminal sanctions for selling unserialized firearms and "unfinished frames or receivers" until January 1, 2022, to permit an opportunity for ordinary law-abiding citizens "to sell or dispose of them" before that date, Notes of Assemblywoman Jauregui (AB 286's sponsor) to the amendments of AB 286 on May 11, 2021, a *sale* of unserialized firearms or their constituent unserialized parts is no realistic option, particularly since such items are now *banned* from the hands of all ordinary law-abiding citizens throughout the State of Nevada. On information and belief, many

Case 3:21-cv-00268   Document 1   Filed 06/10/21   Page 34 of 38

licensed firearms dealers refuse or will refuse to purchase or otherwise accept for sale any such products given the potential risks and uncertainties in dealing with legally banned firearms and firearms products, and/or due to objections or concerns about participating in an undertaking that amounts to a *de facto* taking of personal property. And, on information and belief, banned unserialized firearms cannot be brought into compliance with Nevada's Ban, even through licensed firearm retailers.

146.    Further, whatever limited market may exist for the sale of such outlawed items, anyone *forced* to sell under such a legal compulsion surely will not garner the *fair* market value of these otherwise valuable and popular firearms and constituent components.

147.    The lack of any realistic opportunity of obtaining fair compensation for the property these law-abiding citizens are being forced to give up is significant. The only way to potentially make themselves whole again would be to acquire a substitute for the dispossessed firearms and/or firearm components, almost invariably requiring the purchase of a substitute product at its fair market value, forcing these individuals to incur potentially significant additional costs.

148.    Further, even if one could obtain a sale price commensurate with the fair market value of these popular firearms products, the full value of such products is not measured in just dollars. "The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary." *Grace v. District of Columbia*, 187 F.Supp.3d 124, 150 (D.D.C. 2016). The value in terms of "psychic comfort" is immeasurable when considering that the purpose of these products is to protect and preserve life itself, and in particular, with the satisfaction of having manufactured the firearm oneself, with one's own hands and tools.

149.    At the least, fair compensation from the State for this forced dispossession of protected arms and their constituent parts is required to ensure the minimum that due process requires. In fact, such compensation is absolutely required because, unquestionably,

the Nevada Ban completely deprives the property owners of "*all* economically beneficial us[e]' of [their] property," and causes them to "suffer a permanent physical invasion of their property interests." *Lingle*, 544 U.S. at 538 (quoting *Lucas*, 505 U.S. at 1019).

150.    Yet, the Nevada Ban provides no form of compensation whatsoever. Such compensation was never even considered. Instead, it is clear that all ordinary law-abiding citizens swept up into this Ban are expected to just give up the property in response to a mandate of a government that not only pays them nothing for their property but threatens to jail them for failing to comply. Notes of Assemblywoman Jauregui (AB 286's sponsor) to the amendments of AB 286 on May 11, 2021 (reflecting the intent for "those in possession of an unserialized firearm or frame/receiver" "to sell or dispose of them").

151.    Thus, the State has not created or established, nor has there even been any established process, remedy, or administrative body through which one may seek compensation for the forced dispossession this property. Accordingly, Plaintiffs are not required to exhaust any administrative remedies, as no such administrative remedies even exist.

152.    The Supreme Court has established two guides "for detecting when government regulation is so burdensome that it constitutes a taking." *Duncan*, 366 F. Supp. 3d 1131, 1184.

153.    "First, with certain qualifications … a regulation which 'denies all economically beneficial or productive use of land' will require compensation under the Takings Clause." *Murr v. Wisconsin*, 137 S. Ct. 1933, 1942-43 (2017) (citing *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001), quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. at 1015).

154.    "Second, when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found based on a complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3)

the character of the governmental action." *Murr*, 137 S.Ct. at 1938 (citations and quotation marks omitted).

155. And "a physical *appropriation* of property g[ives] rise to a *per se* taking, without regard to other factors." *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427 (2015)*.*

156. Here, Nevada "will deprive Plaintiffs not just of the use of their property, but of possession, one of the most essential sticks in the bundle of property rights. … Thus, whatever might be the State's authority to ban the sale or use of [unserialized NFOs and firearms], the Takings Clause prevents it from compelling the physical dispossession of such lawfully-acquired private property without just compensation." *Duncan*, 366 F. Supp. at 1185.

157. And "[g]uns in general are not 'deleterious devices or products or obnoxious waste materials.' " *Duncan v. Becerra*, 366 F. Supp. 3d 1131, 1183 (S.D. Cal. 2019) (quoting *Staples*, 511 U.S.  at 610). Nor could they be under *Heller*.

158. The Ban's confiscatory process of mandating forfeiture to law enforcement, destruction, or forced dispossession of this constitutionally protected and previously lawfully acquired and possessed property, with no just compensation, inflicts irreparable harm on Plaintiffs.

159. Therefore, as a direct and proximate result of the Ban's confiscatory process of mandating forfeiture to law enforcement, destruction, or forced dispossession of this property with no just compensation, in violation of the rights of Plaintiffs protected under the Fifth and Fourteenth Amendments, Plaintiffs and all similarly situated Nevada resident members of FPC have suffered and will continue to suffer injury unless and until granted the relief they seek herein.

160. Thus, injunctive relief is appropriate to protect against the irreparable harm of compelled destruction of or damage to valuable property interests.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Honorable Court enter

judgment in their favor and against Defendants, as follows:

      a)     Declare that the statutes enacted in AB 286 and Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and customs violate the right of Plaintiffs and all similarly situated Nevada resident FPC members, to keep and bear arms as guaranteed by the Second and Fourteenth Amendments to the United States Constitution;

      b)     Preliminarily, and thereafter permanently, enjoin Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, and all persons who have notice of the injunction, from enforcing against Plaintiffs and all similarly situated Nevada resident FPC members, the statutes enacted in AB 286 and Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and customs that impede or would impede Plaintiffs and similarly situated Nevada resident FPC members, from exercising their right to keep and bear arms guaranteed by the Second and Fourteenth Amendments or sanction them for it;

      c)     Declare that the statutes enacted in AB 286 and Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and customs violate the right of Plaintiffs and all similarly situated Nevada resident FPC members, to due process of the law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution;

      d)     Preliminarily, and thereafter permanently, enjoin Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them, and all persons who have notice of the injunction, from enforcing against Plaintiffs and all similarly situated Nevada resident FPC members, the statutes enacted in AB 286 and Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and customs that impede or would impede Plaintiffs and similarly situated Nevada resident FPC members from obtaining due process under the law and just compensation for the resulting destruction of or damage to their property interests;

      e)     Award Plaintiffs' costs, attorney fees, and all other allowable expenses pursuant to 42 U.S.C. § 1988 and all applicable laws; and,

1        f)      Grant any and all other equitable and/or legal remedies this Court may see

2  fit.

3

4  Dated:  June 10, 2021                THE O'MARA LAW FIRM, P.C.

5                           By   /s/ DAVID C. O'MARA

6                              DAVID C. O'MARA

7                         Attorneys for Plaintiffs