THE O'MARA LAW FIRM, P.C.
DAVID C. OMARA
(Nevada Bar No. 8599)
311 East Liberty Street
Reno, NV 89501
P: (775) 323-1321
F: (775) 323-4082
E: david@omaralaw.net

THE DIGUISEPPE LAW FIRM, P.C.
RAYMOND M. DIGUISEPPE*
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

FIREARMS POLICY COALITION
ADAM KRAUT*
WILLIAM SACK*
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 596-3492
E: akraut@fpclaw.org
E: wsack@fpclaw.org

*PHV Forthcoming*

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ROGER PALMER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> STEPHEN SISOLAK, in his official capacity as Governor of Nevada, *et al.*, <br><br> Defendants. | Case No.: 3:21-cv-00268 <br><br> **PLAINTIFF'S MOTION PRELIMINARY INJUNCTION AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> **Judge: Hon. Miranda Du** <br> **Date:** <br> **Time** <br> **Courtroom:** |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs Roger Palmer, Chad Moxley, and Firearms Policy Coalition, Inc. (collectively, "Plaintiffs") move for a Preliminary Injunction enjoining Defendants Stephen Sisolak, Aaron Ford, George Togliatti, Mindy McKay, Joseph Lombardo, Stephen Wolfson, Daniel Coverley, and Mark Jackson (collectively, "Defendants") from enforcing the statutes enacted in AB 286 and Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and customs as being in violation of the right to keep and bear arms as guaranteed by the Second and Fourteenth Amendments to the United States Constitution and as being in violation of the right to due process and just compensation for the destruction of or damage to property interests.

This Motion is made pursuant to Rule 65 of the Federal Rules of Civil Procedure on the

1   grounds that immediate and irreparable injury will result unless and until such relief is obtained. The

2   Motion is based on this Supporting Memorandum of Points and Authorities, the Declarations of

3   Plaintiff Palmer, Plaintiff Moxley, and Plaintiff Firearms Policy Coalition's President, Brandon

4   Combs, including any exhibits concurrently filed, the pleadings and papers on file in this action, and

5   such other evidence and argument as may be permitted at the hearing.

6   DATED:  June 18, 2021                     THE O'MARA LAW FIRM, P.C.

7

8                                         _____/s/ David C. O'Mara_____
                                          DAVID C. O'MARA, ESQ.
9                                         311 E. Liberty Street
                                          Reno, NV 89501
10                                        775.323.1321
                                          david@omaralaw.net
11
                                          *Attorney for Plaintiff*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES

### I.   INTRODUCTION

Rather than enact tailored laws to address the State's interests in reducing crime, such as increased enforcement of laws prohibiting the possession of firearms by convicted violent criminals, or law enforcement recovery of illegally possessed weapons by such violent convicts, or even addressing root causes of violent crime and social ills, Nevada instead enacted Assembly Bill 286 ("AB 286"), a radically expansive, confiscatory ban on constitutionally protected property and conduct that runs roughshod over the rights of its many thousands of law-abiding citizens who have only ever self-manufactured and used firearms for entirely lawful, indeed constitutionally protected purposes ("Nevada's Ban" and the "Ban").

The regulatory scheme enacted under AB 286, enforced by Defendants, imposes an immediate and total ban on the self-manufacturing of all modern operable firearms, most or a great many of which are of a type in common use for lawful purposes throughout Nevada and much of the rest of the country, and it criminalizes the mere possession of such arms by ordinary law-abiding Nevadans as of January 1, 2022. What is more, this date marks a deadline by which all such people are forced to dispossess themselves of all these arms, in addition to their constituent parts, without any compensation. All this, without a hint of evidence that any of the numerous law-abiding citizens targeted by this ban has ever been involved any instance of gun violence or misuse, that any of them poses any risk to public safety in possessing such arms, or even that violence involving "ghost guns" exists as a significant or prevalent problem generally in Nevada.

By all measures, Nevada's Ban is an unconstitutional infringement of the fundamental rights guaranteed under the Second Amendment to all ordinary law-abiding citizens, including Plaintiffs in this case and all the similarly situated Nevadans that they represent. And by all measures, the Ban's forced dispossession of constitutionally protected, valuable property interests without any compensation constitutes an unconstitutional taking in violation of fundamental due process. The strength of Plaintiffs' claims, the balance of the equities, and the public interest all weigh heavily in favor of granting preliminary injunctive relief against the significant, irreparable harm they have suffered and will continue to suffer on account of these blatant, unjustified constitutional injuries.

## II.  RELAVENT BACKGROUND

**A.    The Nevada Ban**

The provisions of the Ban, enacted under AB 286, individually and collectively work to cut off the fundamental constitutional right of numerous ordinary law-abiding Nevadans to keep, bear, and self-manufacture protected arms commonly used by them and countless others around the country for self-defense and other lawful purposes. The Ban does this by (1) forcing the dispossession of all "unfinished" frames and receivers—amorphously defined to include virtually all non-firearm components and parts that could conceivably be used to construct a firearm ("Non-Firearm Objects" or "NFOs")—as well as all fully assembled firearms that lack "a serial number issued by a firearms importer or manufacturer," (2) eliminating all lawful means of acquiring these so-called "ghost guns" and their component parts, (3) prohibiting any self-manufacturing of such arms, and (4) otherwise outlawing their possession and use by ordinary law-abiding Nevadans.

