THE O'MARA LAW FIRM, P.C.
DAVID C. OMARA
(Nevada Bar No. 8599)
311 East Liberty Street
Reno, NV 89501
P: (775) 323-1321
F: (775) 323-4082
E: david@omaralaw.net

THE DIGUISEPPE LAW FIRM, P.C.
RAYMOND M. DIGUISEPPE*
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

FIREARMS POLICY COALITION
ADAM KRAUT*
WILLIAM SACK*
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 596-3492
E: akraut@fpclaw.org
E: wsack@fpclaw.org

*Admitted PHV

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| ROGER PALMER, *et al.*,<br><br>            Plaintiffs,<br><br>       v.<br><br>STEPHEN SISOLAK, in his official capacity as Governor of Nevada, *et al.*,<br><br>            Defendants. | Case No.: 3:21-cv-00268<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Judge:** Hon. Miranda Du<br>**Date:** July 16, 2021<br>**Time:** 1:30 p.m.<br>**Courtroom:** 5 |

### REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

### I.    INTRODUCTION

Ultimately, this case is not about serial numbers or background checks at all. It is about a state that blew past less-restrictive means of advancing its purported interests, instead completely banning law-abiding individuals from self-manufacturing their own firearms for lawful purposes, and worse, criminalizing the possession of constitutionally protected items that Nevada previously allowed people to have and construct. The false narrative that the State Defendants push about "ghost guns" and background checks simply does not align—or fit—with the total ban enacted.[1]

---

[1] Clark County Defendants "defer the defense of AB 286 to the Attorney General," Clark Cnty. Def. Resp. at 2. For their part, Douglas County Defendants "do not offer any arguments" regarding the injunctive relief being sought. Douglas Cnty. Def. Resp. at 2.

Indeed, the State Defendants' purported concern with unserialized weapons and background checks is completely at odds with the laws being challenged, which—rather than providing a mechanism by which individuals could submit to a background check or mark their self-built firearm with a State-issued number, do the opposite—make it impossible for an individual to comply other than through complete forced dispossession of property and termination of all proscribed conduct. The State of California—widely regarded as having strict firearms regulations—itself has chosen to provide background checks and State-issued serial numbers rather than enact a complete, confiscatory ban. In fact, a lawfully self-manufactured gun in California that *does* bear a State-issued serial number obtained *after* an applicant completes a State-provided background check is *still* illegal to possess under Nevada's Ban, even though, as a marked gun, it is not any kind of "ghost." The only plausible conclusion is that, rather than enacting a tailored law to directly further its purported interests in background checks and serialization for tracing, Nevada chose to completely ban an entire category of firearms and related conduct despite readily available less-restrictive alternatives.[2]

In the First Amendment context, for example, even if the government has a strong interest in ensuring that the text of the Constitution is accurately reflected in publicly available works, it could not—especially under pain of criminal sanction—require that all individuals dispossess themselves of all self-printed copies of the Constitution, and then be limited to acquiring a copy of the Constitution solely from government-licensed retailers selling copies produced by government-licensed Constitution printers *when and if* those licensees choose to make copies available. As the Supreme Court has made clear, "the enshrinement of constitutional rights necessarily takes certain policy choices"—including Nevada's here—"off the table." That is essentially what Nevada is trying to do here through AB 286 in targeting homemade firearms lawfully built for lawful purposes.

First, there is no factual support in the legislative record that "ghost guns" pose any widespread or substantial risk to the public safety in Nevada. State Defendants cite only nationwide data that ultimately devolves into speculation about possible connections to crime. Some percentage

---

[2] Of course, the fact that criminals might ignore such requirements doesn't justify a complete ban on the possession and making of arms by non-criminals, especially with zero evidence that this ban is more effective in *preventing* crime than other less-restrictive means, let alone a reasonable fit.

