# EXHIBIT 1

Declaration of Joseph G.S. Greenlee

# EXHIBIT 1

THE O'MARA LAW FIRM, P.C.
DAVID C. OMARA
(Nevada Bar No. 8599)
311 East Liberty Street
Reno, NV 89501
P: (775) 323-1321
F: (775) 323-4082
E: david@omaralaw.net

THE DIGUISEPPE LAW FIRM, P.C.
RAYMOND M. DIGUISEPPE*
4320 Southport-Supply Road
Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

FIREARMS POLICY COALITION
ADAM KRAUT*
WILLIAM SACK*
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 596-3492
E: akraut@fpclaw.org
E: wsack@fpclaw.org

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| ROGER PALMER, *et al.*,<br><br>                   Plaintiffs,<br><br>    v.<br><br>STEPHEN SISOLAK, in his official capacity as Governor of Nevada, *et al.*,<br><br>                Defendants. | Case No.:  3:21-cv-00268<br><br>**DECLARATION OF JOSEPH G.S. GREENLEE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**Judge: Hon. Miranda Du**<br>**Date:   July 16, 2021**<br>**Time:  1:30 p.m.**<br>**Courtroom: 5** |

## DECLARATION OF JOSEPH G.S. GREENLEE

I, Joseph G.S. Greenlee, declare as follows:

1.     I am not a party to the above-captioned action, I am over the age of 18, I have personal knowledge of the facts stated herein, and I am competent to testify as to the matters stated and the opinions rendered below.

2.     I earned my Juris Doctor degree in 2014 from the University of Denver Sturm College of Law, after earning a Bachelor of Science Degree from Park University in 2011.

3.      I have practiced law since 2014, and currently serve as the Director of Constitutional Studies at the Firearms Policy Coalition and as a Policy Advisor for Legal Affairs at the Heartland Institute.

4.      I have published ten scholarly research articles in the field of Second Amendment law.

5.      My work has been cited in the dissenting opinion in *New York State Rifle & Pistol Ass'n, Inc. v. City of New York, New York*, 140 S. Ct. 1525, 1541 (2020) (Alito, J., joined by Gorsuch and Thomas, JJ., dissenting), as well as by justices of the Ohio and Wisconsin Supreme Courts, judges of the Third and Ninth Circuit Courts of Appeals, and the United States District Court for the Northern District of Florida.

6.      Attached hereto as **Exhibit 1** is a true and correct copy of my Curriculum Vitae. It describes my education, employment background, career experience, and publications.

7.      My opinions expressed here are formed in light of my scholarship and study of the current legal landscape of the Second Amendment.

8.      Based on my education, work experience, research, publications, and review of the research of others, in my opinion, the right of law-abiding citizens to build their own firearms for personal use is protected by the Second Amendment. Americans have been building their own arms since the early colonial days, and the practice has been largely unregulated throughout American history. What is more, the ability to build arms was critical to American success during the Revolution and also important for western expansion.

9.      The Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008) focused on the Second Amendment's text, as informed by history and tradition.

Text

10.     The text of the Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear

1

Arms, shall not be infringed."[1] The text does not make a distinction between the different methods of acquiring the firearms Americans have a right to keep and bear. It shows no preference for purchasing a firearm built by another individual over building one's own firearm.

<u>History and Tradition</u>

11.     The colonists in the first permanent English settlements in America had the express right to import arms and the items necessary to make them. Binding his "Heirs and Successors," King James I in 1606 granted the "Southern Colony" (Virginia) the right to import from Great Britain "the Goods, Chattels, Armour, Munition, and Furniture, needful to be used by them, for their said Apparel, Food, Defence or otherwise."[2] The 1620 Charter of New England granted colonists the right "to take, load, carry, and transport in . . . Shipping, Armour, Weapons, Ordinances, Munition, Powder, Shott, Victuals, and all Manner of Cloathing, Implements, Furniture, Beasts, Cattle, Horses, Mares, and all other Things necessary for the said Plantation, and for their Use and Defense, and for Trade with the People there."[3]

12.     Because the colonists depended on firearms for food and survival, the ability to build arms was a highly valued skill. Gunsmiths quickly appeared throughout the colonies, and some people who specialized in other occupations learned to build and repair arms as well. Blacksmiths, locksmiths, farmers, silversmiths, clock and watchmakers, stonemasons, whitesmiths, tinsmiths, cabinet makers, lockmakers, and

---

[1] U.S. CONST. amend. II.

