THE O'MARA LAW FIRM, P.C.
DAVID C. OMARA
(Nevada Bar No. 8599)
311 East Liberty Street
Reno, NV 89501
P: (775) 323-1321
F: (775) 323-4082
E: david@omaralaw.net

THE DIGUISEPPE LAW FIRM, P.C.
RAYMOND M. DIGUISEPPE*
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com

FIREARMS POLICY COALITION
ADAM KRAUT*
WILLIAM SACK*
1215 K Street, 17th Floor
Sacramento, CA 95814
P: (916) 596-3492
E: akraut@fpclaw.org
E: wsack@fpclaw.org

*Admitted PHV

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

ROGER PALMER, *et al.*,

Plaintiffs,

v.

STEPHEN SISOLAK, in his official capacity as Governor of Nevada, *et al.*,

Defendants.

Case No.:  3:21-cv-00268

**PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS PURSUANT TO FRCP 12(B)(6)**

**Judge: Hon. Miranda Du**
**Date:  TBD**
**Time:  TBD**

## I. Introduction

State Defendants' Motion to Dismiss ("MTD") the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Rule 12(b)(6)") must be denied. The Complaint states strong, indeed meritorious, constitutional challenges to Assembly Bill No. 286 ("AB 286" or the "Ban") which easily survive the lenient standards of review on any motion to dismiss under Rule 12(b)(6).

## II. The Lenient Standards of Review

In any challenge to the Complaint as failing to sufficiently state claims for relief under Rule 12(b)(6), "we accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable" to Plaintiffs and "draw[] all reasonable inferences in their favor." *Association for Los Angeles Deputy Sheriffs v. County of Los Angeles*, 648 F.3d 986, 990 (9th Cir. 2011). The Complaint "need not contain detailed factual allegations; rather, it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Cousins v. Lockyer*, 568 F.3d 1063, 1067-68 (9th Cir.

1   2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). And the Complaint does that

2   so long as it "pleads factual content that allows the court to draw the reasonable inference that the

3   defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

4        In ruling on such motions, "it must be borne in mind that in many a suit such a motion cannot

5   take the place of submission of evidence and of findings of fact and conclusions of law." *Rennie &*

6   *Laughlin, Inc. v. Chrysler Corp.*, 242 F.2d 208, 213 (9th Cir. 1957) (internal quotations omitted).

7   "The salvaged minutes that may accrue from circumventing these procedures can turn to wasted

8   hours if the appellate court feels constrained to reverse the dismissal of an action." *Id.* Thus, it is

9   settled that "a motion to dismiss is viewed with disfavor in the federal courts," *id.*, and a complaint

10  should not be dismissed on this ground "unless it appears beyond doubt that the plaintiff[s] can

11  prove no set of facts in support of [their] claim which would entitle [them] to relief," *Geraci v.*

12  *Homestreet Bank*, 347 F.3d 749, 751 (9th Cir. 2003) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46

13  (1957)); *accord Nichols v. Mayflower Transit, LLC*, 368 F.Supp.2d 1104, 1106 (D. Nev. 2003).

14       Generally, this inquiry is based on the face of the complaint and any attachments to the

15  complaint. *Patel v. American National Property and Casualty Company*, 367 F.Supp.3d 1186, 1191

16  (9th Cir. 2019) ("Generally, a district court may not consider any material beyond the pleadings in

17  ruling on a Rule 12(b)(6) motion .... However, material which is properly submitted as part of the

18  complaint may be considered on a motion to dismiss."). "Similarly, 'documents whose contents are

19  alleged in a complaint and whose authenticity no party questions, but which are not physically

20  attached to the pleading, may be considered in ruling on a Rule 12(b)(6) motion to dismiss.'" *Id.*

21  (quoting *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994)). Additionally, the court may consider

22  matters that are proper subjects for judicial notice under Federal Rule of Evidence 201. *Id.*

23       In the unlikely event that a court grants a motion to dismiss on the basis of failure to state a

24  claim, "[t]he court should 'freely give' leave to amend" absent any "undue prejudice to the opposing

25  party." *Farmer v. Las Vegas Metropolitan Police Department*, 423 F.Supp.3d 1008, 1013 (D. Nev.

26  2019) (quoting Fed. R. Civ. P. 15(a)). Generally, such "leave to amend is only denied when it is

27  clear that the deficiencies of the complaint cannot be cured by amendment." *Id.*

28               **III.   The Undisputed Effects of Nevada's Ban Under AB 286**

The Complaint details the extraordinary impacts of the prohibitions imposed by AB 286's Ban, the full extent of which State Defendants essentially concede in their motion (*see* MTD at 6):

**Section 3.** Effective January 1, 2022, it is a crime for anyone in Nevada to "possess, purchase, transport or receive an unfinished frame or receiver," unless "[t]he person is a firearms importer or manufacturer" or "[t]he unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by a firearms importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number." Comp. ¶ 61; AB 286, § 3(1)(a)-(b). Consequently, all ordinary law-abiding citizens (i.e., everyone except firearms importers and manufacturers) must dispossess themselves of all "unfinished" frames, receivers, and other non-firearm objects ("NFOs") not serialized as "required by federal law" by no later than January 1, 2022. Compl. ¶ 63. Further, no ordinary law-abiding citizen may ever again lawfully possess, purchase, transport, or receive any such frames, receivers, or NFOs on or after January 1, 2022, effectively barring them from ever lawfully self-building any firearm for any purpose unless and until (1) federal law or regulations *require* serialization of such component parts and (2) the components are in fact serialized and then transferred in accordance with those laws or regulations before being incorporated into any firearm self-built by the ordinary person. Compl. ¶ 66.

**Section 3.5.** Effective immediately, it is a crime for anyone in Nevada to "sell, offer to sell or transfer an unfinished frame or receiver," unless (1) the person is (a) a firearms importer or manufacturer and (b) "the recipient of the unfinished frame or receiver is a firearms importer or manufacturer," or (2) "[t]he unfinished frame or receiver is required by federal law to be imprinted with a serial number issued by an importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number"—subject to the limited exception for sales under section 5.5. AB 286, § 3.5(1)(a)-(b); *id.* at §10(1). Compl. ¶ 67. Thus, this section shuts the door on any future sale or transfer of any "unfinished frame or receiver," not serialized as "required by federal law," to or by any ordinary law-abiding citizen, by immediately criminalizing all such sales or transfers, except for sales conducted for purposes of complying with the mandatory dispossession of frames, receivers, and other NFOs by the dispossession deadline of January 1, 2022. Compl. ¶ 67.

**Section 4.** Effective immediately, it is a crime for anyone in Nevada to "manufacture or

cause to be manufactured or assemble or cause to be assembled a firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law and any regulations adopted thereunder," unless the firearm "[h]as been rendered permanently inoperable," "[i]s an antique firearm," or "[h]as been determined to be a collector's item pursuant to 26 U.S.C. Chapter 53 or a curio or relic pursuant to 18 U.S.C. Chapter 44." AB 286, § 4(1)(a)-(c). Compl. ¶ 69. Because the serialization requirement of this manufacturing prohibition mandates that the firearm's serial number be "*issued by* a firearms importer or manufacturer," the prohibition effectively bans all self-manufacturing by ordinary law-abiding citizens. Only licensed manufacturers and importers are *required* to imprint serial numbers and then only on *completed* firearms or *finished frames or receivers.* In other words, unless and until a serialization *requirement* for *unfinished* frames or receivers is established under federal law, the Ban literally mandates that, to be lawfully made or possessed, any homebuilt firearm must *start*, at a minimum, with a *finished* frame or receiver, and thus it completely extinguishes any right to self-manufacturing for the ordinary person, because obviously one cannot *self*-manufacture a firearm that has *already* been manufactured. Compl. ¶ 70.