### 1.  The Forced Dispossession of All Existing "Unfinished Frames or Recievers" by January 1, 2022 (Section 3)

Under Section 3 of AB 286, effective January 1, 2022, it is a crime for anyone in Nevada to "possess, purchase, transport or receive an unfinished frame or receiver," unless "[t]he person is a firearms importer or manufacturer" or "[t]he unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by a firearms importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number." AB 286, § 3(1)(a)-(b); *id.* at §10(2). Only those "licensed to import or manufacture firearms pursuant to 18 U.S.C. Chapter 4" fit within the classification of a "firearms importer or manufacturer." AB 286, § 6(5). And the term "unfinished frame or receiver" is sweepingly defined to include all Non-Firearm Objects potentially serving as precursor components in the construction of a firearm, as follows:

> a blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined.

AB 286 § 6(9).

1    Obtaining serialization of such components after the fact is not an option, as federal law only

2    requires that any necessary serialization of be completed *before* the firearm reaches the consumer

3    and that the final product is indeed a *firearm*. *See* 27 C.F.R. § 478.92(a)(1) & (a)(2) (firearms

4    importers and manufacturers "must legibly identify each firearm manufactured or imported" and

5    identify "as required by this section" any "firearm frame or receiver that is not a component part of a

6    complete weapon at the time it is sold, shipped, or otherwise disposed"); *see also* 18 U.S.C. §

7    921(a)(3) (defining "firearm"). Consequently, all ordinary law-abiding Nevadans (i.e., everyone

8    except licensed firearms importers and manufacturers) must dispossess themselves of all unfinished

9    frames and receivers, i.e., all NFOs, by no later than January 1, 2022.

10    Dispossession is the only option the State ever intended. The sponsor of AB 286 herself

11    declared that the effective date of section 3 was set for January 1, 2022, just to permit those in

12    possession of such firearm components "to sell or dispose of them" before the total ban kicks in.

13    Notes of Assemblywoman Jauregui to amendments of AB 286 on 5/11/21.

14    (https://www.leg.state.nv.us/App/NELIS/REL/81st2021/ExhibitDocument/OpenExhibitDocument?e

15    xhibitId=53667&fileDownloadName=AB%20286_Work%20Session%20Document_Patrick%20Gui

16    nan_Policy%20Analyst_Research%20Division_LCB.pdf). Then, once the ban takes effect, no

17    ordinary law-abiding citizen of Nevada may ever again lawfully possess, purchase, transport, or

18    receive any unserialized frame, receiver, or other NFO. This blanket prohibition effectively bans any

19    manufacture or assembly of any firearm using any such object unless and until some unknown date

20    in the future (if ever) when (1) federal law or regulations require serialization of components, (2) the

21    components are in fact serialized, and (3) they are transferred in accordance with those laws or

22    regulations, all before being incorporated into any self-built firearm.

23    **2.    The Immediate Ban on the Sale and Transfer of All Unserialized "Unfinished Frames or Receivers" (Section 3.5)**

24

25    Section 3.5 of AB 286 shuts the door on any future sale or transfer of any unserialized frame,

26    receiver, or other NFO to or by any ordinary law-abiding citizen, by immediately criminalizing all

27    such sales or transfers, except for sales conducted to comply with the mandatory dispossession of

28    such frames and receivers by the dispossession deadline of January 1, 2022, § 3.5(1)(a)-(b); *id.* at

§10(1), after which the permanent and total ban in Section 3 takes hold.

### 3. The Immediate Ban on Self-Manufacturing of All Modern Operable Firearms(Section 4)

Section 4 immediately makes it a crime for anyone in Nevada to "manufacture or cause to be manufactured or assemble or cause to be assembled a firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law and any regulations adopted thereunder," unless the firearm "[h]as been rendered permanently inoperable," "[i]s an antique firearm," or "[h]as been determined to be a collector's item pursuant to 26 U.S.C. Chapter 53 or a curio or relic pursuant to 18 U.S.C. Chapter 44." AB 286, § 4(1)(a)-(c); *id.* at §10(1). This prohibition effectively bans all self-manufacturing of modern operable firearms since the mandated form of serialization must be "*issued by* a firearms importer or manufacturer."

### 4. The Forced Dispossession of All Unserialized Operable Modern Firearms by January 1, 2022, and Total Ban Against All Such Firearms (Section 5)

Section 5 targets existing unserialized firearms of ordinary law-abiding Nevadans, banning as of January 1, 2022 the possession, sale, transfer, transport, or receipt of all such modern and operable firearms manufactured after 1969. As noted, federal law requires any necessary serialization of firearms and related components be completed *before* they reach the consumer, so that obtaining serialization after the fact for pre-existing unserialized firearms is no option. *See* 27 C.F.R. § 478.92(a)(1) & (a)(2). Consequently, all ordinary law-abiding citizens must dispossess themselves of all such firearms no later than January 1, 2022, in order not to be in violation of this prohibition. *See* Notes of Assemblywoman Jauregui to the amendments of AB 286 on 5/11/21. And, as of January 1, 2022, no ordinary law-abiding citizen may ever again lawfully possess, sell, transfer, purchase, transport, or receive any unserialized modern and operable firearm, further nailing the coffin shut on any future self-manufacturing of firearms by these individuals.