- 2 –
PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION (3:21-CV-00268-MMD-EGC)

of any class of arms will always be used illegally and found at crime scenes, and there is no evidence of a disproportionate risk from law-abiding self-manufacturers. And, wherever and to whatever extent such risks may be prevalent, it is certain that Nevada's Ban directly impacts Plaintiffs and numerous other entirely *law-abiding* Nevadans. These good citizens of Nevada have only ever sought to possess and use firearms components to build guns for lawful purposes. But rather than provide them with options to comply with a regulatory scheme that requires serialization and background checks, Nevada never gives them the opportunity to do so. Instead, it lumps them in with criminals who, if they prefer unserialized weapons, can and do file the serial number off a commercially produced firearm more easily than they can manufacture their own firearm.

Second, contrary to the claim that Plaintiffs and others like them seek to "exploit" the system, "avoid" background checks, or evade serialization, the reality is that State never previously required, or even provided, serialization and background check mechanisms, and now affirmatively *precludes* them from being able to satisfy these asserted aims of the law. State Defendants, having no real legal argument, simply mischaracterize Plaintiffs' *compliance* with the applicable laws as 'exploitation' of a 'loophole' because their lawful conduct resulted in outcomes the State now dislikes. To be sure, AB 286 has now erected an absolute ban on self-manufacturing *all* modern, operable firearms for *all* lawful purposes by mandating that all "unfinished frames or receivers" be serialized through a *non-existent* serialization process under *non-existent* federal law, and then declaring it illegal to possess or use any such part in manufacturing *or* assembling a firearm unless and until it so serialized. Rather than provide an opportunity to serialize the firearms and submit to a background check—the purported interests animating the State—everyone is just forced to dispossess themselves of it all.

Third, the State cannot extinguish the existing property rights of law-abiding individuals by merely labeling their current arms and parts "dangerous private property" subject to destruction, or by saying they can instead *purchase* new arms or component parts from licensed dealers. The building of one's own arms for lawful purposes has been recognized since the nation's founding as a time-honored constitutionally protected activity, long popular among many Americans—far longer than any of the few regulations on self-manufacturing arms have ever existed. And the end products of this protected activity fall squarely within the protected class of firearms that cannot themselves

be banned because they are in common use for lawful purposes throughout the country. The *purchase* alternative is no answer, just as it was no answer to say in *Heller* that people in Washington, D.C. could still purchase and possess long guns despite the (doomed) ban on handguns.

The State's attempt to absolutely ban self-manufacturing firearms, and the products involved with the process, constitutes a flagrant violation of the Second Amendment that is categorically unconstitutional under *Heller* and necessarily fails even intermediate scrutiny.

## II.     The Extreme Prohibitions of Nevada's Ban

As of January 1, 2022, AB 286 makes it a crime for any ordinary citizen to "possess, purchase, transport or receive an unfinished frame or receiver" unless the unfinished frame or receiver "*is required by federal law* to be imprinted with a serial number issued by a firearms importer or manufacturer and the unfinished frame or receiver *has been imprinted with the serial number*." AB 286, § 3(1)(a)-(b) (italics added). Currently, it is literally impossible to comply with such requirement, either retrospectively as to existing components, or prospectively as to new components. As State Defendants' themselves detail, while there is a *proposal* to change the regulatory definitions of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") to require serialization of such "unfinished frames or receivers," neither those rules nor the underlying federal statutes *require* such serialization. Resp. at 5-6 (citing Proposed Rules, Dept. of Justice, Definition of "Frame or Receiver" and Identification of Firearms, 86 Fed. Reg. 27720, 27722-27; 18 U.S.C. § 923(i); 27 C.F.R. § 487.92(a)). And even this proposed regulatory process would not cover all of the parts prohibited under AB 286. That is, unless and until *this regulation* is changed—*if* it ever is—no possession of any such components *could* be lawful under Nevada law.

Similarly, section 3.5 *immediately* bans the sale or transfer of any such "unfinished frame or receiver" to any ordinary law-abiding citizen unless it "*is required by federal law* to be imprinted with a serial number issued by a firearms importer or manufacturer and the unfinished frame or receiver *has been imprinted with the serial number*." AB 286, § 3.5(1)(a)-(b) (italics added). So, unless and until—*if* ever—the federal regime *requires* such serialization, none of these people may even lawfully *purchase* these components for purposes of self-manufacturing or assembling firearm.