[2] 7 FEDERAL AND STATE CONSTITUTIONS: COLONIAL CHARTERS AND OTHER ORGANIC LAWS OF THE STATES, TERRITORIES AND COLONIES NOW OR HERETOFORE FORMING THE UNITED STATES OF AMERICA 3787–88 (Francis Thorpe ed., 1909).

The definition of "armour," at the time, included all weapons as well defensive clothing. *See* 1 Noah Webster, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated) ("In English statutes, *armor* is used for the whole apparatus of war; including offensive as well as defensive arms.").

[3] 3 *id.* at 1834–35.

at least one lawyer were among the early Americans who have been documented as also making firearms.[4]

13.     Historian M.L. Brown explained that "[t]he influence of the gunsmith and the production of firearms on nearly every aspect of colonial endeavor in North America cannot be overstated, and that pervasive influence continuously escalated following the colonial era."[5] It has been reported that over 600 gunsmiths were operating in America between 1775 and 1783 alone.[6]

14.     Both professional and amateur gunsmiths played an important role in the American Revolution. There was a shortage of firearms and gunpowder during the Revolutionary War, due in large part to British efforts to restrict or prohibit arms manufacture in the colonies leading up to and during the war. States depended on the American people to help meet the demand. For example, on February 15, 1775, Massachusetts's Provincial Congress recommended that the towns and districts within the colony "encourage such persons as are skilled in the manufacturing of firearms and bayonets, diligently to apply themselves thereto, for supplying such of the inhabitants as may still be deficient."[7] The Provincial Congress promised to purchase "so many effective arms and bayonets as can be delivered in a reasonable time upon notice given to this congress at its next session."[8]

15.     On April 2, 1776, Pennsylvania's Committee of Safety approved a contract paying someone named Tomlinson fifty pounds "for making publick the art of boring and grinding Gun-barrels, and instructing such persons as they shall require to

---

[4] James Whisker, THE GUNSMITH'S TRADE 145–63 (1992).

[5] M.L. Brown, FIREARMS IN COLONIAL AMERICA 149 (1980).

[6] Clayton Cramer, LOCK, STOCK, AND BARREL: THE ORIGINS OF AMERICAN GUN CULTURE 54 & Appendix A (2018).

[7] THE JOURNALS OF EACH PROVINCIAL CONGRESS OF MASSACHUSETTS IN 1774 AND 1775, AND OF THE COMMITTEE OF SAFETY 103 (1838).

[8] *Id.*

be taught that art."[9] That same day, the Pittsburgh Press announced in its paper that "The Pennsylvania Committee of Safety authorized three of its members 'to contract for making public the art of boring and grinding gun-barrels.'"[10] Thus, Pennsylvania did not only rely on those already familiar with building arms, it desired to spread that knowledge throughout the colony.

16.    Similar efforts were made to increase domestic gunpowder production. For example, Paul Revere—who built firearms and gunpowder although he was a brass founder and silversmith by trade[11]—"engraved a plate diagramming how to refine saltpeter, an essential component in the making of gunpowder."[12] Revere's instructions were published in the Royal American Magazine in August 1774.[13]

17.    During this period in particular, many firearm makers intentionally omitted any markings that would suggest who built the firearm, "for the gunsmiths of that troubled time had no desire to invite British reprisals, as they would if it were known that they were furnishing arms to the colonists."[14]

18.    Many inventions came from the making of arms from people outside of the gunsmithing profession. Joseph Belton informed the Continental Congress on April 11, 1777 that he had invented "a common small arm" that could "discharge sixteen, or twenty [rounds], in sixteen, ten, or five seconds of time."[15] That summer, Belton demonstrated his rifle before leading military officers—including General Horatio Gates and Major General Benedict Arnold—and scientists—including David

---

[9] 5 AMERICAN ARCHIVES, FOURTH SERIES, 734 (Peter Force ed. 1844).