**Section 5.** Effective January 1, 2022, it is a crime for anyone in Nevada to "possess, sell, offer to sell, transfer, purchase, transport or receive a firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law and any regulations adopted thereunder," unless (1) the person is a law enforcement agency or a firearms importer or manufacturer, or (2) the firearm has been rendered permanently inoperable, was manufactured before 1969, is an antique firearm, or has been determined to be a collector's item pursuant to 26 U.S.C. Chapter 53 or a curio or relic pursuant to 18 U.S.C. Chapter 44. AB 286, § 5(1)(b)-(b). Compl. ¶ 71. This section targets existing firearms of ordinary law-abiding Nevadans, who *lawfully* built them *before* the Ban, prohibiting as of January 1, 2022, the possession, sale, transfer, transport, or receipt of all such modern and operable firearms manufactured after 1969. As with the existing NFOs *lawfully* acquired *before* the Ban, obtaining serialization after the fact is no option, because federal law requires that any necessary serialization occur *before* a completed firearm ever reaches the consumer. *See* 27 C.F.R. § 478.92(a)(1) & (a)(2). Compl. ¶¶ 63, 71.

In net effect then, AB 286 imposes a blanket prohibition against all self-built modern

operable firearms of any type (all handguns and all long guns) *in addition* to component parts integral to their manufacture that are not already—and *could not* be—imprinted with a serial number as *required* by federal law, it mandates that all ordinary law-abiding citizens *dispossess* themselves of all such arms and parts on or before January 1, 2022 (or render them useless), it totally bans all such individuals from possessing or using any of the same on and after that date, it *immediately* bans sales or transfers to these individuals of any "unfinished frames or receivers" that lack the required but unobtainable form of serialization, and it *immediately* bans them from self-manufacturing any firearms that lack the required but unobtainable form of serialization. Compl. ¶¶ 64, 71, 127. Indeed, it is clear that the Nevada lawmakers fully anticipate and intend dispossession as the sole means of compliance. *See* Notes of Assemblywoman Jauregui (AB 286's sponsor) to the amendments of AB 286 on May 11, 2021. Compl. ¶ 64. State Defendants readily concede this as well. MTD at 6.

## IV. The Complaint States a Strong, Ultimately Meritorious Second Amendment Claim

No basis exists to dismiss the Second Amendment claim, especially under the lenient standards of Rule 12(b)(6). Rather, it is a strong, indeed meritorious claim that must proceed.

### A. The Ban's Undisputed Targeting of Arms in Common Use for Lawful Purposes

The Complaint is replete with assertions, grounded in Supreme Court precedent, that the arms targeted for prohibition and dispossession by the Ban are arms in common use for lawful purposes and are thus protected by the Second Amendment. As the Complaint expounds, the Supreme Court "has held that 'the Second Amendment extends, *prima facie*, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding.'" *Caetano v. Massachusetts*, 577 U.S. 411, 416 (2016) (Alito, J., concurring) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008)). Compl. ¶ 1. Thus, the Second Amendment "guarantees the right to carry weapons '*typically possessed* by law-abiding citizens for lawful purposes,'" *id.* (quoting *Heller* at 625) (italics added), and its protection extends to all firearms currently in common use that are not both "dangerous per se" and "unusual," *id.* at 417 ("A weapon may not be banned unless it is both dangerous *and* unusual."). Compl. ¶ 34; *see also Miller v. Bonta*, __ F.Supp.3d__, 2021 WL 2284132, *45 (S.D. Cal. 2021) ("Fortunately, no legislature has the constitutional authority to dictate to a good citizen that he or she may not acquire a modern and popular gun for self-defense.").

"Dangerous *per se*" does not mean the mere inherent propensity of a firearm to cause injury. *Caetano*, 577 U.S. at 418 ("firearms cannot be categorically prohibited just because they are dangerous"). In fact, "the relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Id.* "*Heller* defined the 'Arms' *covered by* the Second Amendment to include " 'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.' " *Id.* (quoting *Heller*, 554 U.S. at 581) (quoting 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)). Compl. ¶ 35. And an arm is not "unusual" so as to fall outside the ambit of this protection so long as it is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Caetano* at 420 (italics original). Compl. ¶ 36.

As the Complaint further details—also based on sources not subject to reasonable dispute— both handguns and AR-15 rifles are in common use and neither class of arms is "dangerous" *or* "unusual" in this sense. Handguns have been recognized, by the Supreme Court itself, as "the quintessential self-defense weapon" "overwhelmingly chosen by American society" for lawful self-defense. *Heller*, 554 U.S. at 628-29. Compl. ¶ 36. Similarly, over 25 years ago, the Supreme Court recognized the AR-15 as a common firearm possessed by *ordinary people*, finding, "The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon." *Staples v. United States*, 511 U.S. 600, 603 (1994). Compl. ¶¶ 138-140; *see also Miller v. Bonta*, __ F.Supp.3d __, 2021 WL 2284132, *6 (finding such rifles are "commonly owned by law-abiding citizens" and "the overwhelming majority of citizens who own and keep the popular AR-15 rifle and its many variants do so for lawful purposes, including self-defense at home").

State Defendants do not contest that such arms are in common use for lawful purposes throughout the country. Nor do they claim either class of arms is "dangerous" *or* "unusual"—much less "dangerous *and* unusual" as would be necessary to strip them of constitutional protection. State Defendants use the term "dangerous" in connection with the arms at issue only once, and then only in context of their (fallacious) claim that the dispossession mandate of AB 286 does not constitute a compensable "taking." MTD at 2 ("The Fifth Amendment's takings clause also does not hamstring state government's traditional power to regulate, and indeed prohibit, dangerous private property."). They say nothing to even suggest that handguns or AR-15 rifles are anything but arms in common

1   use for lawful purposes within the purview of the Second Amendment's protection.

2       This is significant because, as the Complaint sets out, both the individual Plaintiffs, Roger

3   Palmer and Chad Moxley, own and possess multiple self-built handguns and AR-15 rifles "of a type

4   commonly possessed by law-abiding citizens for lawful purposes today," as well as NFOs used in

5   the construction of such arms, which they lawfully acquired before the Ban and which they have

6   only ever used for lawful purposes, but which are now subject to prohibitions of the Ban. Compl. ¶¶

7   81-85, 101-103. Moreover, both rightfully desire to continue to own, possess, acquire, use, and self-

8   build such arms along with their constituent parts for self-defense and other lawful purposes. Both

9   would do so, but for the Ban's prohibitions which prohibit all such activity and property interests

10   without providing any pathway for ordinary law-abiding citizens to *lawfully* engage in the

11   manufacturing or assembly of arms in common use for lawful purposes. Compl. ¶¶ 86-87, 104-105.