### 5. The Penalties

The penalties for any violation of these prohibitions are severe. The first offense subjects the alleged violator to conviction of a gross misdemeanor punishable by incarceration for up to 364 days, a fine up to $2,000, or both. AB 286 §§ 3(2), 3.5(2), 4(2), 5(2); NRS § 193.140. Any additional

offense calls for conviction of a category D felony, punishable by incarceration for at least a year and up to four years, in addition to a $5,000 fine, *id.*, and which would result in a lifetime ban on the right to keep and bear arms under federal law, *see* 18 U.S.C. § 922(g)(1).

**B.     Impact on Plaintiffs**

The individual Plaintiffs and all similarly situated Nevada resident FPC members are directly and significantly impacted by the prohibitions of the Ban. Plaintiff Palmer owns and possesses firearms of a type commonly used for lawful purposes, including handguns and AR-15 rifles, which he previously self-manufactured lawfully. Complaint ("Compl.") ¶ 84; Decl. of R. Palmer ¶¶ 8, 10. He also owns and possesses firearm building kits and other NFOs of a type commonly possessed for lawful purposes which fall within the Ban's definition of "unfinished frames and receivers," but which he lawfully acquired before the Ban. Compl. ¶¶ 83-84; Decl. of R. Palmer ¶ 9. Plaintiff Palmer desires to continue possessing and using for lawful purposes the self-built firearms and NFOs he currently owns, and he also desires to acquire additional NFOs to self-manufacture additional firearms in common use for lawful purposes. Compl. at ¶¶ 86-87; Decl. of R. Palmer ¶¶ 12-13. But he is subject to the immediate bans against the acquisition of "unfinished frames and receivers" and self-manufacturing of firearms, the mandates requiring dispossession of existing self-manufactured firearms and related NFOs by January 1, 2022, without compensation, and the permanent ban against any ownership or possession of any such firearms or components after that date. Decl. of R. Palmer ¶¶ 11-12, 14. Plaintiff Palmer thus has been prevented and will continue to be prevented from acquiring, possessing, transporting, or receiving NFOs, and from self-manufacturing any additional operable firearms in common use, for self-defense and other lawful purposes. *Id.* ¶¶ 12, 14.

Plaintiff Moxley also owns and possesses handguns and rifles of a type commonly used for lawful purposes, which he previously self-manufactured lawfully, which he desires to keep for such purposes, and of which he desires to build more for lawful purposes. Compl. ¶¶ 84, 101; Decl. of C. Moxley ¶¶ 11-12. Thus, he is left to face the same peril that Plaintiff Palmer faces should this Ban continue to be enforced. Decl. of C. Moxley ¶¶ 13-16. Additionally, Plaintiff Moxley lawfully conducts sales of firearms and firearm precursor parts to law-abiding people at gun shows in Nevada, including NFOs that fall within the definition of "unfinished frames and receivers." Compl.

¶¶ 87, 95-97; Decl. of C. Moxley ¶¶ 5-7. He desires to continue doing so and would do so but for the Ban. Compl. ¶ 99-100; Decl. of C. Moxley ¶¶ 9-10. Before the Ban, Plaintiff Moxley had arranged to attend several more shows this year where he would have sold additional NFOs to law-abiding citizens for lawful purposes, but which he is now immediately banned from doing. Compl. at ¶ 99; Decl. of C. Moxley ¶ 8. Consequently, he has lost and will continue to lose sales, revenue, and goodwill, while his would-be consumers have been concomitantly denied and will continue to be denied the ability to acquire NFOs in the lawful exercise of their self-manufacture rights, as he has been and will remain restrained from conducting any further such sales based on the threat of criminal prosecution. Compl. at ¶ 99; Decl. of C. Moxley ¶ 10.

Plaintiff FPC brings this action on behalf of its Nevada resident members, including Palmer and Moxley, who are subject to the immediate bans against the acquisition of "unfinished frames and receivers" and self-manufacturing, the mandates requiring dispossession of existing self-manufactured firearms and related NFOs by January 1, 2022, without compensation, and the permanent ban against any ownership or possession of any such firearms or components. Compl. ¶¶ 107, 113; Decl. of B. Combs ¶¶ 8-16. Plaintiff Moxley is also asserting the rights of his customers whose Second Amendment rights are being violated by the Ban's prohibition against their acquiring NFOs for lawful purposes, including for the self-manufacture of arms. *Id.* at ¶ 107.

### III. GENERAL LEGAL STANDARDS

To obtain preliminary relief, a plaintiff "'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008)). Alternatively, injunctive relief "is appropriate when a plaintiff demonstrates that serious questions going to the merits [are] raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

# IV. ARGUMENT

## A. Plaintiffs Hold a Strong Likelihood of Success on Their Claims

"[A] party seeking preliminary injunction must establish that it will prevail on the merits with a 'reasonable certainty.'" *South Bay United Pentecostal Church v. Newsom*, __ F.Supp.3d__, 2020 WL 7488974 (S.D. Cal. 2020) *6 (quoting *Sierra Club v. Hickel*, 433 F.2d 24, 33 (9th Cir. 1970)). "In this circuit, the burden is lessened to a fair chance of success on the merits in cases in which the harm that may occur to the plaintiff is sufficiently serious." *Id.* (citing *William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.*, 526 F.2d 86, 88 (9th Cir. 1975)).