Further, Section 4 of the Ban expressly criminalizes—also *immediately*—the very act of

"manufactur[ing] or caus[ing] to be manufactured" or "assembl[ing] or caus[ing] to be assembled" any modern operable firearm "that is not imprinted with a serial number issued by a firearms importer or manufacturer *in accordance with federal law and regulations*." AB 286, § 4(1)(a)-(c) (italics added). Again, no means exist for law-abiding citizens to satisfy the supposed concerns of the State in a manner that would allow them to build their own firearms for lawful purposes.

Section 5 then separately criminalizes as of January 1, 2022, any possession of modern operable firearms not "imprinted with a serial number issued by a firearms importer or manufacturer *in accordance with federal law and regulations* adopted thereunder." AB 286, § 5(1)(a)-(b) (italics added). Thus, for the average Nevadan, the Ban prohibits the acquisition, possession, and use of "unfinished frames or receivers" and the firearms otherwise lawfully manufactured or assembled with the same for entirely lawful purposes, thereby criminalizing the entire spectrum of conduct and property interests involved in the exercise of the rights secured by the Second Amendment. And, it provides no compensation for the dispossession mandate that takes effect January 1, 2022.

### III. The Constitutional Framework that Must be Applied to This Ban

In defense of their Ban, State Defendants run straight to intermediate scrutiny and try to shift all the burdens to Plaintiffs, arguing that the Ban does not implicate "core" Second Amendment rights or at least does not seriously burden any such rights because "no proper evidence" shows unserialized firearms and their precursor parts are "commonly possessed by law-abiding citizens" and, even if they are, "no evidence" shows they lack other means for self-defense. Resp. at 2, 4, 11. They blow past Plaintiffs' discussion of the true test under the *Heller-McDonald* framework as if it were just a bad riff on the test by a lone district court judge. Resp. at 9 (claiming Plaintiffs rely solely on the opinion in *Miller v. Bonta*, __ F.Supp.3d __, WL 2284132 (S.D. Cal. 2021)). The "hardware test" distilled in the *Miller* opinion is firmly rooted in Supreme Court authority.

The Supreme Court has made clear that the Second Amendment guarantees the right to keep and bear all "weapons 'typically possessed by law-abiding citizens for lawful purposes,'" *Caetano v. Massachusetts*, 577 U.S. 411, 416 (2016) (Alito, J., concurring) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008)), which includes all "typically possessed" firearms that are not *both* "dangerous *per se* and unusual," *Caetano* at 417. To be "dangerous" in this sense requires

substantially more than a firearm's mere potential to cause injury, and a firearm is not "unusual" so long as it is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Id.* at 420 (italics original). Thus, the Supreme Court struck down the District of Columbia's ban on handguns because they are in common use for lawful purposes and "citizens must be permitted to use handguns for the core lawful purposes of self-defense"—despite the evidence that such arms are *also* used in the commission of crime. *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010). It reversed the Massachusetts Supreme Judicial Court's decision on stun guns for the same reason— they "are widely owned and accepted as legitimate means of self-defense across the county," and thus a "categorical ban of such weapons violates the Second Amendment." *Caetano* at 420. (Alito, J., concurring). In both cases, the availability of alternative arms for self-defense was irrelevant.

This right to possess and use firearms typically possessed for lawful purposes has always included the right to build one's own firearms, as illustrated by the discussion and evidence Plaintiffs have already cited—none of which State Defendants attempt to dispute. *See also* Exh. 1, Dec. of J. Greenlee, ¶¶ 11-22 (further detailing the historical foundation of the constitutionally recognized right to build and possess one's own firearms for lawful purposes). Moreover, constitutional rights "implicitly protect those closely related acts necessary to their exercise." *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014). The Ninth Circuit "and other federal circuit courts of appeals have held that the Second Amendment protects ancillary rights necessary to the realization of the core right to possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir. 2016). This includes "important corollary" rights, such as the right to acquire ammunition, *id.* at 958, and the right to maintain proficiency with those arms, *Ezell*, 651 F.3d at 708. Much as the right to keep and bear arms "wouldn't mean much without the training and practice that make it effective," *Ezell* at 704, the right to self-manufacture arms "wouldn't mean much" without the corresponding right to own, possess, and use them for lawful purposes.