[10] THE PITTSBURGH PRESS, Apr. 2, 1776.

[11] Whisker, THE GUNSMITH'S TRADE, at 153.

[12] Stephen P. Halbrook, THE FOUNDERS' SECOND AMENDMENT 33 (2008).

[13] Id.

[14] Charles Edward Chapel, GUNS OF THE OLD WEST 23 (1961).

[15] Letter from Joseph Belton to the Continental Congress, Apr. 11, 1777, in PAPERS OF THE CONTINENTAL CONGRESS, COMPILED 1774–1789, vol. 1 AB, at 123.

Rittenhouse—who verified that "[h]e discharged Sixteen Balls loaded at one time."[16] The Congress ordered 100 of them,[17] but ultimately the deal fell through when Belton demanded what the Congress deemed "an extraordinary allowance."[18]

19.     Charles Willson Peale, who had formerly worked in saddlery, clockmaking, and silversmithing before becoming a world-renown portraitist, "prized a firelock" throughout the Revolutionary War "with a telescopic sight that he had built with help from the astronomer David Rittenhouse."[19]

20.     After the war, the ability to manufacture and repair arms was important to western expansion. For example, Daniel Boone, whose father taught him to build firearms, benefited from the skill in his explorations.[20] Meriwether Lewis was also experienced in amateur gunsmithing. Indeed, the Journals from the Lewis and Clark Expedition include many entries about the men repairing their arms.[21]

21.     The Girandoni rifle Meriwether Lewis carried on the expedition and relied on heavily was made by Isaiah Lukens, a Philadelphia clockmaker. The rifle, capable of firing 22 consecutive rounds without reloading,[22] was essential to the Expedition's success.[23]

---

[16] *Id.* at 139.

[17] 7 JOURNALS OF THE CONTINENTAL CONGRESS 1774–1789, at 324 (1907).

[18] *Id.* at 361.

[19] Rick Atkinson, THE BRITISH ARE COMING 493 (2019).

[20] Robert Morgan, BOONE 14 (2007) (Squire Boone's "skill at making and repairing guns was passed down to his fourth son," Daniel, for whom "[i]t would be an essential, lifesaving skill in later years, in the wilderness beyond the mountains.").

[21] Meriwether Lewis and William Clark, THE JOURNALS OF THE LEWIS & CLARK EXPEDITION (Gary Moulton ed., 1983) (13 vols.).

[22] James B. Garry, WEAPONS OF THE LEWIS AND CLARK EXPEDITION 100–01 (2012).

[23] Lewis mentioned the rifle at least 22 times in the journals, nearly always demonstrating it to impress various Native American tribes encountered on the expedition. *See e.g.*, 6 The Journals of the Lewis & Clark Expedition, at 233 (Jan. 24, 1806 entry) ("My Air-gun also astonishes them very much, they cannot comprehend it's [sic] shooting so often and without powder; and think that it is great medicine which comprehends every thing that is to them incomprehensible.").

22.     The ability to manufacture firearms, for personal use or otherwise, was critical in early American history. It was also an activity the ordinary American could legally partake in. As Thomas Jefferson wrote in 1793, "[o]ur citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them."[24]

## Supreme Court Precedent

23.     The *Heller* Court specifically addressed "*what* types of weapons" the Second Amendment protects.[25] The Court concluded that the right protects arms that are "typically possessed by law-abiding citizens for lawful purposes."[26] In other words, as *United States v. Miller*, 307 U.S. 174 (1939) "said . . . the sorts of weapons protected were those 'in common use at the time.'"[27]

24.     Thus, according to the concurring opinion in *Caetano v. Massachusetts*, "the pertinent Second Amendment inquiry is whether [the arms] are commonly possessed by law-abiding citizens for lawful purposes today."[28]

25.     The Supreme Court has not expressly defined "common." It had no need to in *Heller* or *McDonald v. City of Chicago*, 561 U.S. 742 (2010), because both cases dealt with handgun bans, and handguns are "the most popular weapon chosen by Americans for self-defense in the home,"[29] so they were clearly common.