12       Further, before the enactment of AB 286, Plaintiff Moxley, who holds a valid Federal

13   Firearms License ("FFL") and a Nevada Concealed Carry Permit, regularly engaged in lawful sales

14   of firearms and constituent NFOs to law-abiding gunowners for lawful purposes, and he had made

15   arrangements to attend at least six more gun shows before the end of the year at which he would

16   have otherwise made available for sale and sold firearm components now prohibited from

17   commercial sale under the Ban. Compl. ¶¶ 95-98. Plaintiff Moxley desires to continue, and would

18   continue, doing so but for the Ban's prohibition of such commercial sales. Compl. ¶¶ 99-100.

19       On this basis, and in an assertion of standing which has never been challenged by anyone,

20   Plaintiffs Palmer and Moxley are bringing this action on behalf of themselves and as representatives

21   of the class of numerous similarly situated Nevada resident FPC members impacted by the Ban,

22   which leaves them all no pathway for compliance with the new law except through total

23   dispossession of their existing self-built arms (or rendering them inoperable and thus useless for self-

24   defense or any other lawful purpose), dispossession of NFOs lawfully acquired under the prior law,

25   and a total cessation of any further manufacturing of any arms in common use for lawful purposes.

26   Compl. ¶¶ 88, 106, 113-118, 135-137. Further, as a seller of the now-banned precursor parts,

27   Plaintiff Moxley has further asserted—in another entirely unchallenged claim to standing—that he is

28   bringing this action on behalf of his customers who seek to purchase NFOs for lawful purposes and

1   whose Second Amendment rights are being violated by the Ban. Compl. ¶ 107.

2       As to all the common questions of law and fact that substantially affect the rights, duties, and

3   liabilities of Plaintiffs Palmer and Moxley, and the numerous similarly situated FPC Nevada resident

4   members included within this unchallenged representative class, Plaintiffs have individually and

5   collectively asserted that, absent the requested judicial relief, they and all such Nevadans have been

6   and will continue to be adversely and directly harmed by Defendants' actual and threatened

7   administration, implementation, and enforcement of the Ban. Compl. ¶¶ 114, 119-121.

8       Thus, the Complaint has firmly established that the Ban targets arms protected under the

9   Second Amendment, and any lingering doubt on that point must resolved in Plaintiffs' favor because

10  their allegations must be taken as true and construed in the light most favorable to them. *Association*

11  *for Los Angeles Deputy Sheriffs v. County of Los Angeles*, 648 F.3d at 990.

12  **B.   The Undisputed Right to Self-Manufacture Firearms in Common Use**

13      The Complaint also sets forth a solid, unrefuted case that the Second Amendment secures the

14  closely related, historically recognized right to self-manufacture firearms in common use for lawful

15  purposes. Compl. ¶ 40. Like the other foundational pillars of the Complaint, this is drawn from

16  Supreme Court authority and a clear historical record. The *Heller* court itself emphasized that the

17  contours of the Second Amendment's protection must be defined by its founding-era origins,

18  because "[c]onstitutional rights are enshrined with the scope they were understood to have when the

19  people adopted them, whether or not future legislatures or (yes) even future judges think that scope

20  too broad." *Heller*, 554 U.S. at 634-35; Compl. ¶ 132; *see also Young v. Hawaii*, 992 F.3d 765, 783

21  (9th Cir. 2021) (quoting *Heller* at 625) ("Courts must look at the "historical understanding of the

22  scope of the right."). Compl. ¶¶ 10, 42-51 (detailing the historical pedigree of self-manufacturing).

23      This right necessarily includes the right to own, possess, and use NFOs and other precursor

24  parts necessary for the construction and thus the exercise of the right to self-manufacture arms in

25  common use for lawful purposes. The Ninth Circuit "and other federal courts of appeals have held

26  that the Second Amendment protects ancillary rights necessary to the realization of the core right to

27  possess a firearm for self-defense." *Teixeira v. County of Alameda*, 873 F.3d 670, 677 (9th Cir.

28  2017); Compl. ¶ 133; *Luis v. United States*, __ U.S. __, 136 S.Ct. 1083, 1097 (2016) (Thomas, J.,

concurring) (quoting *Jackson v. City and County of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014)) ("Constitutional rights thus implicitly protect those closely related acts necessary to their exercise ... The right to keep and bear arms, for example 'implies a corresponding right to obtain the bullets necessary to use them.'"). Much as the right to keep and bear arms "wouldn't mean much without the training and practice that make it effective," *Ezell v. City of Chicago*, 651 F.3d 684, 704 (9th Cir. 2011), the right to self-manufacture arms "wouldn't mean much" without the right to own, possess, and use the constituent parts necessary to engage in such activity—and, of course, the firearm itself as end product of this protected activity—for lawful purposes. Compl. ¶ 134.

While this self-manufacturing right is clear, and State Defendants offer no evidence to the contrary, any question that may exist here must be resolved in favor of sustaining the Complaint.

**C.    The Ban's Categorical Prohibitions Render It Categorically Unconstitutional, and At the Least Subject It to the Strictest Form of Scrutiny**

It is clear that a flat ban on the exercise of conduct guaranteed to law-abiding citizens under the Second Amendment is flatly unconstitutional—full stop. The *Heller* court itself expressly rejected any use of "rational basis" scrutiny for restraints on Second Amendment rights and emphasized that any "judge-empowering interest-balancing inquiry" is inappropriate because the Second Amendment is "the very *product* of an interest balancing by the people" already solidified at the time of the founding, which is not subject to second-guessing based on "future judges' assessments of its usefulness." *Heller*, 554 U.S. at 628, n. 27, 634. And the Ninth Circuit itself has said, at least twice now, "If a regulation 'amounts to a destruction of the Second Amendment right,' it is unconstitutional under any level of scrutiny." *Young v. Hawaii*, 992 F.3d at 784 (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)). It is equally clear that any *severe* burden on such conduct is subject to the strictest form of scrutiny. *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) (quoting *Silvester* at 821) (holding that strict scrutiny must be applied to any "'law that implicates the core of the Second Amendment right and severely burdens that right'").

The Ban here unquestionably *destroys* fundamental guarantees of the Second Amendment for all ordinary law-abiding Nevadans otherwise fully entitled to exercise this bundle of constitutional rights. It declares unlawful, on pain of criminal penalty and a mandate of property dispossession, an entire spectrum of protected conduct along with the full gamut of the related protected property

interests: the acquisition, possession, and use of firearm precursor parts that lack the required serialization, which means *all of them* because the form of serialization required by the Ban is unobtainable; the manufacturing or assembly of any modern operable firearms with any such precursor parts; and the ownership, possession, or use of any such firearms which are manufactured or assembled through such a self-building process—i.e., all those arms that lack the required serialization, which, again, means *all of them* because the required serialization is unobtainable.