### 1. The Second Amendment Rights Directly Infringed by the Ban

Incorporated against the states through the due process clause of the Fourteenth Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010), the Second Amendment confers "an individual right to keep and bear arms," *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008). It is "a fundamental constitutional right guaranteed to the people," *id.*, which is and always has been key to "our scheme of ordered liberty," *McDonald* at 767-68. The Second Amendment guarantees an individual, personal right "to keep and bear arms for lawful purposes, most notably for self-defense within the home," *McDonald* at 780, and "to possess and carry weapons in case of confrontation," *Heller* at 592. This is a "fundamental constitutional right guaranteed to the people," *Heller* at 592, which is and always has been key to "our scheme of ordered liberty," *McDonald* at 767-68. Ultimately, "[t]he Second Amendment is about America's freedom: the freedom to protect oneself, family, home, and homeland." *Miller v. Bonta*, __ F.Supp.3d __, 2021 WL 2284132 (S.D. Cal. 2021), *44.

"Government is not free to impose its own new policy choices on American citizens where Constitutional rights are concerned. As *Heller* explains, the Second Amendment takes certain policy choices and removes them beyond the realm of permissible state action." *Miller*, 2021 WL 2284132, *45. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Heller*, 554 U.S. at 634. The Second Amendment "elevates above all other interests"—including any interest in targeting the self-manufacturing of so-called "ghost guns"—

1  "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id* at 635.

2  "Fortunately, no legislature has the constitutional authority to dictate to a good citizen that he or she

3  may not acquire a modern and popular gun for self-defense." *Miller* at *45.

4  "There is only one policy enshrined in the Bill of Rights. Guns and ammunition in the hands

5  of criminals, tyrants and terrorists are dangerous; guns in the hands of law-abiding responsible

6  citizens are better." *Miller*, 2021 WL 2284132, *45. "To give full life to the core right of self-

7  defense, every law-abiding responsible individual citizen has a constitutionally protected right to

8  keep and bear firearms *commonly owned and kept for lawful purposes*." *Id.* (italics added). The

9  Second Amendment "guarantees the right to carry weapons '*typically possessed* by law-abiding

10 citizens for lawful purposes,'" *Caetano v. Massachusetts*, 577 U.S. 411, 416 (2016) (Alito, J.,

11 concurring) (quoting *Heller*, 554 U.S. at 625) (italics added), so its protection extends to all firearms

12 in common use that are not both "dangerous per se" and "unusual," *id.* at 417. "*Heller* defined the

13 'Arms' *covered by* the Second Amendment to include ""any thing that a man wears for his defence,

14 or takes into his hands, or useth in wrath to cast at or strike another."" *Id.* (quoting *Heller* at 581)

15 (quoting 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)).

16 This right to keep and bear all arms commonly possessed for lawful purposes includes—and

17 has always included—the right to self-manufacture such arms. The Supreme Court made clear in

18 *Heller* that the rights secured under the Second Amendment are, and always must be, defined by the

19 history and tradition of citizens' firearm rights as recognized during the founding era. *See Heller*,

20 554 U.S. 623-24 (rejecting any reliance on the opinion in *United States v. Miller*, 307 U.S. 174

21 (1939) to define the nature and scope of the Second Amendment rights, because the *Miller* opinion

22 "discusses *none* of the history of the Second Amendment" and the government's briefing in that case

23 also "provided scant discussion of the history of the Second Amendment"); *id.* at 598 (observing that

24 "once one knows the history that the founding generation knew," the text of the Second Amendment

25 "fits perfectly" with an interpretation that it "confers an individual right to keep and bear arms"); *id.*

26 at 595 ("There seems to us no doubt, on the basis of both text and history, that the Second

27 Amendment conferred an individual right to keep and bear arms.").

28 As detailed in the historical analysis of the Complaint, Americans' freedom to self-

manufacture firearms has been recognized since the earliest days of this country's founding. As Thomas Jefferson observed more than two centuries ago, "[o]ur citizens have always been free to make, vend, and export arms." Secretary of State Thomas Jefferson, letter to George Hammond, British Ambassador to the U.S., May 15, 1793, in 7 The Writings Of Thomas Jefferson 325, 326 (Paul Ford ed., 1904). And this historical right to self-manufacture arms in common use for lawful purposes necessarily secures the related right to *own, possess, and use* these arms constructed for lawful purposes. *Luis v. United States*, __ U.S. __, 136 S.Ct. 1083, 1097 (2016) (Thomas, J., concurring) (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise ... The right to keep and bear arms, for example 'implies a corresponding right to obtain the bullets necessary to use them.' ").

Indeed, the rights secured under the Second Amendment would be rendered meaningless if the states could force the dispossession or permanent disabling of such arms once they are assembled for lawful purposes. That would undermine the Second Amendment's essential protection against government tyranny. *Heller*, 554 U.S. at 598 (the Second Amendment secures an individual right to keep and bear arms because tyrants have historically succeeded in oppressing their subjects "simply by taking away the people's arms, enabling a select militia or standing army to suppress political opponents") *id.* at 608-09 (quoting A Familiar Exposition of the Constitution of the United States § 450 (reprinted 1986)) ("One of the ordinary modes, by which tyrants accomplish their purposes without resistance, is, by disarming the people, and making it an offence to keep arms, and by substituting a regular army in the stead of a resort to the militia.").

The existence of alternative channels for the lawful acquisition of firearms, such as through lawful purchases or other transfers, in no way negates this long recognized and revered right of individuals to self-manufacture firearms in common use for lawful purposes in the exercise of their fundamental right to keep and bear arms under the Second Amendment. A government regulation eliminating one of the rights secured by the Second Amendment cannot be excused or overlooked on the basis that it does not eliminate one or more *additional* rights secured thereunder. The *Heller* court already made this clear in flatly rejecting the District of Columbia's attempt to justify its

1   handgun ban with the argument that the District had not *also* banned residents from possessing long

2   guns. *Heller*, 554 U.S. at 629 ("It is no answer to say … that it is permissible to ban the possession

3   of handguns so long as the possession of other firearms (i.e., long guns) is allowed.").