The Ninth Circuit has also recognized that complete bans against the exercise of core Second Amendment rights are categorically unconstitutional: "If a regulation 'amounts to a destruction of the Second Amendment right,' it is unconstitutional under any level of scrutiny." *Young v. Hawaii*, 992 F.3d 765, 784 (9th Cir. 2021) (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)). It

has further instructed that strict scrutiny must be applied to any "'law that implicates the core of the Second Amendment right and severely burdens that right.'" *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) (quoting *Silvester*, 843 F.3d at 821). Thus, when it comes to a ban on the exercise of core rights, at the least the government must prove the law "is narrowly tailored to serve compelling state interests." *In re National Security Letter*, 863 F.3d 1110, 1121 (9th Cir. 2017). Even under intermediate scrutiny, the government bears the burden of proving the law is "narrowly tailored to serve a significant governmental interest," *Packingham v. North Carolina*, 137 S. Ct. 1730, 1736 (2017), which is an exceedingly tall order in any instance of a *total ban*.

### IV. The Ban is Categorically Unconstitutional

State Defendants make no attempt to dispute that the classes of arms to which the Plaintiffs' firearms and component parts belong—e.g., handguns and AR-15 rifles—are in common use for lawful purposes. That is already well established. *See Heller*, 554 U.S. at 628-29 (handguns are "the quintessential self-defense weapon" "overwhelmingly chosen by American society" for lawful self-defense; *Staples v. United States*, 511 U.S. 600, 603 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle . . ."). State Defendants jab about a supposed lack of "proper evidence" that homemade firearms and component parts are in common use among law-abiding citizens, without acknowledging that this is *their* burden to carry. Anyway, their own evidence alone proves this. The same sections of the Federal Register that State Defendants cite to paint their picture of perils concerning "ghost guns" repeatedly emphasize the *general* popularity and widespread possession of homemade firearms and component parts—not just among criminals, but the public at large. *See* Resp. at 6-7 (citing 86 Fed. Reg. at 27722-27, where arms and parts are variously described as "popular," "widely available," and "proliferat[ing] throughout the marketplace").

Indeed, the many statements of concerned residents and organizations who opposed AB 286 included large groups speaking for the "tens of thousands" of law-abiding Nevadans seeking to retain the right to peaceably build their own firearms for lawful purposes. *See* https://www.leg.state.nv.us/App/NELIS/REL/81st2021/Bill/7778/Exhibits. Moreover, a jurisdiction survey confirms that numerous retailers around the country sell precursor firearm parts now banned by Nevada to people across many States, as the possession, use, and manufacturing with such parts

- 7 –
PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION (3:21-CV-00268-MMD-EGC)

remains entirely legal in most all states. Exh. 2, Dec. of J. Ostini ¶¶ 8-10. In fact, restraints on the self-manufacturing of firearms and possession of the component parts for such purposes exist only in a small handful of states, and none rises to the level of Nevada's Ban on the full spectrum of protected activities and property interests involved. Exh. 1, Dec. of J. Greenlee. ¶¶ 32, 37-45.

Notably too, *even with* the enactment of the proposed new ATF rule, which would *prospectively* extend serialization requirements to "unfinished frames or receivers," the federal regime would *continue* to permit self-manufacturing of firearms for personal use. The rule expressly declares that "nothing in this rule would restrict persons not otherwise prohibited from possessing firearms from making their own firearms at home *without markings* solely for personal use (not for sale or distribution)." 86 Fed. Reg. at 27725, 22732 (italics added). That is, people would retain the means to lawfully own, possess, use, manufacture and/or assemble firearms for personal use, regardless of serialization. In fact, because the federal regulatory regime would *purposefully* continue to permit self-building for personal use—what State Defendants falsely label a "loophole"—all the barriers that Nevada has erected against the exercise of this right through AB 286 would remain fixed in place because serialization would still not be "*required* by federal law."