26.     But *Heller* did establish what matters is whether the arm is among "the

---

[24] Letter from Secretary of State Thomas Jefferson to British Ambassador to the United States George Hammond, May 15, 1793, in 7 THE WRITINGS OF THOMAS JEFFERSON 325, 326 (Paul Ford ed., 1904).

[25] 554 U.S. at 624 (emphasis in original).

[26] *Id.* at 625.

[27] *Heller*, 554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179).

[28] *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032 (2016) (Alito, J., concurring) (emphasis omitted).

[29] *Heller*, 554 U.S. at 629.

sorts of weapons" or "of the kind" that are in common use.[30] In other words, the specific features, make, or model, of the arm in question need not be common. Nor does it matter whether the arm is purchased, bequeathed, or self-built.

27.    *Caetano* summarily reversed and remanded an opinion of the Massachusetts Supreme Judicial Court upholding a stun gun prohibition. While the Court's per curiam opinion focused on the lower court's violations of the precedent set in *Heller*, Justices Alito and Thomas's concurrence determined that stun guns are common—and thus protected—arms.

28.    The concurrence clarified that in determining commonality for Second Amendment protection, "[t]he more relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 States."[31]

29.    In other words, the raw number of arms and the number of jurisdictions in which those arms are lawful controls. This is the best indication yet from the Supreme Court of what factors are relevant in determining commonality.

30.    Applying those factors here, Nevada's ban as it applies to self-built handguns contradicts *Heller*'s holding that handguns cannot be banned. If rifles are also protected by the Second Amendment, the ban on self-built rifles would contradict *Heller* as well.

31.    Even limiting the analysis to self-built arms, rather than handguns generally or rifles generally as *Heller* suggests,[32] the test from the *Caetano* concurrence suggests that self-built firearms are protected.

<u>Jurisdictional Analysis</u>

32.    It is lawful to build arms for personal use under federal law and in 44

---

[30] *Id.* at 624, 627.

[31] *Caetano*, 136 S. Ct. at 1032 (Alito, J., concurring) (quotation omitted).

[32] *See* 554 U.S. at 624, 627 (what matters is whether the banned arms are among "the sorts of weapons" or "of the kind" that are in common use).

7

states, with no special restrictions. Only six states (including Nevada) and the District of Columbia regulate the manufacture of arms for personal use. This is almost identical to the jurisdictional analysis that led the *Caetano* concurrence to conclude that stun guns were protected arms.[33]

33.     The federal government has never required a license to build a firearm for personal use.

34.     The federal restrictions that do exist on self-manufactured arms have limited application and are aimed at firearms generally. For example, federal law forbids any person to manufacture, import, sell, ship, deliver, possess, transfer, or receive any firearm if "after removal of grips, stocks, and magazines, [it] is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar,"[34] or if "any major component . . . when subjected to inspection by the types of x-ray machines commonly used at airports, does not generate an image that accurately depicts the shape of the component."[35]

35.     Federal law also forbids any person to "assemble from imported parts any semiautomatic rifle or any shotgun which is identical to any rifle or shotgun prohibited from importation under" 18 U.S.C. 925(d)(3).[36]

36.     The making of a firearm that falls within the scope of the National Firearms Act requires advanced approval by the Bureau of Alcohol, Tobacco, Firearms and Explosives, as well as a tax payment.[37]

37.     Just recently, California, New Jersey, Connecticut, Hawaii, Rhode Island, and the District of Columbia have regulated self-built firearms.

38.     California's law became effective in 2018. It requires that prior to

---

[33] *Caetano*, 136 S. Ct. at 1032 (Alito, J., concurring).

[34] 18 U.S.C. § 922(p)(1)(A).

[35] 18 U.S.C. § 922(p)(1)(B).

[36] 18 U.S.C. § 922(r).