State Defendants offer only two meager retorts in addressing the obvious concerns about the breadth of the Ban, both of which ignore or distort the truth about its sweeping reach. First, they say Plaintiffs and the rest of the countless law-abiding Nevadans being treated like criminals can just purchase a *completed* firearm that already contains a serial number imprinted by the manufacturer. MTD at 9. This, of course, ignores the entire point that they have a constitutional right to *self*-manufacture arms in common use for lawful purposes and the Ban *destroys* that right. Second, State Defendants say all these individuals can alleviate their woes by just purchasing NFOs imprinted with the required serial numbers and use those to assemble firearms. MTD at 9. This ignores the reality that such parts are only lawful to acquire, own, possess, or use at all under the Ban if they are serialized as *required by federal law*, illustrating again how the whole statutory scheme is tied to a *non-existent* federal regulatory regime. By its very design, the scheme cuts off all opportunity for ordinary, law-abiding citizens to *lawfully* self-build any firearms unless and until—*if ever*—the federal regulatory scheme is formally modified to require serialization of such precursor parts.

Moreover, underlying both of State Defendants' feeble attempts to mask what's really going on here by pointing to other purported alternatives is their refusal to recognize the fundamental precept solidified in *Heller*: the existence of some other option to the banned activity, even if true, does not and cannot excuse the destruction of the rights being eliminated under the Ban. *Heller*, 554 U.S. at 629 (flatly rejecting the District of Columbia's attempt to justify its handgun ban with the argument that the District had not *also* banned residents from possessing long guns as "no answer"). Whether such individuals may have access to some *other* arms is simply irrelevant.

Thus, under binding Supreme Court and Ninth Circuit precedent, the Ban's *destruction* of core Second Amendment guarantees "is unconstitutional under any level of scrutiny," *Young*, 992

1  F.3d at 784, and at the very least must be seen as *severely* burdening these guarantees so as to require

2  the strictest form of scrutiny, *Pena*, 898 F.3d at 977. This is especially true in an arena where all the

3  supporting allegations must be construed in the light most favorable to the claim being raised.

4  **D.   The Ban Flatly Fails Any Form of Heightened Scrutiny**

5        Because, at the least, it must be said that the Ban severely burdens the fundamental

6  constitutional rights at stake, at the least the State bears the burden of demonstrating that the law "is

7  narrowly tailored to serve compelling state interests" so as to survive strict scrutiny. *In re National*

8  *Security Letter*, 863 F.3d 1110, 1121 (9th Cir. 2017). But, even applying the least stringent forms of

9  heightened scrutiny that *could* be applied to a restraint on core Second Amendment rights, *see Teter*

10  *v. Connors*, 460 F.Supp.3d 989, 1001 (D. Haw. 2020) (*Heller* makes clear that "rational basis is not

11  appropriate" and "some degree of heightened scrutiny applies" to such restraints), the Complaint

12  makes a rock solid case for a clear violation of the Second Amendment.

13       **1.   The Proper Standards of Constitutional Scrutiny**

14        As the Ninth Circuit has explained, we are "guided by First Amendment principles" in

15  analyzing the constitutionality of burdens imposed on the Second Amendment. *Jackson*, 746 F.3d at

16  961. The First Amendment jurisprudence has established at least two forms of heightened scrutiny

17  for restraints on free speech rights that do not trigger strict scrutiny—"exacting scrutiny" and

18  "intermediate scrutiny." "Exacting scrutiny" requires the government to demonstrate a "sufficiently

19  important" governmental interest, and a "substantial relation" between the restraint and that interest

20  "is necessary but not sufficient." *Americans for Prosperity Foundation v. Bonta*, __ U.S. __, 141

21  S.Ct. 2373, 2384 (2021). Rather, "the challenged requirement must be narrowly tailored to the

22  interest it promotes, even if it is not the least restrictive means of achieving that end." *Id.*

23        Similarly, for "intermediate scrutiny," while the law need not be the *least* restrictive means of

24  advancing a "significant" or "important" governmental interest, it must be "narrowly tailored" to

25  achieve that interest. The Supreme Court has repeatedly said this. *See e.g.*, *Packingham v. North*

26  *Carolina*, 137 S. Ct. 1730, 1736 (2017) (the government must show that the law is "narrowly

27  tailored to serve a significant governmental interest" under intermediate scrutiny); *Ward v. Rock*

28  *Against Racism*, 491 U.S. 781, 791 (1989) (Content-neutral restrictions on protected speech survive

intermediate scrutiny if "they are narrowly tailored to serve a significant governmental interest, and ... leave open ample alternative channels for communication of the information."). So has the Ninth Circuit. *See e.g.*, *Doe v. Harris*, 772 F.3d 563, 576-77 (9th Cir. 2014) (quoting the *Ward* opinion in articulating this standard); *Vivid Entertainment, LLC v. Fielding*, 774 F.3d 566, 580 (9th Cir. 2014) ("A statute will survive intermediate scrutiny if it: (1) is designed to serve a substantial government interest; (2) is narrowly tailored to serve that interest; and (3) does not unreasonably limit alternative avenues of communication."); *Minority Television Project, Inc. v. F.C.C.*, 736 F.3d 1192, 1204 (9th Cir. 2013) (quoting *F.C.C. v. League of Women Voters of California*, 468 U.S. 364, 380 ("With this substantial interest in mind, the next question in our intermediate scrutiny analysis is whether the law is '"narrowly tailored to further [that] substantial government interest."').

The focus of this "narrowly tailored" requirement is ensuring the restraint does not burden "substantially more" protected conduct "than necessary" to further the interest. *Pacific Coast Horeshoeing School, Inc. v. Kirchmeyer*, 961 F.3d 1062, 1068 (9th Cir. 2020) (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997)) (we review legislation under "intermediate scrutiny" to see whether it '"advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests"'); *Doe v. Harris*, 772 F.3d at 577 (quoting *Ward*, 491 U.S. at 799) (the test is whether "the means chosen ... 'burden[s] substantially more speech than is necessary to further the government's legitimate interests' "). Further, the government must '"demonstrate that the recited harms are real ... and that the regulation will in fact alleviate these harms in a direct and material way."' *Id.* (quoting *Turner* at 664). To do this, the government must "identify the interests served by the restriction" and "provide evidence" that the targeted conduct "endangers those interests." *United Broth. of Carpenters and Joiners of America Local 586 v. N.L.R.B.*, 540 F.3d 957, 967 (9th Cir. 2008). "Speculation as to what might happen if the proposed activity was allowed is insufficient." *Id.* And, ultimately, the State must prove "each activity targeted within the proscription's scope is an appropriately targeted evil," *Ward* at 799–800, in demonstrating a "reasonable fit," *Board of Trustees of the University of New York v. Fox*, 492 U.S. 469, 480 (1989).

**2.  The Claimed Interest is a Pretextual Justification Resting on a False Narrative**

1    Given the severity of the burden imposed by the Ban—in truth, a *destruction* of core Second

2    Amendment rights—if strict scrutiny is not applied, then "exacting scrutiny," as the next highest

3    form of scrutiny, should be applied. But, even viewing the Ban through the lens of intermediate

4    scrutiny, it cannot stand. First, however "important," "substantial," or "significant" the State's

5    claimed interest may be, it cannot suffice in any event because the slightest inspection reveals it is a

6    disingenuous, indeed pretextual, attempt to justify the law as being something other than what it is.