4          **2.      The Proper Rest for the Constitutional Analysis**

5          Just as "there is only one policy enshrined in the Bill of Rights," *Miller*, 2021 WL 2284132,

6   *45, there is only one true test for measuring the constitutionality of restrictions upon the rights that

7   the Second Amendment secures for ordinary law-abiding people. Simply put, "*Heller* asks whether a

8   law bans a firearm that is commonly owned by law-abiding citizens for lawful purposes." *Id.* If so, it

9   cannot stand and "judicial review can end right here." *Id.* The *Heller* opinion does not prescribe any

10  tiers of scrutiny for analyzing the constitutionality of such restrictions. It expressly rejects any use of

11  "rational basis" scrutiny, *Heller*, 554 U.S. at 628, n. 27, and emphasizes that any "judge-empowering

12  interest-balancing inquiry" is inappropriate because the Second Amendment is "the very *product* of

13  an interest balancing by the people" already solidified at the time of the founding, which is not

14  subject to second-guessing based on "future judges' assessments of its usefulness." *Id.* at 634. And,

15  in any event, "[i]f a regulation 'amounts to a destruction of the Second Amendment right,' it is

16  unconstitutional under any level of scrutiny." *Young v. Hawaii*, 992 F.3d 765, 784 (9th Cir. 2021)

17  (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)).

18         Further, because the high court has expressly rejected any "rational basis" testing of restraints

19  on the rights secured under the Second Amendment, only the most stringent forms of scrutiny could

20  ever be appropriate in any "interest balancing." *Teter v. Connors*, 460 F.Supp.3d 989, 1001 (D.

21  Hawaii 2020) (*Heller* makes clear that "rational basis is not appropriate" and "some degree of

22  heightened scrutiny applies" to such restraints). Courts must "strictly scrutinize any '"law that

23  implicates the core of the Second Amendment right and severely burdens that right."' *Pena v.

24  Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) (quoting *Silvester*, 843 F.3d at 821). "Under strict

25  scrutiny, restrictions 'may be justified only if the government proves that they are narrowly tailored

26  to serve compelling state interests."' *In re National Security Letter*, 863 F.3d 1110, 1121 (9th Cir.

27  2017) (quoting *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015)).

28         Intermediate scrutiny is also "not a free pass," even under the "watered down" and "overly

relaxed" iterations of the test prevalent in some courts. *Miller*, 2021 WL 2284132, *11. The State bears the burden of affirmatively proving with "substantial evidence" that the restriction at issue is "narrowly tailored to serve a significant governmental interest," *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017), i.e., that it reasonably fits the claimed interest "to a material degree," *Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996). And the "narrowly tailored" requirement essential to this test can be met "only if each activity within the proscription's scope is an appropriately targeted evil." *Ward v. Rock Against Racism*, 491 U.S. 781, 799–800 (1989).

### 3. The Ban is Unconstitutional Under Any Standard

By all measures, AB 286 is a total ban against the manufacture, ownership, possession, use, transport, purchase, and sale by all ordinary law-abiding Nevadans of all self-manufactured modern, operable arms otherwise in common use for lawful purposes—including the core purpose of self-defense—*in addition* to all "unfinished frames," "unfinished receivers," and other NFOs that fall within the sweepingly broad definition of "unfinished frames or receivers." All such self-manufacturing is *immediately* banned, AB 286 § 4, all sales and transfers of NFOs to and by ordinary citizens are *immediately* banned (except to effect a *dispossession* in compliance with sections 3 and 5), *id.* at § 3.5, all such arms and components must be dispossessed or rendered "permanently in operable" by January 1, 2022, *id.* at §§ 3 & 5, and all ownership, possession, use, transport, purchases, and sales of all such arms and components are completely banned thereafter, *id.* On top of that, the dispossession mandate destroys the valuable property interests in these protected arms and products without even any thought of compensation for the concrete injury.

Unquestionably, this Ban and the destruction of significant protected interests it entails flunks the simple, yet fundamental *Heller* test because it blatantly violates the Second Amendment's guarantee to ordinary law-abiding citizens of the right to self-manufacture, possess, and use for lawful purposes all "weapons '*typically possessed* by law-abiding citizens for lawful purposes,'" *Caetano*, 577 U.S. at 416 (quoting *Heller*, 554 U.S. at 625). Many, if not, most of the firearms targeted by the Ban are just like those that Plaintiffs Palmer and Moxley previously self-manufactured and desire to continue self-manufacturing for lawful purposes—handguns built with the popular and widely sold Polymer80 component materials and AR-15 rifles built with the popular

and widely sold precursor AR-15 lower receivers. Handguns are indisputably in common use throughout the country, as the Supreme Court itself confirmed in declaring such arms "the quintessential self-defense weapon" "overwhelmingly chosen by American society" for lawful self-defense. *Heller*, 554 U.S. at 628-29. Judicial findings in recent case law also confirm the same is true of AR-15 rifles: such rifles are "commonly owned by law-abiding citizens" and "the overwhelming majority of citizens who own and keep the popular AR-15 rifle and its many variants do so for lawful purposes, including self-defense at home." *Miller*, 2021 WL 2284132, *6.