The categorical test of *Heller*, as recognized by the Ninth Circuit, thus applies to the Ban's sweeping prohibitions against the constitutionally protected activities and property that it targets for elimination, and compels that the Ban be declared categorically unconstitutional and enjoined.

## V. The Ban is Unconstitutional Under Intermediate Scrutiny

At the least, it must be said that a ban of this magnitude "'implicates the core of the Second Amendment right and severely burdens that right,'" which triggers strict scrutiny, *Pena*, 898 F.3d at 977 (quoting *Silvester*, 843 F.3d at 821). And the Ban fails even under intermediate scrutiny because the State cannot prove the Ban is "narrowly tailored to serve a significant governmental interest," *Packingham*, 137 S.Ct. at 1736, any more than it can prove that the Ban "is narrowly tailored to serve compelling state interests," *In re National Security Letter*, 863 F.3d at 1121 (9th Cir. 2017), because there has been *no tailoring at all*—it is total ban. California itself demonstrates the obvious availability of less restrictive means to address the State's concern with background checks and serialization. Indeed, Nevada *already* regulates the entire gamut of prohibited persons with its

existing laws that criminalize possession by every class of individual whose use of a firearm could conceivably pose a danger to themselves or others. Nev. Rev. Stat. Ann. §§ 202.300, 202.360. Even engaging in "interest-balancing" under intermediate scrutiny, the State must prove "each activity targeted within the proscription's scope is an appropriately targeted evil," *Ward v. Rock Against Racism*, 491 U.S. 781, 799–800 (1989), in demonstrating a "reasonable fit," *Board of Trustees of the University of New York v. Fox*, 492 U.S. 469, 480 (1989). This the State has not and cannot do.

First, State Defendants claim that "ghost guns" and their components pose a general "threat to public safety" because they can fall into the hands of prohibited persons and be used in criminal activities that cannot be adequately investigated or "traced" due to the lack of a serial number. The State does not explain, let alone show with evidence, how tracing prevents crimes. In any event, the data on which State Defendants rely to support their claimed interest is speculative, at best. The sole support for this claim consists of references to two pages of the Federal Register where the ATF has compiled some information about this supposed "ghost gun" phenomenon, which State Defendants portray as establishing "[l]aw enforcement agencies recovered nearly 24,000 ghost guns at crime scenes between 2016 and 2020," and "that number has been increasing every year." Resp. at 7 (citing 86 Fed. Reg. at 27722-23). But the sources cited for ATF's information are limited to publications of newspaper and media outlets, like the Baltimore Sun, the Wall Street Journal, NPR, and CBS News, concerning a supposed rise in crimes involving "ghost guns" in a handful of other states. 86 Fed. Reg. 27722 n. 17. Not one report or publication from any law enforcement agency is included among these hearsay sources. *If* should records existed, State Defendants, in particular, would have access to them, yet none were provided, or even aggregated and summarized.

In fact, while State Defendants portray the locations where these "ghost guns" were recovered as clearly established "crimes scenes," ATF's data compilation includes a notable disclaimer: the ATF referred to them only as "*potential* crime scenes," acknowledging that "*ATF does not know if the firearm being traced by the law enforcement agency was found at a crime scene as opposed to one recovered by them that was stolen or otherwise not from at the scene of a crime.*" *Id.* at n. 18 (italics added). Whatever limited evidentiary value this information might have, *none* of it concerns the situation within *Nevada* where this Ban has been imposed. Thus, the sole basis for the

governmental interest that the State has asserted in support of the Ban is staked around information that reduces to nothing more than speculative hearsay, as the ATF itself essentially concedes.