[37] 26 U.S.C. § 5822.

manufacturing or assembling a firearm, a person must apply to the California Department of Justice for a unique serial number and permanently affix it to the firearm.[38]

39.     New Jersey has regulated self-built arms since 2018. The State punishes with a crime in the third degree, anyone "who, with the purpose to manufacture or otherwise assemble a firearm and without being registered or licensed do so as provided in chapter 58 of Title 2C of the New Jersey Statutes, purchases or otherwise obtains separately or as part of a kit a firearm frame or firearm receiver which is not imprinted with a serial number registered with a federally licensed manufacturer or any combination of parts from which a firearm without a serial number may be readily manufactured or otherwise assembled, but which does not have the capacity to function as a firearm unless manufactured or otherwise assembled. . . ."[39]

40.     Connecticut's 2019 law prohibits anyone from completing the manufacture of a firearm without subsequently "obtaining a unique serial number or other mark of identification from the Department of Emergency Services and Public Protection" and "engraving upon or permanently affixing to the firearm such serial number or other mark in a manner that conforms with the requirements imposed on licensed importers and licensed manufacturers of firearms."[40] Additionally, the transfer of an unfinished frame or receiver must comply with regulations for transfers of pistols or revolvers.[41]

41.     Under Hawaii's 2020 law:

> A person who is not licensed to manufacture a firearm under section 134-31, or who is not a dealer licensed by the United States Department of Justice, shall not, for the purpose of assembling a firearm, purchase, produce with a

---

[38] Cal. Penal Code § 29180(b).

[39] N.J. Stat. § 2C:39-9.

[40] Conn. Pub. Act No. 19-6 (2019).

[41] Id.

three-dimensional printer, or otherwise obtain separately, or as part of a kit:

(1) A firearm receiver that is not imprinted with a serial number registered with a federally licensed manufacturer;

(2) A firearm receiver that has not been provided a serial number that may be registered in accordance with section 134-3(c); or

(3) Any combination of parts from which a firearm having no serial number may be readily assembled; provided that the parts do not have the capacity to function as a firearm unless assembled.[42]

42.     The District of Columbia since 2020 requires the registration of "ghost guns,"[43] which it defines as "an unfinished frame or receiver."[44]

43.     Rhode Island, since 2020, forbids anyone to "manufacture, sell, offer to sell, transfer, purchase, possess, or have under his or her control . . . any firearm produced by a 3D printing process," or any "firearm, including a frame or receiver, that lacks a unique serial number engraved or cased in metal alloy on the frame or receiver by a licensed manufacturer, maker, or importer under federal law or markings in accordance with 27 C.F.R. § 479.102."[45]

44.     There appear to be no special regulations for self-built arms for personal use in 44 states. This is similar to the facts in *Caetano*, in which the concurrence determined stun guns were protected arms based in part on their legality in 45 states.[46]

45.     Even in the few jurisdictions that regulate self-built arms, some still allow them as long as they are serialized or meet some similar requirement. Nevada, by contrast, provides no such path for people to build their own arms.

---

[42] 2019 Hi. HB 2744.

[43] D.C. Code § 7-2502.02(a)(8),

[44] D.C. Code § 7-2501.01(9B).

[45] 2020 R.I. HB 7102.

[46] *Caetano*, 136 S. Ct. at 1032 (Alito, J., concurring) (quotation omitted).

**CONCLUSIONS**

46.     My research leads me to the following conclusions:

47.     The building of firearms for personal use is deeply rooted in American tradition.

48.     The building of firearms for personal use has been largely unregulated throughout American history.

49.     The building of firearms for personal use remains a lawful Second Amendment activity in a large majority of jurisdictions across the United States.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed within the United States on July 9, 2021.

__/s/Joseph G.S. Greenlee_____
Joseph G.S. Greenlee

# EXHIBITS

| **Exhibit** | **Description** |
| --- | --- |
| 1 | Joseph G.S. Greenlee Curriculum Vitae |

# EXHIBIT 1

# Joseph Greenlee

josephgreenlee@gmail.com □ 970-485-3303 □ PO Box 4061, McCall, ID 83638

## LEGAL EXPERIENCE

| | |
|---|---|
| Attorney at Law: Constitutional and Appellate Law | 2014 – Present |
| Firearms Policy Coalition: Director of Constitutional Studies | 2019 – Present |
| Firearms Policy Foundation: Director of Constitutional Studies | 2021 – Present |
| Heartland Institute: Policy Advisor for Legal Affairs | 2019 – Present |
| Millennial Policy Center: Fellow in Constitutional Studies | 2017 – 2021 |
| Steamboat Institute: Emerging Leaders Advisory Council | 2016 – 2019 |