7    In articulating the State's purported interest in AB 286, State Defendants fundamentally

8    mischaracterize the purpose and function of the law, declaring "AB 286's basic requirement is that

9    functioning firearms be serialized." MTD at 8. They claim that this "basic requirement" serves the

10   interest of addressing the problem of "ghost guns," which "circumvent background checks" and "are

11   virtually impossible to trace if used in a crime," and thus pose "a present and increasing threat to

12   public safety." MTD at 5-6. Thus, they assert, AB 286 is both necessary and effective in ensuring

13   that the State's law enforcement agencies can conduct "background checks" on those who seek to

14   acquire firearms and can "trace" firearms used to perpetrate crimes. MTD at 2, 4-6.

15       If the true purpose and function of AB 286 were to require firearms in the State "be

16   serialized," the State could and would have actually *required* serialization of both the existing self-

17   manufactured firearms and those that would have otherwise been self-manufactured had the Ban not

18   been imposed, instead of *outlawing* all existing self-manufactured firearms and *outlawing* any future

19   self-manufacturing of firearms. Indeed, California and Connecticut are among the small handful of

20   states that regulate self-manufacturing of firearms at all, and they have established mechanisms that

21   permit their citizens to engage in this activity so long as they pass a background check and apply for

22   and obtain a state-issued serial number. Cal. Penal Code §§ 29180(b)(1), 29182(b)(1); C.G.S.A. §§

23   29-36a, 29-36b. These regulatory regimes clearly illustrate the reality that *if* the regulatory purpose is

24   truly intended to require serialization in order to ensure those who manufacture their own firearms

25   are subjected to background checks and that their firearms are subject to "tracing," the State would

26   create a create a mechanism for doing so and then require use of that mechanism as a condition to

27   engaging in lawful self-manufacturing of firearms. In a telling irony for Nevada, a *lawfully* self-

28   manufactured gun in California that *does* bear a State-issued serial number obtained *after* an

PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS PURSUANT TO FRCP 12(B)(6)

1   applicant has completed and passed a State-provided background check is *still* illegal to possess

2   under Nevada's Ban, even though, as a marked gun, it is not any kind of "ghost."[1]

3          Nevada has not only *not* established any sort of mechanism through which its citizens could

4   submit to a background check or obtain a serial number as a condition to lawfully retaining their

5   existing self-built arms or manufacturing any firearms in the future, but it has designed the entire

6   statutory scheme of AB 286 to affirmatively *bar* any opportunity for its citizens to demonstrate they

7   are not "prohibited" persons or to obtain serial numbers to facilitate "tracing" of their self-built

8   firearms. As previously detailed, Nevada has tied the whole scheme to a unobtainable serialization

9   requirement, by outlawing any and all firearm precursor parts, any and all modern operable firearms

10  built with such parts, and any and all manufacturing of such firearms with precursor parts *unless* the

11  proscribed parts or firearms are "required by federal law" to be serialized *and* are in fact so

12  serialized. Nothing in the current federal regulatory scheme *requires* serialization of NFOs that fall

13  within AB 286's sweepingly broad definition of "unfinished frames or receivers." As State

14  Defendants themselves explain, there is, at most, a *proposal* to *change* the regulatory definitions of

15  the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") to require serialization of such

16  "unfinished frames or receivers," because no such requirement exists. MTD at 5. Thus, it is

17  *impossible* to satisfy the statute's own serialization requirement and, for the same reason, the scheme

18  *cannot* achieve the aims that State Defendants claim it is intended to achieve.

19         Just recently, on July 16, 2021, a court in Lyon County, Nevada spotlighted this impossibility

20  of statutory compliance and this impossibility of achieving the claimed statutory aims. In that case,

21  the court issued a preliminary injunction in favor of the Plaintiff who challenged AB 286 as

22  unconstitutional on vagueness grounds, temporarily enjoining the sales prohibition under section 3.5

23  on the basis that the Ban's definition of "unfinished frame or receiver" is unconstitutionally vague.

24  *Polymer80, Inc. v. Sisolak*, 21-CV-00690, Third District Court of Nevada, Order Granting

25

26

27  [1]       Because this case is about the right to self-manufacture firearms, and not about the
    constitutionality of serialization or other firearm marking requirements, the handgun
28  microstamping requirement at issue in the *Pena* case is beside the point. *See* MTD at 9.

Preliminary Injunction ("Polymer80 MPI Order").[2] Along the way, the court addressed State Defendants' claim that "Polymer80, Inc. can simply serialize its products to avoid the harm it will suffer as a result of the enactment of AB 286." *Id.* at 4. The court rejected this argument as "unconvincing" and "belied" by the Ban's language creating an impossible compliance standard:

> Section 3.5 of AB 286 criminalizes the sale of an 'unfinished frame or receiver unless … [t]he unfinished frame or receiver **is required by federal law** to be imprinted with a serial number.' (emphasis added). Thus, unless Federal Law requires the unfinished frame or receiver (whatever that may be) to be imprinted with a serial number, Polymer80, Inc. can find no safe haven under AB 286 by simply placing a serial number on its products that Federal Law does not require.

*Id.* at 4. The same is true of the other sections of AB 286, as each ties compliance to this impossible standard.

Moreover, who knows if or when the *proposal* to change ATF's regulations to expand the definition of "firearm" to include firearm precursor parts, through its own proposed definition of "unfinished frame or receiver,"[3] will ever be formally adopted? In fact, the portions of the Federal Register on which State Defendants rely as support for their position show that ATF has recognized *since at least the 1970s* that "unfinished" frames or receivers have been excluded from the federal regulatory regime, and that for the last several years (since at least 2016) ATF has been monitoring the cases in which courts have strictly interpreted the existing regulations so as to exclude "unfinished" frames or receivers, 86 Fed. Reg. at 27721 & n. 9, 27722. Yet, nothing has changed, indicating a lack of political support or will to actually alter the regulatory scheme as proposed.

Notably too, *even if* the proposed rule were adopted, that would not remove the impossibility bar the State has imposed. The federal regime would *continue* to permit self-manufacturing of firearms for personal use. What State Defendants portray as a "loophole" in the federal law has been the status quo for more than 50 years now—prior to that, there were no such regulations at all—and the proposed new ATF rule continues to preserve an express exception for the building of homemade firearms for personal use. The language of the proposed rule expressly declares that "nothing in this

---

[2]    This order is attached as Exhibit A.

[3]    The state court found that Nevada chose not to adopt the federal definition and that it "presumably did so purposely." Polymer80 MPI Order at 3.

rule would restrict persons not otherwise prohibited from possessing firearms from making their own firearms at home *without markings* solely for personal use (not for sale or distribution)." 86 Fed. Reg. at 27725, 22732 (italics added). That is, people would retain the means to lawfully own, possess, use, manufacture, and/or assemble firearms for personal use, regardless of serialization. In fact, because the federal regulatory regime would *purposefully* continue to permit self-building for personal use, all the barriers that Nevada has erected against the exercise of this right through AB 286 would remain fixed in place because serialization would still not be "*required* by federal law."