Thus, the Ban's blanket prohibitions against the self-manufacture, possession, and use of such protected arms "'amounts to a destruction of the Second Amendment right'" so as to be "unconstitutional under any level of scrutiny," *Young*, 992 F.3d at 784 (quoting *Silvester*, 843 at 821), and at the least constitutes a "'law that implicates the core of the Second Amendment right and severely burdens that right'" such that strict scrutiny must set the minimum constitutional floor for any "interest-balancing inquiry," *Pena*, 898 F.3d at 977 (quoting *Silvester*, 843 F.3d at 821). The State cannot prove these prohibitions are "*narrowly tailored* to serve compelling state interests" because, whatever the claimed interest may be and however "compelling" the interest might be, there has been *no tailoring at all*. *In re National Security Letter*, 863 F.3d at 1121. The very nature of *the Ban* is just that—a *ban* against the full spectrum of protected arms and activities associated with these otherwise widely available firearms in common use for self-defense and other lawful purposes.

For the same essential reasons, the Ban must fail intermediate scrutiny, because a total absence of any tailoring necessarily cannot meet any test requiring that the law be "narrowly tailored to serve a significant governmental interest," *Packingham*, 137 S. Ct. at 1736 (2017) —much less tailored "to a material degree," *Liquormart, Inc.*, 517 U.S. at 505—as this test requires.

Even continuing to look through the overly-lenient lens of intermediate scrutiny, beyond the clear lack of "the reasonable fit" required to satisfy this test, *Board of Trustees of the University of New York v. Fox*, 492 U.S. 469, 480 (1989), the State has no chance of carrying its related burden of showing that "each activity within the proscription's scope is an appropriately targeted evil," *Ward*, 491 U.S. at 799–800. The only discernable "evil" being targeted here is "ghost guns" and the

unserialized parts used in self-manufacturing such guns—a menacing label attached to unserialized firearms through sensationalism of instances of gun violence and misuse, conduct worlds apart from the constitutionally protected purposes for which law-abiding Nevadans and countless others across the country build and use such arms in the exercise of their Second Amendment rights. The State cannot show, and has made no attempt to show, that *any* of the countless law-abiding Nevadans targeted under this Ban—much less any significant number of these individuals—has had any involvement in any crime associated with any unserialized firearm or any unserialized firearm component so as to somehow justify dispossessing them of all such firearms and firearm parts and prohibiting them from exercising their fundamental right to possess, use, and self-manufacture these arms in common use for self-defense and other lawful purposes.

In fact, the State has cited no evidence of *any* pervasive gun violence or misuse of "ghost guns" or their constituent parts within Nevada which could reasonably warrant their eradication through a ban so all-encompassing that it captures the protected arms and entirely lawful conduct of countless law-abiding Nevadans simply seeking to exercise their constitutional rights. To the extent the State may claim a legitimate interest in ensuring firearms are "traceable" for law enforcement purposes, no such interest could justify its blanket prohibition against the self-manufacture, possession, and use of all modern operable unserialized firearms. Even California apparently recognizes that is a bridge too far; as oppressive as its regulatory scheme is, California residents who apply for and obtain a serial number from the State, and pass its background check, "shall" be authorized to construct their own firearm. Cal. Penal Code §§ 29180(b)(1), 29182(b)(1).

Even under intermediate scrutiny, the restraint must be "in reasonable proportion to the interests served," *Edenfield v. Fane*, 507 U.S. 761, 767 (1993), and however strong the interests served may be, the government must prove its chosen means are "'closely drawn'" to achieve that end without "'unnecessary abridgment'" of constitutionally protected conduct, *McCutcheon v. FEC*, 134 S. Ct. 1434, 1456-57 (2014) (quoting *Buckley v. Valeo*, 424 U.S. 1, 25 (1976)). Given the blanket outlawing of all unserialized arms and their constituent components under Nevada's Ban, stripping all ordinary law-abiding people of their constitutional rights to harness all such protected arms for any purpose including for the "core" right to self defense, the State has no hope of even

1    coming close to satisfying the most lenient test conceivably applicable here.

2         Success on the merits of Plaintiffs' Second Amendment claim is thus inevitable, but they

3    need only show a "reasonable certainty" of prevailing on the merits. *South Bay United Pentecostal*

4    *Church*, 2020 WL 7488974, \*6. This they have done, especially in light of the seriousness of the

5    harm inflicted by the Ban (as discussed more fully below), which further reduces the required degree

6    of certainty here. *See id.* ("In this circuit, the burden is lessened to a fair chance of success on the

7    merits in cases in which the harm that may occur to the plaintiff is sufficiently serious.").

8         **4.    The Ban Also Unquestionably Effects an Unconstitutional Taking**

9         A similarly high likelihood of success exists for Plaintiffs' claim that they and all similarly

10   situated Nevada resident FPC members face an unconstitutional deprivation of their property

11   interests in the absence of relief from this Court. "[W]here government requires an owner to suffer a

12   permanent physical invasion of her property—however minor—it *must* provide just compensation."

13   *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005) (italics added); *Horne v. Dep't of Agric.*,

14   576 U.S. 350, 359 (2015) ("a physical appropriation of property, giv[es] rise to a per se taking"). The

15   same is true for government regulations that "completely deprive an owner of '*all* economically

16   beneficial us[e] of her property,'" even without a physical invasion or appropriation. *Id.* (quoting

17   *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1009 (1992)).