Second, State Defendants cannot avoid responsibility for this unwarranted and unjustified Ban by couching it as "a longstanding, presumptively lawful regulation" insulated from review. Resp. at 10 (citing *Heller*, 554 U.S. at 626-27). Indeed, what they claim is "presumptively lawful" is "a *serialization* requirement." Resp. at 10 (italics added). But the Ban affirmatively *precludes* people from obtaining serialization (or even a background investigation) as means to lawfully self-build. The refusal to provide any mechanism to comply with the very procedure the State claims is essential to protect the public safety certainly can have *no historic pedigree at all*. A mandate without available means of compliance is not and cannot be presumptively lawful—it is presumptively *un*lawful and a disingenuous means of banning the underlying activity in toto. Any such regulation is necessarily stripped of any "presumptive" lawfulness it might otherwise hold at the outset. *See Pena*, 898 F.3d at 1009-1010 (quoting *Heller II*, 670 F.3d 1244, 1253 (D.C. Cir. 2011)) (observing that, like all legal presumptions, this presumption is rebutted upon a showing that "'the regulation does have more than a de minimis effect on [plaintiff's] right'").

Further, this Ban, as a whole, is simply far afield from any of the types of regulations that the *Heller* court recognized as "presumptively lawful," which were "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." *Heller* at 626-27. The only remotely related concern that State Defendants have articulated is "the possession of firearms by felons and the mentally ill." Yet, they cite no evidence and articulate no reason for believing that, if and when such individuals engage in gun-related crime, they use "ghost guns" any more than they use commercially manufactured firearms. Additionally, as a general matter, governmental regulations on the exercise of the right to self-manufacture firearms are simply not "longstanding." They are instead of very recent advent among the small handful of states that do impose such restrictions. Dec. of J. Greenlee, ¶¶ 37-45.

Third, State Defendants also cannot insulate the Ban from Plaintiffs' requested judicial relief by pointing to the supposed alternatives that still exist for the exercise of the rights it otherwise

stamps out. The Supreme Court has already flatly rejected such arguments, in both *Heller* and *Caetano*. *Heller*, 554 U.S. at 629; *Caetano*, 577 U.S. 416-420. Moreover, as already noted, the State has left its law-abiding citizens *no* viable channels for the exercise of the extinguished rights, by tying all the *potential* alternative channels to a non-existent serialization process.

Lastly, the non-binding opinion of the Third Circuit in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) on which State Defendants heavily rely, Resp. 11-13, does not change things. That case involved a challenge to federal prohibition of possessing firearms with required serial numbers *defaced*, under 18 U.S.C. § 922(k), not a ban on the full spectrum of constitutionally protected predecessor conduct involved in the building of a firearm for lawful purposes with precursor firearm components that do not now—and may not ever—themselves require any serialization under the federal regime. And even if a serialization requirement in general is permissible, there are far less restrictive means of requiring serialization of firearm precursors and self-manufactured firearms by providing an actual mechanism of compliance. Further, what State Defendants seek to portray as a "loophole" in the federal law has been the status quo for more than 50 years now—prior to that, there were no such regulations at all—and the proposed new ATF rule continues to preserve an express exception for the building of homemade firearms for personal use. That is also why the *Pena* case, upholding California's handgun microstamping requirement, is inapposite. Resp. at 12 (citing *Pena*, 898 F. 3d at 982). As heavily regulated as the California regime is, the Ban still stands in stark contrast, because even California has established a process for residents to make their own firearms so long as they obtain a state-issued serial number. Cal. Penal Code §§ 29180(b)(1), 29182(b)(1).