## EDUCATION

Juris Doctor – University of Denver Sturm College of Law (2014)
Bachelor of Science – Park University (2011)

## ADMISSIONS

Colorado
Idaho
Colorado District Court
Maryland District Court (pro hac vice)
First Circuit Court of Appeals
Second Circuit Court of Appeals
Third Circuit Court of Appeals
Fifth Circuit Court of Appeals
Seventh Circuit Court of Appeals
Ninth Circuit Court of Appeals
Tenth Circuit Court of Appeals
Eleventh Circuit Court of Appeals
United States Supreme Court

## PUBLICATIONS

David B. Kopel & Joseph G.S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 ST. LOUIS L.J. 193 (2017)

Jonathan S. Goldstein & Joseph G.S. Greenlee, *Pennsylvania's Expanded Castle Doctrine: An Annotated Tour of the First Five Years*, 88 PA. B.A. Q. 170 (2017)

David B. Kopel & Joseph G.S. Greenlee, *History and Tradition in Modern Circuit Court Cases on the Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J 119 (2018)

David B. Kopel & Joseph G.S. Greenlee, *Federal Circuit Second Amendment Doctrines 2017–2018*, Tx. B. J. ch.7 (2018)

David B. Kopel & Joseph G.S. Greenlee, *The Second Amendment Rights of Young Adults*, 43 S. Ill. U. L.J 495 (2019)

David B. Kopel & Joseph G.S. Greenlee, *Federal Circuit Second Amendment Developments 2018*, 7 L.M.U. L. REV. 105 (2019)

Joseph G.S. Greenlee, *Concealed Carry and the Right to Bear Arms*, FED. SOC. REVIEW, Vol. 20 (2019)

David B. Kopel & Joseph G.S. Greenlee, *The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms*, 13 CHARLESTON L. REV. 205 (2018)

Joseph G.S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms*, 20 WYO. L. REV. 249 (2020)

Joseph G.S. Greenlee & Matthew Larosiere, *Red Flag Laws Raise Red Flags of Their Own*, 45 ALABAMA LAW & PSYCHOL. REV. (Forthcoming 2021)

## AMICUS BRIEFS IN FIREARMS LAW CASES

*Virginia Duncan, et al. v. Xavier Becerra*
Ninth Circuit Court of Appeals

*Michael Cargill v. Merrick B. Garland, et al.*
Fifth Circuit Court of Appeals

*Joshua Wade v. The Board of Regents of the University of Michigan*
Supreme Court of Michigan

*United States v. Antonio Francisco Gutierrez*
Supreme Court of Idaho

*Kenneth E. Flick v. Robert M. Wilkinson*
Supreme Court of the United States

*Maryland Shall Issue, Inc., et al. v. Lawrence Hogan*
Supreme Court of the United States

*New York State Rifle & Pistol Association, Inc., et al. v. Keith M. Corlett*
Supreme Court of the United States

*United States of America v. Israel Torres*
Supreme Court of the United States

*Association of New Jersey Rifle & Pistol Clubs, Inc., et al. v. Attorney General New Jersey, et al.*
Third Circuit Court of Appeals

*Kim Rhode, et al. v. Xavier Becerra*
Ninth Circuit Court of Appeals

*Zoie H. v. State of Nebraska*
Supreme Court of the United States

*William Drummond, et al. v. Township of Robinson, et al.*
Third Circuit Court of Appeals

*George K. Young, Jr. v. State of Hawaii, et al.*
Ninth Circuit Court of Appeals

*State of Vermont v. Max Misch*
Supreme Court of Vermont

*Raymond Holloway, Jr. v. William P. Barr, et al.*
Third Circuit Court of Appeals

*United States of America v. Israel Torres*
Ninth Circuit Court of Appeals

*Association of New Jersey Rifle & Pistol Clubs, Inc., et al. v. Attorney General New Jersey, et al.*
Third Circuit Court of Appeals

*Steven Rupp, et al. v. Xavier Becerra*
Ninth Circuit Court of Appeals

*Brian Kirk Malpasso, et al. v. William M. Pallozzi, et al.*
Supreme Court of the United States