For all these reasons, State Defendants cannot deal with the Ban by characterizing it as "a longstanding, presumptively lawful regulation" insulated from judicial review. MTD at 7-8 (citing *Heller*, 554 U.S. at 626-27). Indeed, what they claim is "presumptively lawful" is "a *serialization* requirement." MTD at 8 (italics added). But again, the Ban affirmatively *precludes* people from obtaining serialization (or even a background investigation) as means to lawfully self-build. The refusal to provide any mechanism to comply with the very procedure the State claims is essential to protect the public safety certainly can have *no historic pedigree at all*. A mandate without available means of compliance is not and cannot be presumptively lawful—it is presumptively *un*lawful and a disingenuous means of banning the underlying activity in toto. Any such regulation is necessarily stripped at the outset of any "presumptive" lawfulness it might otherwise hold. *See Pena*, 898 F.3d at 1009-1010 (quoting *Heller II*, 670 F.3d 1244, 1253 (D.C. Cir. 2011)) (observing that, like all legal presumptions, this presumption is rebutted upon a showing that "'the regulation does have more than a de minimis effect on [plaintiff's] right'"). Additionally, governmental restraints on the exercise of the right to self-manufacture firearms simply are not "longstanding" at all. They are instead of very recent advent among the small handful of states that do impose such restrictions.[4]

Because it rests on a false and misleading narrative about the Ban's purpose and effect, State

---

[4]     According to Plaintiffs' research, only six other jurisdictions regulate self-manufacturing of firearms, and they began doing so only within the last few years: California (Stats. 2016, c. 60 (A.B.857), § 4, eff. Jan. 1, 2017); Connecticut (2019, P.A. 19-6, § 2, eff. Oct. 1, 2019); New Jersey (L.2019, c. 165, § 3, eff. July 16, 2019); Hawaii (2019 HI H.B. 2744); Rhode Island (2020 R.I. HB 7102); and the District of Columbia (Apr. 27, 2021, D.C. Law 23-274, § 201(b), 68 DCR 1034).

1    Defendants' claimed interest in the Ban simply cannot be deemed an "important," "substantial," or

2    "significant" state interest and thus the Ban necessarily fails any form of heightened scrutiny.

3              **3.  The Ban's Destructive Sweep is Far Broader Than Could Ever Be Tolerated**

4              Even assuming State Defendants have carried their initial burden of articulating a legitimate

5    governmental interest behind the Ban, their Ban still necessarily fails any form of heightened

6    scrutiny for a clear absence of the required tailoring—much less *any* tailoring at all. Even continuing

7    to apply the most lenient form of heightened scrutiny, to carry their tailoring burden under

8    intermediate scrutiny, State Defendants must show (1) the Ban does not burden "substantially more"

9    protected conduct "than necessary" to further the claimed interest, *Kirchmeyer*, 961 F.3d at 1068, (2)

10   "the recited harms are real," *Doe*, 772 F.3d at 577, and (3) "the regulation will in fact alleviate these

11   harms in a direct and material way," *id.* State Defendants torpedo their own case on the first

12   requirement with their disingenuous claim that AB 286 is all about ensuring serialization of self-

13   manufactured firearms, while at the same time making it *impossible* for any ordinary law-abiding

14   Nevadan to obtain the serialization required to comply with the law and advance its supposed

15   purposes. Any such scheme pushed forward on the basis of this claimed interest necessarily burdens

16   "substantially more" protected conduct "than necessary"—a reality underscored by the regulatory

17   schemes in California and Connecticut, which actually establish mechanisms for background checks

18   and serialization in providing a realistic pathway to the lawful self-manufacturing of firearms.

19             State Defendants have also failed to carry their burden of showing "the recited harms are

20   real." At the outset, it must be borne in mind that the mere propensity for or existence of some

21   misuse of a protected arm cannot suffice as a reason to ban or severely restrict its availability for

22   lawful purposes. Were it otherwise, the handgun ban in *Heller* and stun gun ban in *Caetano* could

23   have been upheld. They had to fall *despite* the propensity for misuse of these arms for the simple, yet

24   fundamental reason that they are in common use for lawful purposes and are not "dangerous" or

25   "unusual" in the *constitutional* sense. *See Heller*, 554 U.S. at 682 (Souter, J., dissenting) (Justice

26   Souter advocated *for* the ban by emphasizing that handguns "specially linked to urban gun deaths

27   and injuries," and "are the overwhelmingly favorite weapon of armed criminals"); *id.* at 628 (the

28   majority still struck down the ban because what mattered was that this weapon is "overwhelmingly

1   chosen by American society" for lawful self-defense purposes). The same is true here: the mere fact

2   that *some* people may seek to misuse self-manufactured arms, "circumvent" background checks, or

3   avoid law enforcement detection with "ghost guns" simply cannot serve as a justification to ban the

4   whole class of arms and the full spectrum of protected self-manufacturing activities.

5        Further, the only actual data State Defendants cite in support of their claim that AB 286

6   combats a "present and increasing threat to public safety" consists of references to two pages of the

7   Federal Register where the ATF has compiled information about this supposed "ghost gun"

8   phenomenon. State Defendants portray this "evidence" as establishing that "[l]aw enforcement

9   agencies recovered nearly 24,000 ghost guns at crime scenes between 2016 and 2020," and "that

10  number has been increasing every year." MTD at 5 (citing 86 Fed. Reg. at 27722-23). But, as the

11  ATF's own reference list shows, this information was drawn solely from newspaper and media

12  publications, like the Baltimore Sun, the Wall Street Journal, NPR, and CBS News, which

13  supposedly documented instances of crime involving "ghost guns" in a handful of other states, based

14  on unknown and unidentified sources. 86 Fed. Reg. 27722 n. 17. Such hearsay information is clearly

15  not a proper subject of judicial notice. *U.S. v. Ritchie*, 342 F.3d 903, 908-09 (9th Cir. 2003) ("Courts

16  may only take judicial notice of adjudicative facts that are 'not subject to reasonable dispute.'

17  Fed.R.Evid. 201(b). Facts are indisputable, and thus subject to judicial notice, only if they are either

18  'generally known' under Rule 201(b)(1) or 'capable of accurate and ready determination by resort to

19  sources whose accuracy cannot be reasonably questioned' under Rule 201(b)(2).").