18        The Nevada Ban forces ordinary law-abiding citizens to rid themselves of all modern

19   operable self-manufactured firearms and all NFOs that fall within the definition of "unfinished

20   frames or receivers." All the NFOs must be sold or transferred away by no later than January 1,

21   2022, and all the firearms must be sold, transferred away, or rendered "permanently inoperable" (i.e.,

22   totally useless) by then. The purported option of selling these arms and constituent parts is illusory.

23   First, and fundamentally, it is the *State's* duty to provide just compensation; it cannot shift to the

24   citizen the burden of remedying or mediating the loss suffered on account of the taking. *Horne v.*

25   *Dept. of Agriculture*, 576 U.S. 352, 358 (2015) ("The Government has a categorical duty to pay just

26   compensation when it takes your car, just as when it takes your home.") Moreover, "just

27   compensation" is "normally measured by fair market value" in a sale on the open market. *U.S. v. 50*

28   *Acres of Land*, 469 U.S. 24, 26 (1984). "A 'sale' implies willing consent to the bargain. A

transaction although in the form of a sale, but under compulsion or duress, is not a sale." *Dore v. U.S.*, 97 F.Supp. 239, 224 (Ct. Cl. 1951). The Ban has destroyed or significantly diminished the value of the property to any would-be purchasers and has thus destroyed the very market to which it has relegated the affected citizens. *See Amen v. City of Dearborn*, 718 F.2d 789, 797 (6th Cir. 1983) ("the City chose not to invoke its condemnation powers, but, rather, elected to engage in a deliberate course of conduct to force the sale of private property at reduced value").

Thus, no "*just* compensation" could be obtained through any government-compelled sale of the condemned property. Indeed, because all arms and parts of the same type are now banned, any substitute for the property would almost invariably require the purchase of other *legal* reasonably equivalent arms and component parts at their *full* fair market value. Realistically then, the vast majority of Nevadans will ultimately be forced to just surrender their valuable arms and constituent parts to law enforcement before the deadline, suffering a total loss of their property interests.

Despite having undeniably effected a "physical appropriation," a "permanent physical invasion," or at the very least a complete deprivation of "all economically beneficial use" of their property through the Nevada Ban, the State never even contemplated providing compensation for the taking of this personal property. It just assumed it could condemn the property out of existence with the stroke of the Governor's pen. *See* Notes of Assemblywoman Jauregui (AB 286's sponsor) to the amendments of AB 286 on 5/11/21 (reflecting the intent for "those in possession of an unserialized firearm or frame/receiver" to just "sell or dispose of them" by the deadline).

Such a taking is plainly unconstitutional and cannot be permitted, compelling the relief Plaintiffs seek. At the very least, it must be said that Plaintiffs hold a "reasonable certainty" of prevailing on the merits so as to warrant preliminary relief pending ultimate resolution of the merits. *South Bay United Pentecostal Church*, 2020 WL 7488974, *6.

**B.    Likelihood of irreparable harm absent preliminary relief**

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts

hold that no further showing of irreparable injury is necessary."). The Ninth Circuit has applied the First Amendment's "irreparable if-only-for-a-minute" rule to cases involving other rights and, in doing so, has held a deprivation of these rights represents irreparable harm. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997); *Ezell v. Chicago*, 651 F.3d 684, 700 (7th Cir. 2011) (a deprivation of the right to arms is "irreparable," with "no adequate remedy at law"). As the court has also recognized, we are generally "guided by First Amendment principles" in resolving challenges to Second Amendment restrictions. *Jackson*, 746 F.3d at 961.

Here, the deprivation is indisputable, and so is the irreparability of the harm should this Ban be permitted to remain in effect without any injunctive relief. The deprivation of protected rights exacted by the prohibitions against any further self-manufacturing of unserialized firearms and any further sales or transfers of "unfinished frames or receivers," under sections 3.5 and 4 of AB 286, became *immediately* effective on June 7, 2021. Much more than "a minute" is at stake, as these prohibitions have already been in effect for more than ten days and they will remain in effect indefinitely because they are *permanent*. The dispossession mandates under sections 3 and 5 of AB 286 force the *permanent* dispossession of the targeted arms and constituent parts by no later than January 1, 2022, and without any compensation, and thereafter *permanently* ban any future ownership, possession, use, transport, purchases, and sales of all such arms and components.

Irreparable harm is not just likely, it is certain, it has already occurred, and will persist *indefinitely* unless and until injunctive relief is obtained against the operation of the Ban.

## C. The Balance of Equities Tips Sharply in Plaintiffs' Favor

When it comes to "the balance of hardships between the parties" in this context, fundamentally, the State "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see also Valle del Sollnc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable ... to allow the state ... to violate the requirements of federal law.") (citations omitted). The illegality of the Ban and the significant, irreparable harm it forces upon countless law-abiding Nevadans are clear, and any potential harm to the State is comparatively minimal, if any exists at all. Again, the apparent interest behind the Ban devolves into

nothing more than a claim to be regulating in favor of the general public welfare and safety by eradicating the potential dangers of untraceable "ghost guns" when in the hands of wrongdoers. This claim is staked without evidence of *any* pervasive or significant violence or misuse of such firearms, *much less* any instances of misuse by any of the numerous law-abiding citizens like Plaintiffs and those similarly situated Nevadans they represent, who have only used and only ever intended to use these arms for lawful, constitutionally protected purposes. When the State cannot show any prevalence of "ghost gun" violence within its borders and cannot point to even one instance of misuse involving the *law-abiding* people whose constitutional rights are being directly targeted by the Ban, it cannot reasonably claim *any* meaningful degree of "harm" in being required to suspend enforcement of the Ban pending resolution of the merits in this case and, whatever theoretical harm it may be able to conjure would necessarily be of miniscule significance in comparison to the undeniably significant, and concrete, deprivation of constitutional rights.