### VI. Any Taking of This Valuable Property Requires Just Compensation

The entire thesis of State Defendants' claim that *no* compensation at all is required for the forced dispossession of the countless homemade firearms and components targeted by the Ban rests on the notion that the State can treat all such objects as "dangerous private property" subject to complete destruction under the government's "police powers." Resp. 13-14 (citing *Guedes v. ATF*, __ F.Supp.3d __ (D.C. Cir. 2021), 2021 WL 663183). Yet, their position here stands in stark contrast to its position concerning the Second Amendment claim, in which context it has not even attempted to claim, much less show, the homemade firearms and components at issue are *either* "dangerous" *or*

"unusual"—let alone both—so as to be stripped of constitutional protection. That the State provides no viable means of making the existing property "safe," i.e., having it serialized so as to remove the supposed nuisance, illustrates that the problem is not with the property itself, but with the restrictive regulatory regime that literally makes compliance impossible. That is not even a remote basis for invoking a public safety exception to the Takings Clause. It is equivalent to forbidding a homeowner from installing noise abatement technology on his or her vehicle and then claiming that the noisy car is now a nuisance. And it is surely no answer to say that compensation can be denied because the property at issue is personal, as opposed to real, property. Resp. at 14. Property is property. *See Horne v. Dept. of Agriculture*, 576 U.S. 352, 358 (2015) ("The Government has a categorical duty to pay just compensation when it takes your car, just as when it takes your home."). Thus, compensation is due for any taking of this constitutionally protected property and injunctive relief is appropriate in the Takings context unless and until such time that just compensation is provided.

## VII.    Conclusion

Even the most lenient form of scrutiny cannot save the Ban because it flatly fails every test. With the deprivation of constitutional rights so abundantly clear, it necessarily follows that (1) Plaintiffs stand to "prevail on the merits with a reasonable certainty," *South Bay United Pentecostal Church v. Newsom*, __ F.Supp.3d __, 2020 WL 7488974 (S.D. 2020), *6, (2) they and all similarly situated Nevadans face "irreparable injury," *Melendres* v. *Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), (3) the State by contrast "cannot suffer harm from an injunction that merely ends an unlawful practice," *Rodriguez v. Robbins*, 715 F.3d 1006, 1029 (9th Cir. 2013), and (4) inevitably the "public interest … tip[s] sharply in favor of enjoining" the law, *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). Thus, all relevant factors weigh heavily in favor of issuing injunctive relief against the Ban under all variations of the essential test for granting such relief.

And the injunctive relief is necessary against all the Douglas County Defendants just the same, *see* Resp. of Douglas Cnty. Def. at 1-2 (summarily asserting without argument or authority that no "justiciable controversy" exists as between them and Plaintiffs), because they are charged with enforcement of the Ban against all Douglas County residents for long as it is in effect.

Dated: July 9, 2021                                                                    Dated: July 9, 2021

| | |
|---|---|
| THE O'MARA LAW FIRM, P.C. | THE DIGUISEPPE LAW FIRM, P.C. |
| /s/ David C. O'Mara | /s/ Raymond M. DiGuiseppe |
| DAVID C. O'MARA, ESQ. | RAYMOND M. DIGUISEPPE |
| 311 E. Liberty Street | 4320 Southport-Supply Road, Ste 300 |
| Reno, NV 89501 | Southport, NC 28461 |
| Tel: 775.323.1321 | 910.713.8804 |
| david@omaralaw.net | Law.rmd@gmail.com |
| | |
| FIREARMS POLICY COALITION | FIREARMS POLICY COALITION |
| /s/ Adam Kraut | /s/ William Sack |
| ADAM KRAUT, ESQ. | WILLIAM SACK, ESQ |
| 1215 K Street 17th Floor | |
| Sacramento, CA 95814 | |
| 916.596.3492 | |
| akraut@fpclaw.org | |

## CERTIFICATE OF SERVICE

I hereby certify that I am an employee of The O'Mara Law Firm, P.C. and on this date, the foregoing document was filed electronically *via* the Court's ECF system which provided notification of such filing to counsel of record for all parties.

Dated: July 9, 2021                                    /s/ Bryan Snyder
                                                                                  BRYAN SNYDER

**INDEX OF EXHIBITS**

| Exh No. | Description | Pages |
|---|---|---|
| 1 | Declaration of Joseph Greenlee | 18 |
| 2 | Declaration of Joseph Ostini | 9 |