*David Seth Worman, et al. v. Maura T. Healey, et al.*
Supreme Court of the United States

*Damien Guedes, et al. v. Bureau of Alcohol, Tobacco, Firearms and Explosives, et al.*
Supreme Court of the United States

*Jorge L. Medina v. William P. Barr*
Supreme Court of the United States

*Virginia Duncan, et al. v. Xavier Becerra*
Ninth Circuit Court of Appeals

*Remington Arms Co., LLC, et al. v. Donna L. Soto, et al.*
Supreme Court of the United States

*Mark Cheeseman v. John Polillo, et al.*
Supreme Court of the United States

*United States of America v. Raphael Hunt-Irving*
Third Circuit Court of Appeals

*Raymond Holloway, Jr. v. William P. Barr, et al.*
Third Circuit Court of Appeals

*Lisa M. Folajtar v. William P. Barr, et al.*
Third Circuit Court of Appeals

*National Association for Gun Rights, Inc., et al. v. Jared S. Polis*
Colorado Supreme Court

*The People of the State of Illinois v. Vivian Claudine Brown*
Supreme Court of Illinois

*New York State Rifle & Pistol Association, Inc., et al. v. City of New York, New York, et al.*
Supreme Court of the United States

*Ivan Pena, et al. v. Martin Horan, Director, California Department of Justice Bureau of Firearms*
Supreme Court of the United States

*Fredric Russell Mance, Jr., et al. v. Matthew G. Whitaker, Acting U.S. Attorney General, et al.*
Supreme Court of the United States

*Maryland Shall Issue, Inc., et al. v. Lawrence Hogan, et al.*
Maryland District Court

*David Seth Worman, et al. v. Charles D. Baker, et al.*
First Circuit Court of Appeals

*Lori Rodriguez, et al. v. City of San Jose, et al.*
Ninth Circuit Court of Appeals

*John Teixeira, et al. v. County of Alameda, et al.*
Supreme Court of the United States

*Rocky Mountain Gun Owners, et al. v. John W. Hickenlooper*
Colorado Court of Appeals

4

*Virginia Duncan, et al. v. Xavier Becerra*
Ninth Circuit Court of Appeals

*Stephen V. Kolbe, et al. v. Lawrence J. Hogan, Jr., et al.*
Supreme Court of the United States

*John Teixeira, et al. v. County of Alameda, et al.*
Ninth Circuit Court of Appeals (en banc)

## COURT CITATIONS

*Pena v. Lindley*, 898 F.3d 969, 1004 n.17 (9th Cir. 2018) (Bybee, J., concurring in part and dissenting in part)

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York, New York*, 140 S. Ct. 1525, 1541 (2020) (Alito, J., joined by Gorsuch and Thomas, JJ., dissenting)

*Chiafalo v. Washington*, 140 S. Ct. 2316, 2325 (2020)

*Ass'n of New Jersey Rifle & Pistol Clubs Inc. v. Attorney Gen. New Jersey*, 974 F.3d 237, 270, 274 & n.18 (3d Cir. 2020) (Matey, J., dissenting)

*State v. Weber*, 2020-Ohio-6832, ¶ 89, 163 Ohio St. 3d 125, 151, 168 N.E.3d 468, 490

*State v. Roundtree*, 2021 WI 1, ¶130, 395 Wis. 2d 94, 156, 952 N.W.2d 765, 795

*Young v. Hawaii*, 992 F.3d 765, 796 (9th Cir. 2021) (en banc)

*NRA of Am., Inc. v. Swearingen*, No. 4:18cv137-MW/MAF, 2021 U.S. Dist. LEXIS 117837 (N.D. Fla. June 24, 2021).

## CONTINUING LEGAL EDUCATION PRESENTATIONS

1. Annual National Firearms Law Seminar
   05/20/2016

2. Regulating Arms Under the Second Amendment and Colorado Constitution
   Colorado Bar Association
   03/21/2017

3. TexasBarCLE - Firearms Law: What Every Texas Lawyer Needs to Know
   Texas Bar Association
   09/20/2018