20       While State Defendants portray ATF's statements here as declarations about the number of

21  "ghost guns" found at *actual* crime scenes, ATF itself only described the scenes as "*potential* crime

22  scenes," acknowledging that "*ATF does not know if the firearm being traced by the law enforcement*

23  *agency was found at a crime scene as opposed to one recovered by them that was stolen or*

24  *otherwise not from at the scene of a crime.*" 86 Fed. Reg. 27722 n. 18 (italics added). Thus, the

25  24,000 "ghost guns" purportedly "recovered" represent nothing more than additional evidence of the

26  growing popularity of the self-built arms.  Moreover, while State Defendants cite reports of the

27  Department of Homeland Security concerning its intention to conduct annual threat assessments of

28  "ghost guns" in connection with acts of domestic terrorism, MTD at 5, they overlook the unfavorable

aspects of it. A supplemental report published by other members of the same committee argued that "[a]vailability is not the issue" when it comes to "ghost guns," because what matters is "the intent and actual usage of the devices," and the decision to conduct annual threat assessments concerning such devices "ignores the lack of evidence that ghost guns are being used in terrorist acts." H.R. Rep. No. 116-88, Part 2, at 2. Further, the "overly broad definitions in this bill will unfairly associate the legal acts of lawful gun owners, hobbyists, and gunsmiths with acts of terrorism." *Id.*

Whatever limited evidentiary value this information might have, *none* of it concerns the situation within *Nevada*. And this goes to the third tailoring requirement—that "the regulation will in fact alleviate [the claimed] harms in a direct and material way." *Doe*, 772 F.3d at 577. State Defendants cannot carry this aspect of the burden either because the evidence of the public safety threat on which they rely as the supposed aim of the Ban is simply too attenuated from those actually impacted by the Ban. The State has not even attempted to show any of the numerous law-abiding citizens directly targeted by this law has ever misused, much less committed any crime of violence with, any self-built firearm or firearm component, so as to somehow justify dispossessing them of all such firearms and firearm parts and prohibiting them from exercising their fundamental right to possess, use, and self-manufacture protected arms. To the contrary, the strong opposition in the legislative history of AB 286 starkly illustrates that the Ban impacts "tens of thousands" of law-abiding gun owners in Nevada who have only ever exercised and only ever intend to exercise the self-manufacturing right for self-defense and other lawful purposes. *See e.g.*, https://www.leg.state.nv.us/App/NELIS/REL/81st2021/ExhibitDocument/OpenExhibitDocument?exhibitId=53373&fileDownloadName=AB%20286_Opposition%20Statement_Randi%20Thompson_Nevada%20Firearms%20Coalition%20PAC.pdf (Statement of Nevada Firearms Coalition); https://www.leg.state.nv.us/App/NELIS/REL/81st2021/ExhibitDocument/OpenExhibitDocument?exhibitId=53350&fileDownloadName=AB%20286_Opposition%20Statement_Raymond%20Sherwood_Big%20Daddys%20Fireams%20Training.pdf (Statement of Raymond Sherwood).

Nevada *already* regulates the entire gamut of *prohibited* persons with its existing laws that criminalize possession by every class of individual whose use or possession of a firearm could conceivably pose a danger to themselves or others. Nev. Rev. Stat. Ann. §§ 202.300, 202.360. State

1    Defendants have not, and cannot, show the Ban is *at all* necessary to alleviate the public safety

2    concerns it claims to be addressing about self-built firearms in the hands of would-be wrongdoers,

3    much less that it will *in fact* alleviate those harms in a *direct and material way*. And, to whatever

4    extent the Ban may operate to deter such conduct, the fact is, it unquestionably sweeps in

5    "substantially more" protected conduct "than necessary" to further the claimed interest. Again, State

6    Defendants must prove with *evidence* that "each activity targeted within the proscription's scope is

7    an appropriately targeted evil." *Ward*, 491 U.S. at 799–800. They have not even come close in

8    pressing their disingenuous defense of the Ban with their false narrative about its purpose and effect.

9    Citing to the non-binding opinion of the Third Circuit in *United States v. Marzzarella*, 614 F.3d 85

10   (3d Cir. 2010), *see* MTD at 9-10, is of no help to State Defendants. *Marzzarella* involved a challenge

11   to the federal prohibition of possessing firearms with *defaced* serial numbers, under 18 U.S.C. §

12   922(k). That is a world removed from a ban on the full spectrum of constitutionally protected

13   conduct and property interests involved in self-manufacturing firearms for lawful purposes under a

14   scheme that makes it *impossible* to comply with the statute's own serialization requirement.

15       For all these reasons, Plaintiffs' claim that the Ban violates the Second Amendment is

16   strong—indeed meritorious. Surely then, it survives the lenient standard of review which permits

17   dismissal under Rule 12(b)(6) *only* if "it appears beyond doubt that the plaintiff[s] can prove no set

18   of facts in support of [their] claim which would entitle [them] to relief." *Geraci*, 347 F.3d at 75.

19       **V.   Any Taking of This Valuable Protected Property Compels Just Compensation**

20       The Takings claim also stands on solid ground against any attempt to dismiss it.

21   **A.   The Complaint States a Strong Case of an Actionable Takings Claim**

22       At the outset, State Defendants cannot just sweep all this under a rug by trying to relegate the

23   entire class of affected individuals to state court inverse condemnation proceedings. MTD at 10.

24   Fundamentally, the cases on which State Defendants rely here do not involve a taking of property

25   interests protected under separately enumerated *federal* constitutional rights; they concern property

26   rights created and protected under state law alone. *Knick v. Township of Scott*, 139 S. Ct. 2162, 2168

27   (2019) (concerning real property in Pennsylvania); *McCarran Int'l Airport v. Sisolak*, 137 P.3d

28   1110, 1114 (Nev. 2006) (concerning air space above real property in Nevada). Indeed, even though

1    the property at issue in the *Knick* was not separately protected under an enumerated federal

2    constitutional right, unlike the property rights at stake here, the Supreme Court still applied the

3    fundamental due process principle that "[a] property owner has an actionable Fifth Amendment

4    takings claim when the government takes his property without paying for it." *Knick* at 2167.

5           This fundamental right to due process of law takes center stage here with the Ban's mandate

6    that all ordinary law-abiding Nevadans dispossess themselves of all "unfinished frames or receivers"

7    (and the many other NFOs that fall within the Ban's sweepingly broad definition of this term) that

8    lack the required but unobtainable serialization requirement, as well as all modern operable firearms

9    manufactured with such parts (or render them useless), without any compensation.

10          Beyond this, the essential thesis of State Defendants' claim that no compensation at all is

11   required for the forced dispossession of the countless homemade firearms and components targeted

12   by the Ban rests on the notion that the State can treat all such objects as "dangerous private property"

13   subject to complete destruction under the government's "police powers." MTD at 10 (citing *Guedes*

14   *v. ATF*, __ F.Supp.3d __ (D.C. Cir. 2021), 2021 WL 663183). Yet, this in stark contrast to their

15   position concerning the Second Amendment claim, in which context they have not even attempted to

16   claim, much less show, the homemade firearms and components at issue are either "dangerous" or

17   "unusual"—let alone both—so as to be stripped of constitutional protection. That the State provides

18   no viable means of making the existing property "safe" in the way the State says it must be—i.e.,

19   having it serialized so as to remove the supposed nuisance—illustrates that the problem is not with

20   the property itself, but with the restrictive regulatory regime that literally makes it impossible to

21   comply with the stated aims of the law. This is no basis for invoking a public safety exception to the

22   Takings Clause. It is equivalent to forbidding a homeowner from installing noise abatement

23   technology on his or her vehicle and then claiming that the noisy car is now a nuisance.