**D.    A Preliminary Injunction is in the Public's Interest**

When the challenged government action substantially impacts the exercise of constitutional rights, necessarily, "[t]he public interest … tip[s] sharply in favor of enjoining the" law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (emphasis added).  Thus, simply put, for all the same reasons already discussed, this factor also weighs in Plaintiffs' favor and further compels preliminary injunctive relief pending resolution of the merits.

**E.    The Alternative Test for Preliminary Relief is Also Fully Satisfied**

While the likelihood of success is strong, even assuming it is not, preliminary relief remains appropriate and necessary regardless. Again, "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d at 1135. The "[s]erious questions need not promise a certainty of success, nor even present a probability of success," as they need only "involve a 'fair chance of success on the merits.'" *National Association of Manufacturers v. United States Department of Homeland Security*, 491 F.Supp.3d 549, 550 (N.D. Cal. 2020) (quoting *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985)). The strength of

1   Plaintiffs' claims easily meets this "fair chance" standard of success, the irreparable injury is

2   undeniable, the balance of hardships indeed tip sharply in their favor, and preliminary injunctive

3   relief against this severe, unjustified deprivation of fundamental rights is strongly in the public

4   interest. Thus, this alternative test for a preliminary injunction is also fully satisfied.

5   **F.      Waiver of Bond is Proper and Appropriate Under These Circumstances**

6            "Notwithstanding its seemingly mandatory language," stating that the movant must provide

7   "security in an amount that the court considers proper to pay the costs and damages sustained by any

8   party found to have been wrongfully enjoined or restrained," "'Rule 65(c) invests the district court

9   with discretion as to the amount of security required, if any.'" *Weaver v. City of Montebello*, 370

10  F.Supp.3d 1130, 1139 (C.D. Cal. 2109) (quoting *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th

11  Cir. 2009)). The court may properly dispense with any such bond requirement when "'the balance of

12  ... equities weighs overwhelmingly in favor of the party seeking the injunction,'" *East Bay Sanctuary*

13  *Covenant v. Trump*, 349 F.Supp.3d 838, 869 (N.D. Cal. 2018) (quoting *Elliott v. Kiesewetter*, 98

14  F.3d 47, 60 (3d Cir. 1996)), when "there is no realistic likelihood of harm to the defendant from

15  enjoining his or her conduct," *Johnson* at 1086 (internal quotations omitted), and where the plaintiffs

16  have a "likelihood of success on the merits," *People of the State of Cal. ex rel. Van De Kamp v.*

17  *Tahoe Regency Planning Agency*, 766 F.2d 1319, 1326 (9th Cir. 1985). All these factors are true

18  here, as illustrated above, thus rendering a waiver both proper and appropriate.

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28                                    [*signatures on following page*]

**CONCLUSION**

For these reasons, Plaintiffs respectfully request preliminary injunctive relief enjoining Defendants, their officers, agents, servants, employees, all persons in active concert or participation with them, and all persons who have notice of the injunction, from enforcing the statutes enacted in AB 286 and Defendants' derivative laws, regulations, policies, procedures, enforcement practices, and customs, as being in violation of the right to keep and bear arms as guaranteed by the Second and Fourteenth Amendments to the United States Constitution and the right to due process and just compensation for the destruction of or damage to property interests.

Dated: June 18, 2021

THE O'MARA LAW FIRM, P.C.


_____/s/ David C. O'Mara_____
DAVID C. O'MARA, ESQ.
311 E. Liberty Street
Reno, NV 89501
Tel: 775.323.1321
david@omaralaw.net

Dated: June 18, 2021

THE DIGUISEPPE LAW FIRM, P.C.


_____/s/ Raymond M. DiGuiseppe_____
RAYMOND M. DIGUISEPPE
4320 Southport-Supply Road, Ste 300
Southport, NC 28461
910.713.8804
Law.rmd@gmail.com

FIREARMS POLICY COALITION

_____/s/ Adam Kraut_____
ADAM KRAUT, ESQ.
1215 K Street 17th Floor
Sacramento, CA 95814
916.596.3492
akraut@fpclaw.org

FIREARMS POLICY COALITION

_____/s/ William Sack_____
WILLIAM SACK, ESQ
1215 K Street 17th Floor
Sacramento, CA 95814
916.596.3492
wsack@fpclaw.org

1

## <u>CERTIFICATE OF SERVICE</u>

2

I hereby certify that I am an employee of The O'Mara Law Firm, P.C. and on this date, the

3 foregoing document was filed electronically *via* the Court's ECF system which provided notification

4 of such filing to counsel of record for all parties.

5

Dated: June 18, 2021                                          /s/ Bryan Snyder

6                                                                          BRYAN SNYDER

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## INDEX OF EXHIBITS

| Exh No. | Description | Pages |
|---------|-------------|-------|
| 1 | Declaration of Brandon Combs | 3 |
| 2 | Declaration of Chad Mosley | 3 |
| 3 | Declaration of Roger Palmer | 3 |

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28