24          Moreover, it is axiomatic that private property interests cannot be taken without

25   compensation on "nuisance" grounds unless the property or its intended use was clearly established

26   as a nuisance *before* the taking. "[R]egulations that prohibit all economically beneficial use" of

27   property "cannot be newly legislated or decreed (without compensation), but must inhere in the title

28   itself, in the restrictions that background principles of the State's law of property and nuisance

already place upon land ownership." *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1029 (1992). That is, nuisance takings are proper only when the property or its intended use has *historically* been understood as prohibited, because only then can it be fairly said the property owner lacks investment-backed expectations. *Id.* at 1030; *Cedar Point*, 141 S.Ct. at 2079 (italics added) ("For example, the government owes a landowner no compensation for requiring him to abate a nuisance on his property, because *he never had a right to engage in the nuisance in the first place*."). The property interests at stake here—common-use firearms and their constituent parts owned, possessed, used, and self-manufactured for lawful purposes—have never been *until now* deemed a "nuisance" injurious to the public in Nevada, nor could they ever be properly classified as such.

**B.   Due Process Compels Just Compensation for This Taking**

The settled law is clear: the government must provide just compensation for any "physical invasion" of private property interests. *Cedar Point Nursery v. Hassid*, ___ U.S. ___, 141 S.Ct. 2063, 2074 (2021) ("government-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation"). This is true whether the invasion involves a classic exercise of eminent domain powers, an occupation or possession (even temporarily or intermittently), or "a regulation [that] results in a physical appropriation of property." *Id.* at 2071–2072. A regulation has this effect when it effectively deprives the owner of "all economically beneficial us[e]' of [their] property." *Lingle v. Chevron, U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992)). A "regulatory" taking having such effect is no different than a "physical" taking, as it requires compensation *per se*. *Cedar Point* at 2072 (the "regulatory taking" label "can mislead" in this context because the more lenient *Penn Central* test for less invasive regulations "has no place").

As asserted in the Complaint, the numerous modern operable firearms, and the unfinished frames, receivers, and NFOs possessed as constituent parts of the same, targeted by the Ban were previously owned, possessed, used, and manufactured for self-defense and other lawful purposes, but are now subject to dispossession or permanently disabling by no later than January 1, 2022. Compl. ¶ 144. Yet, for the very reason of these investment-backed expectations, borne out of Nevada's own prior law under which all these individuals were permitted to acquire and use these arms and parts,

1    this property has substantial value to all those now being forced to comply with the Ban, including

2    Plaintiffs and all similarly situated Nevada resident FPC members who have come to rely on their

3    existing self-built arms for lawful purposes and on their ability to self-manufacture additional such

4    arms with constituent parts that they currently possess or may later acquire. Compl. ¶ 144, 156.

5         Indeed, while Nevada has suspended the criminal sanctions for selling such firearms and

6    "unfinished frames or receivers" until January 1, 2022, so that ordinary law-abiding citizens can

7    "sell or dispose of them" before that date, a sale of these firearms or their constituent parts is no

8    realistic option in Nevada, particularly since such items are now banned from the hands of all

9    ordinary law-abiding citizens throughout the State. Presumably, many licensed firearms dealers will

10   refuse to purchase or otherwise accept for sale any such products given the potential risks and

11   uncertainties in dealing with legally banned firearms and firearms products, particularly when these

12   arms and parts cannot be brought into compliance with the Ban's impossible-to-satisfy serialization

13   requirement. Compl. ¶ 145. Further, whatever limited market may exist for the sale of such outlawed

14   items, anyone forced to sell under such a legal compulsion surely will not garner the fair market

15   value of these otherwise valuable and popular firearms and constituent components. Compl. ¶ 146.

16   "A 'sale' implies willing consent to the bargain. A transaction although in the form of a sale, but

17   under compulsion or duress, is not a sale." *Dore v. U.S.*, 97 F.Supp. 239, 224 (Ct. Cl. 1951). The

18   Ban has destroyed or significantly diminished the value of the property to any would-be purchasers

19   and has thus destroyed the very market to which it has relegated the affected citizens.

20        Selling out of state is not a reliable alternative either given the restraints on sales under

21   *federal* law. First, while the federal scheme does not require serialization of "unfinished" frames or

22   receivers, it *does* require serialization of *completed* firearms or *finished* frames or receivers before

23   the point of sale. 18 U.S.C. § 921(a)(3)(*i*); 27 C.F.R. § 478.92(a)(1) & (a)(2). Anyone attempting to

24   sell such arms or parts lacking serial numbers, including licensed dealers like Plaintiff Moxley, thus

25   bears the risk of running afoul or being accused of running afoul of this basic requirement for

26   commercial sales. Second, in addition to the serialization problem, any unlicensed person engaging

27   in the sale of self-built arms runs the risk of violating, or being accused of violating, the ATF

28   regulations requiring everyone "engaged *in the business*" of manufacturing firearms to obtain a

license. https://www.atf.gov/firearms/qa/can-individual-now-manufacture-these-firearms-and-sell-them. Third, federal law also regulates all firearm sales to anyone out of state, generally prohibiting any such sales by any unlicensed person. 18 U.S.C. § 922(a)(5) (it is generally unlawful for anyone (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) "to transfer, sell, trade, give, transport, or deliver any firearm to any person" (other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector) "who the transferor knows or has reasonable cause to believe does not reside in … the State in which the transferor resides.").

Consequently, the Ban completely deprives the affected property owners of "all economically beneficial us[e]' of [their] property," and causes them to "suffer a permanent physical invasion of their property interests," effecting a taking *per se*. *Lingle*, 544 U.S. at 538.

For all the same reasons, even assuming this situation does not rise to the level of a taking *per se*, it is still one requiring compensation under the *Penn Central* factors, because the economic impact on this valuable constitutionally protected property is substantial, the extent of interference is great, and the character of the governmental action is in the general nature of a government-imposed invasion of property interests so as to compel compensation consistent with the spirit and purpose of the Takings Clause. *See Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978).

Dated: August 9, 2021

THE O'MARA LAW FIRM, P.C.

/s/ David C. O'Mara
DAVID C. O'MARA, ESQ.
311 E. Liberty Street
Reno, NV 89501
Tel: 775.323.1321
david@omaralaw.net

FIREARMS POLICY COALITION

/s/ Adam Kraut
ADAM KRAUT, ESQ.
1215 K Street 17th Floor
Sacramento, CA 95814
916.596.3492
akraut@fpclaw.org

Dated: August 9, 2021

THE DIGUISEPPE LAW FIRM, P.C.

/s/ Raymond M. DiGuiseppe
RAYMOND M. DIGUISEPPE
4320 Southport-Supply Road, Ste 300
Southport, NC 28461
910.713.8804
Law.rmd@gmail.com

FIREARMS POLICY COALITION

/s/ William Sack
WILLIAM SACK, ESQ

**CERTIFICATE OF SERVICE**

1       I hereby certify that I am an employee of The O'Mara Law Firm, P.C. and on this date, the

2   foregoing document was filed electronically *via* the Court's ECF system which provided notification

3   of such filing to counsel of record for all parties.

4   Dated: August 9, 2021                              _____/s/ Bryan Snyder_____

5                                                              BRYAN SNYDER

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS PURSUANT TO FRCP 12(B)(6)

1

**INDEX OF EXHIBITS**

2

| Exh No. | Description | Pages |
|---|---|---|
| 1 | *Polymer80, Inc. v. Sisolak*, 21-CV-00690, Third District Court of Nevada Order Granting Preliminary Injunction | 5 |

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS PURSUANT TO FRCP 12(B)(6)