```
 1                  UNITED STATES DISTRICT COURT
                        DISTRICT OF NEVADA
 2   BEFORE THE HONORABLE MIRANDA M. DU, CHIEF DISTRICT JUDGE
                          ---o0o---
 3

 4   Roger Palmer, Chad        :
     Moxley, Firearms Policy   :
 5   Coalition,                :
                               :  No. 3:21-cv-268-MMD-CSD
 6           Plaintiffs,       :
                               :
 7      -vs-                   :  July 16, 2021
                               :
 8   Stephen Sisolak, Aaron    :
     Ford, George Togliatti,   :  United States District Court
 9   Mindy McKay, Joseph       :  400 S. Virginia Street
     Lombardo, et al.,         :  Reno, Nevada  89501
10                             :
                Defendants.    :
11   _____:


12

            TRANSCRIPT OF MOTION HEARING
13

14   A P P E A R A N C E S:

15   FOR THE PLAINTIFF:           Raymond DiGuiseppe
                                   David O'Mara
16                                 Adam Kraut
                                   William Sack
17                                 Attorneys at Law

18   FOR STATE DEFENDANT:         Jeffrey Conner
                                   Attorney at Law
19
     FOR CLARK COUNTY DEFENDANT:  Nicholas Crosby
20                                 Attorney at Law

21   FOR DOUGLAS COUNTY DEFENDANT: Zachary Wadle

22
     Proceedings recorded by mechanical stenography produced
23   by computer-aided transcript

24
     Reported by:                 KATHRYN M. FRENCH, RPR, CCR
25                                 NEVADA LICENSE NO. 392
                                   CALIFORNIA LICENSE NO. 8536
```

1          Reno, Nevada, Friday, July 16, 2021, 1:30 p.m.

2                          ---oOo---

3

4     ****ZOOM CONFERENCE EXPERIENCING AUDIO INTERRUPTIONS

5               THROUGHOUT THE PROCEEDINGS***

6

7          THE CLERK:  3:21-civil-268-MMD-WGC,

8  Roger Palmer, et al. versus Stephen Sisolak, et al.

9          Present by video conference for plaintiff

10 are David O'Mara, Raymond DiGuiseppe, Adam Kraut, and

11 William Sack.

12          Present for the State defendants,

13 Jeffrey Conner.

14          Present for the Clark County defendants,

15 Nicholas Crosby.

16          Present for Douglas County defendants,

17 Zachary Wadle.

18          THE COURT:  All right.  Good afternoon,

19 counsel.

20          For the record, I have reviewed the Motion

21 For Preliminary Injunction, which is ECF number 6; and,

22 really, the main substantive Response from the State

23 defendants, ECF number 31; and the Reply brief, ECF

24 number 40.  I also skimmed through the brief Response

25 from the County defendants, basically deferring to the

1   State defendants.

2            I don't have any questions on the arguments

3   relating to the Takings Clause Claim, so I want counsel

4   to focus on the Second Amendment Claim.  And with

5   that, I'll hear arguments, first, from counsel for the

6   plaintiff.

7            MR. DIGUISEPPE:  Good afternoon, Your Honor.

8   This is Ray DiGuiseppe on behalf of the plaintiffs.

9            First of all, thank you for accommodating

10   us with the Zoom feeds, that makes it much more

11   convenient.  We appreciate that.

12            And just to start off, and to be clear,

13   as indicated in the briefing, this isn't a case about

14   firearms (audio interruption) and background checks.

15   No one asked any of the tens of thousands of law

16   abiding, responsible gun owners in Nevada to submit

17   to a background check or apply for a serial number for

18   (audio interruption) --

19            THE COURT:  I'm sorry.  The court reporter

20   is saying that you are dropping out periodically, so

21   you need to make sure you speak into your speaker

22   and slow down.  If you're reading, you need to slow

23   down because the court reporter will not be able to

24   transcribe if you're reading too fast.

25            MR. DIGUISEPPE:  Sure.  No problem.

1          I just was saying that there was not an

2     opportunity for anyone to submit to a background check

3     or apply for a serial number -- can you hear me better?

4     Just to be sure.

5               THE COURT:  Yes.

6               MR. DIGUISEPPE:  Okay.  Great.

7               -- which would have actually achieved the

8     interests the State is indicating that it is advancing

9     through AB-286.  The State just banned the full spectrum

10    of activity and protected property interests associated

11    with the process of self-manufacturing firearms; while,

12    on the other hand, affirmatively precluding the ability

13    of law abiding Nevadans to comply with the various

14    systems the State says are being evaded through this

15    process.

16              THE COURT:  But AB-286 does not ban

17    the possession of all firearms, right?  It leaves

18    alternative channels for possession of firearms,

19    legally, for self-defense purposes.  For example,

20    serialized firearms, am I right?

21              MR. DIGUISEPPE:  A person could acquire a

22    serialized firearm from a licensed seller of firearms,

23    that's correct, but what we have here is an entire class

24    of arms which have already been recognized as lawful

25    under State law, and constructed and possessed and

1   used as such (audio interruption) in unlawful, and not

2   allowing anyone to continue with manufacturing of such

3   arms in the future, all tied to a statutory scheme,

4   which is based upon a requirement that any such further

5   self-manufacturing or possession of parts has to be in

6   compliance with a serialization process that does not

7   exist and may never exist until, effectively --

8                   THE COURT:  But does --

9                   MR. DIGUISEPPE:  Sorry?

10                  THE COURT:  -- the State have to include a

11  mechanism for serialization with the ban?

12                  MR. DIGUISEPPE:  I think if it's a ban -- I

13  don't think that a ban is permissible in this sense.

14  This reaches far, far greater -- has a far greater

15  reach than any other type of restriction of this (audio

16  interruption) and there aren't very many.

17                  As far as whether there has to be an avenue,

18  I think there, absolutely, does because otherwise you're

19  talking about a situation where the activity itself of

20  manufacturing firearms and being able to possess and

21  use those arms -- which is all protected by the Second

22  Amendment -- is absolutely forbidden.  And that is not

23  permissible unless there's some means by which people

24  are able to comply with the stated interest.  If the

25  stated interest is we want to ensure that everything

```
 1   is serialized, either through tracing, so we can have
 2   background checks and know who has all guns, they can do
 3   that.  There are ways in which they can achieve that,
 4   like other states who impose such regulations and are
 5   put in place to allow people to continue with this
 6   protected process (audio interruption) manufacturer
 7   without --
 8            THE COURT:  I'm sorry.  The court reporter
 9   is saying that she is not able to understand you again.
10   Would you repeat your last statement.  And maybe,
11   perhaps, you're moving around somewhat, if you could
12   just try to get closer to your microphone.
13            I haven't had any issue like this in other
14   video conferencing hearings.  So, let's try this.  It
15   may be that I have to get you on  the phone instead.
16            MR. DIGUISEPPE:  All right.  I'll try to
17   just to speak louder, if I can.
18            Is that better?
19            THE COURT:  I'm sorry.  Give me just one
20   moment.
21            What is it, Kathy.
22            THE COURT REPORTER:  It's not that he needs
23   to be louder.  He just needs to slow down because he
24   drops off and he is mumbling and I can't understand what
25   he is saying.
```

1          THE COURT:  So, you also -- she is asking

2    you to slow down slightly because you tend to drop

3    off at the end of your sentence, too, which makes it

4    more difficult to hear.

5          MR. DIGUISEPPE:  Okay.  All right.  I will

6    do so.

7          So, I think as far as whether there needs

8    to be some avenue through which to allow people to

9    continue with the process of self-manufacturing arms,

10   I think that there must be.  A State cannot just simply

11   ban all of the protected conduct that's associated with,

12   with manufacturing firearms for lawful purposes, and

13   allow for no means to comply with the stated interests.

14   I think it's really important to pay attention

15   and notice that the stated interest is, in fact,

16   serialization for traceability purposes and background

17   checks to identify and know who has what firearms.

18   And to the extent that that is the only stated interest,

19   the State has to be able to show that they can't achieve

20   that through some other reasonably (indecipherable)

21   tailoring means.  And an absolute ban is simply not

22   constitutionally permissible.  Whichever test that

23   we happen to apply, I mean there's no tailoring,

24   essentially, at all, when  you have a situation like

25   that.

1           THE COURT:  Well, if I agree, and I think

2    that the -- assuming that the AB-286 burden conduct

3    protected under the Second Amendment, I think that

4    intermediate scrutiny applies, and under that test the

5    State just has to articulate a significant interest

6    that -- and a reasonable fit between the challenged law

7    and the asserted objective.  I mean, the case law in the

8    Ninth Circuit is clear that the State does not have to

9    adopt the least restrictive means, and so that's why I

10   asked, under that framework, is the State required to

11   have a means for serialization?  Within that framework,

12   is what I'm looking for.

13           MR. DIGUISEPPE:  I understand.

14           Within the framework of the intervening

15   scrutiny test as recognized by the Ninth Circuit itself,

16   and the Supreme Court, clearly, the difference between

17   strict scrutiny and intermediate scrutiny is the nature

18   of the State's interest, whether it has to be compelling

19   or important.  And the major difference, then, is

20   just that.  Beyond that, they both have to be narrowly

21   tailored.  And in a situation like this, there's not

22   any form of tailoring when the conduct and the property

23   is just outright banned.  That is not going to survive

24   even under the most lenient form of intermediate

25   scrutiny, which, as the Supreme Court has repeatedly

1   said, requires that there be a narrow -- a narrow

2   tailoring.  It's got to be in reasonable proportion with

3   the interests being served.  There's closely drawn

4   without an unnecessary abridgement.  And if the focus,

5   again, of the State interest is "want to ensure

6   serialization or traceability purposes," and we want

7   to ensure that we know who is getting these through

8   background checks, there's no reason why it could not

9   have allowed for some mechanism through which to

10  permit people to do so.  Because the alternative is,

11  essentially, a ban, as Your Honor previously made

12  reference to.  That's absolutely right.  It is a ban.

13  And a ban of these rights is simply not permissible.

14  And that is just considering things under the

15  intermediate scrutiny test, which I understand Your

16  Honor feels may be applicable.  And of course we have

17  other tests that we could look to.  In the context of a

18  total ban situation, we would say that the first place

19  to look is the "common use" test that is articulated

20  through and supported by Heller.  And that, alone,

21  wouldn't allow anything like this to stand because

22  of the -- it's not even just a severe burden.  It's a

23  ban on the protected conduct.

24          The alternative of being able to acquire, as

25  Your Honor referred to previously, a serialized firearm

 1    through another means, again, that is making the other

 2    options type argument that Heller itself rejected.  The

 3    ability to be able to acquire the arm through another

 4    means, is not an answer.  It's not an answer to a ban.

 5            And so just under Heller alone, you would

 6    have a categorical problem, in that it would have to be

 7    considered something that is just impermissible under

 8    any test.  Ninth Circuit law would confirm that as well,

 9    in being that anything that severely burdens a right is

10    going to be subject to scrutiny.  Although, again, even

11    if we're not in strict scrutiny territory and we're

12    just looking at immediate scrutiny, the difference only

13    is the nature of the interest.  Whether it's legitimate

14    or whether it's important or compelling, it still has

15    to be narrowly tailored.  And a ban, along with full

16    spectrum of the activity, is in all other property

17    interests associated with it, it's simply not anything

18    that could be ever considered tailored.

19            THE COURT:  Thank you.

20            Let me hear from the State defendants

21    counsel.

22            MR. CONNER:  Good afternoon, Your Honor.

23    Jeffrey Conner on behalf of the State defendants.

24            Can you hear me okay?

25            THE COURT:  For now I can.

1          MR. CONNER:  Okay.  If there's any problems,

2     let me know.  I'll try to speak slow and clear so that

3     you can hear me.

4          To begin with, where I depart from my

5     opponent's position is that he begins by just assuming

6     that the conduct at issue in this case is protected by

7     the Second Amendment.  What we know from looking at

8     the Ninth Circuit's case law, as well as case law from

9     various other circuits throughout the country, courts

10    have imposed a two-step framework for addressing Second

11    Amendment challenges to State laws, like the law that's

12    at issue in this case.

13         The first step is looking at whether or not

14    the regulation is a burden on protected Second Amendment

15    conduct.  And in <u>Heller</u>, the Supreme Court was very

16    clear that the protected con -- or the protected rights

17    under the Second Amendment is the right to self-defense,

18    and the right to defense of hearth and home.  There is

19    no showing here, whatsoever, that these regulations have

20    any substantial burden or substantial impact on the

21    plaintiff's ability to own a handgun, or any other

22    weapon that they can lawfully own, for purposes of

23    self-defense within the home.  And so I don't --

24         THE COURT:  Well, they cannot own a firearm

25    that's not serialized, under AB-286, for self-defense in

1    the home.

2              MR. CONNER:  Correct, Your Honor, but

3    that is -- I disagree with the sense that that is a

4    categorical ban that prevents them from exercising their

5    Second Amendment rights.

6              The argument, here, is simply that they

7    have a right to self-manufacture a firearm.  And that's

8    really the right that they're trying to enforce here,

9    but there's no recognition under the Second Amendment,

10   historically, that there's a right to self-manufacture

11   a firearm.

12             THE COURT:  So is the argument under the

13   first step that the historical records here support a

14   ban on unserialized firearms?

15             And the reason I ask is it seems like the

16   State defendants may be collapsing two analysis under

17   Heller.  Because if the argument is the Court looks to

18   historical records, I think that the Young decision,

19   the en banc Young decision by the Ninth Circuit that

20   was issued this year, is really instructive on the types

21   of historical records that the Court is required to

22   review under that analysis.  And I don't think the

23   State offers anything close to that.

24             MR. CONNER:  So I would note, Your Honor,

25   that at page 10 of the opposition, we do cite the Fifth

1    Circuit case, the NRA case out of the Fifth Circuit, for

2    acknowledging -- that case acknowledged longstanding,

3    legitimate limitations going back to the colonial era,

4    addressing limitations on -- or recordkeeping on who

5    possessed firearms, and having bans on certain persons

6    that could own a fire -- or possess a firearm.  So,

7    there is a link to longstanding, historical limitations

8    of this nature that demonstrate that the right that

9    they're really trying to protect here, which is the

10   right to self-manufacture a firearm, falls outside the

11   scope of the Second Amendment.

12           Now, even if the Court were to disagree with

13   me on that, though, I -- you -- moving on, if there is

14   Second Amendment conduct here, or a conduct here that is

15   protected by the Second Amendment, you move on to the

16   "means ends" test and identify the appropriate level

17   of strict scrutiny -- or not strict scrutiny.  The

18   appropriate level of "means ends" scrutiny here.  And

19   the default rule is intermediate scrutiny and, under

20   that test, as Your Honor noted, the State merely needs

21   to identify a significant substantial or important

22   interest, and that there is a reasonable fit between

23   the State law and that interest.  And as my opponent

24   acknowledged here, that these laws support two very

25   important State limitations on possession of firearms,

1   which is, on the front end of the transaction, is making

2   sure that prohibitive persons do not obtain a firearm;

3   and, on the back end, it helps in -- with prosecution of

4   crime and tracking guns for purposes of prosecuting gun

5   crime.

6           THE COURT:  So let me try to dissect that.

7               In the front end, why doesn't the State just

8   adopt background check requirements as the plaintiff

9   advanced here?

10          MR. CONNER:  Well, Your Honor, I think that

11  that is a -- that would potentially get into a strict

12  scrutiny analysis.  I don't think we even get to the

13  means end scrutiny.  But under the immediate scrutiny

14  test, there is not a requirement that we, uh, have a

15  least restrictive -- there's not a least restrictive

16  means test under the strict scrutiny.  It just has to

17  be a reasonable fit.  And so -- it looks like Your Honor

18  has a question so I'll --

19          THE COURT:  No, no.  Just finish.  Have you

20  finished your answer?

21          MR. CONNER:  Well, so there doesn't have

22  to be a perfect fit between the, you know, the most

23  restrictive way for the State to achieve this under

24  immediate scrutiny.

25          THE COURT:  What about the -- on the

1   back-end, as you described it, with respect to tracing

2   the firearm to a crime?  Do you want to respond to the

3   plaintiff's argument in their reply that that doesn't --

4   there's no explanation as to how that reduced threats

5   to public safety?

6           MR. CONNER:  It absolutely does, Your Honor.

7   It aids law enforcement in prosecuting crime and being

8   able to track ownership of guns.  And when where, when

9   guns that were used to commit a crime on the street,

10  where that gun came from.

11          THE COURT:  The State is not arguing that

12  the firearms here fall within the dangerous and unusual

13  category that is discussed under Heller, is it?  I don't

14  read the briefs to make that argument.

15          MR. CONNER:  Um, I don't --

16          THE COURT:  So I assume the answer is, no,

17  you're not making that argument?

18          MR. CONNER:  Well, I mean here's the thing,

19  is that whether they are or not, you know, I think that

20  our opponents rely pretty heavily on Justice Olita's

21  concurrence -- I don't know how to pronounce the name on

22  that case -- but they rely very heavily on that.  That,

23  of course, is just a concurrence and doesn't have any

24  real bearing here because you only had two justices

25  join that.  And so their argument in that regard relies

1    heavily on that case.  I don't think that that's
2    particularly instructive here.  But, again, I don't --
3    the -- I think the important point here is what we're
4    talking about in this case is not really about the right
5    to own a firearm.  This isn't a categorical ban on any
6    plaintiff's ability to own a firearm.  It is simply that
7    they cannot self-manufacture a firearm that doesn't have
8    a serialized receiver or frame.
9              THE COURT:  Thank you.
10             Anything else, Mr. Conner?
11             MR. CONNER:  I guess just the one thing I
12   would note, to make a record of it, is we do object to
13   the Court's consideration of Exhibits 4 and 5 that, one,
14   we have not received an expert report that would provide
15   us with the information that's required for expert
16   testimony under Rule 26; and, additionally, that they
17   were improperly attached to the reply brief without
18   giving the State an adequate opportunity to respond.
19             THE COURT:  All right.  Thank you.
20             I don't think that -- well, I'm assuming
21   the County defendant's counsel doesn't have anything
22   additional to add, am I right?
23             MR. WADLE:  That's correct, Your Honor.
24   Zach Wadle on behalf of Douglas County defendants.  I
25   have nothing further to say beyond what's in our brief

1    that we submitted to the Court.

2                    THE COURT:  All right.

3                    Let me hear a brief reply from plaintiff's

4    counsel.  And I think you should address the State's

5    argument that there is a historical regulation

6    supporting the argument that there's no right to

7    self-manufacture firearms under the Second Amendment

8    and, therefore, that's not conduct protected under

9    the Second Amendment.

10                    MR. DIGUISEPPE:  Well, thank you, Your

11   Honor.

12                    Our Complaint lays out, in a lot of detail,

13   a historical discussion that's apart from the discussion

14   that comes in through the Declarations -- which I can

15   respond to the objections to admissibility on those, if

16   you like -- we have an extensive discussion about the

17   historical background for self-manufacturing right.

18   There's been no -- absolutely no effort, whatsoever,

19   from the State, to try to say that any of that is

20   inaccurate.  Heller makes very clear that the nature

21   of the rights protected within the scope of the Second

22   Amendment are defined by the historical and traditional

23   understanding of firearm rights at the time of the

24   founding.  And that historical discussion in the

25   Complaint, and in the opening brief of the Motion For

1   Preliminary Injunction made quite clear that there

2   is a recognized right, and there has been.  It is not

3   sufficient to cite a -- one quote from the NRA case in

4   the Fifth Circuit, which the only thing in there that

5   related to restrictions on serialization of tracking

6   arms was a quote that said that there had been

7   regulations related to keeping track of who has guns

8   in the community.  That's all that it says.  It says

9   nothing to support the notion that you can just

10  take away all of the firearms that have already been

11  manufactured lawfully under the law that it was,

12  without any showing, whatsoever, that they pose any

13  danger with these arms.  There's nothing to refute any

14  of the evidence we submitted with respect to the

15  existence of such a right.  Plus, it has -- I can't

16  ignore that on the back-end of the construction process,

17  what you have is an end product that is protected

18  by the Second Amendment.  There's been no dispute that

19  the firearms which have been manufactured heretofore,

20  lawfully, are within protected classes.  That is very

21  well established in Ninth Circuit and Supreme Court

22  authority.  No dispute to that whatsoever.

23          So, these people have created arms of a

24  protected class.  They can't have their rights to build

25  those arms and then possess and use the arms -- which is

1  a natural outgrowth of the right to manufacture, just

2  as the right to possess them relates back to the

3  manufacture right -- as being recognized historically,

4  that cannot just be completely eliminated, and get

5  within even the most lenient form of intermediate

6  scrutiny, because there's no tailoring.

7        I understand the references to "reasonable

8  fit," but "reasonable fit," is defined as a narrowing

9  tailored restriction.  And I think it's really notable

10  that ATF's own proposed rule continues to include an

11  exception for personal, self-manufacture for personal

12  use.  That shows that it's obvious -- it is obvious,

13  even through the ATF, that even despite all the dangers

14  which may exist when those guns, quote, unquote, are

15  in the hands of the wrong people, that doesn't mean you

16  can just preclude all right and ability of law abiding

17  citizens to construct their own firearms, and then use

18  them for lawful purposes.  Why would ATF recognize that

19  if that wasn't just obvious?

20        It is obvious.  The other states that

21  have regulations, the few that do, California and

22  Connecticut, for example, they have a process for

23  State serialization.  All of the arguments that my

24  opposing counsel is making about the need for, or

25  importance of serialization and background check, just

1    gloss over the whole point that they could certainly

2    require that.  These -- these individuals are not

3    asking to have some kind of special treatment in that

4    way.  Nobody is asking to have preferential treatment

5    for themselves.  They haven't been given any opportunity

6    to comply with the very thing the State says that is so

7    important that they need to enact a ban.  That's totally

8    unacceptable under any view of the law.

9              And with respect to -- if I could respond

10   quickly -- to the inadmissibility to the declarations

11   at issue, I would point out that 26(2)(a)(2)(C) doesn't

12   apply to this situation for two reasons.  One, (b)

13   within that subdivision deals with the timing of the

14   need to disclose a report, and we're not nearly -- near

15   a trial that (C) says that you have to be within 90 days

16   before trial that you have to make such a disclosure.

17   We're at a preliminary phase of the process, so it

18   doesn't even apply.  But, these types of individuals

19   also are not experts of the sort who need to produce

20   such a report because they fall under (C), as employees

21   of FPC, who do not regularly testify.  But aside from

22   that, the subject matter to which they attest is all

23   already supported by independent evidence.  You know,

24   for example, even the conclusions they draw are not

25   disputed, that in the vast majority of the states

1    there's no regulation of this activity; that these types

2    of firearms and the Classes to which they belong; and

3    the activity itself are popular throughout the country

4    and, therefore, these are common use and not dangerous

5    and unusual, as they would have to be to be subject to

6    some kind of outright ban, potentially.  So they -- we

7    have independent evidence in that respect.

8              And I would ask for a moment to respond to

9    the -- to their evidence because we have objections of

10   our own to their statement that the Court should take

11   judicial notice of, quote, various citations to the

12   federal register and the federal legislative history

13   without any specification.  That's, obviously, quite

14   vague and unspecific as to what exactly they're asking

15   for.  And the material, as I point out in the briefing,

16   the material that's cited is full of hearsay and

17   unsubstantiated (indecipherable).  But even if we

18   take that that evidence at its face value, it just

19   undermines their position because it shows that the

20   ATF recognizes how popular these types of arms are;

21   and, most importantly, perhaps, that despite all the

22   dangers and dooms and glooms that they point to when

23   these things are in the hands of the wrong people, they

24   have an exception for personal use.  They retain that.

25   Nevertheless, I would point out, too, that the Homeland

1   Security assessment report that the State cites, there

2   was a supplement to that in which the committee itself

3   pointed out that this type -- even this (indecipherable)

4   assessment could potentially impugn the rights of

5   individuals by associating the improperly bringing

6   into the home of lawful gun owners who are pursuing

7   this activity lawfully.

8          So I mean, ultimately, their evidence just

9   undermines their position, particularly with the

10  exception that ATF provides for itself.

11         The other states, all of that, the law

12  from the other states, is obviously subject to judicial

13  notice.  You've got six other states, Connecticut and

14  California, D.C., New Jersey, and Hawaii, all of them

15  have some other means by which to exercise the right,

16  even if it's regulated.  So, nobody is standing here

17  saying that the State cannot impose reasonable

18  restrictions on self-manufacturing and then possession

19  and use for lawful purposes of those arms after self-

20  manufacturing.  What we're saying is it can't just

21  outright ban the whole spectrum of activity and the

22  products that are used to build them and the firearm

23  that's ultimately constructed of law abiding people

24  who have done nothing wrong and have no intention of

25  doing anything wrong.  And even as I pointed out, the

1  notion that you can just go and build your own firearm
2  from serialized receivers and frames isn't even true, as
3  one of their justifications.  That's not true because
4  the fire -- the parts have to be serialized as required
5  by federal law, under a system that doesn't even exist.
6  So, it's a false statement.
7              I think that the State's interests that
8  have been articulated are, essentially, pretextual.
9  A pretextual claim of interest can't support anything.
10  It has no weight in an interest balancing situation.
11  It shouldn't be afforded any weight at all.  But even
12  if it is, again, there's got to be narrow tailoring.
13  And we don't have narrow tailoring in a situation where
14  there's a total ban on the full spectrum of activity,
15  which has been protected and is protected based on the
16  evidence we submitted, to which there was no response,
17  no dispute, nothing in response besides a quote from a
18  case out of the Fifth Circuit that talked about keeping
19  track of who owns the arms.  That doesn't negate all
20  of the historical facts we've submitted that shows that
21  self-manufacture is a protected right.  Just as you
22  can't take away the implements that a person uses to
23  develop protected speech -- paper and pen and printers
24  and whatnot -- you can't just dispossess people of the
25  products they use to assemble arms, when, especially,

1   the end product is something they're going to use only

2   for lawful purposes.

3            This has gone way too far and it is an

4   extreme, extreme example of overreach by the State.

5   So, you know, it can have all these legitimate interests

6   that it articulates, and it very well may, and those

7   interests can stand with a regulation that permits

8   self-manufacturing, and use of self-manufacturing arms

9   for lawful purposes.  They're trying to eliminate

10  that spectrum of conduct in the product and the property

11  interests involved, and that can't be done.

12           THE COURT:  All right.  Thank you, counsel.

13           I hope to have a decision on the motion

14  within the next week, if not the next two weeks, so

15  you can expect a written order on the motion.

16           Thank you.

17           MR. DIGUISEPPE:  Thank you, Your Honor.

18

19           (Court Adjourned.)

20

21

22

23

24

25

-o0o-

I certify that the foregoing is a correct
transcript from the record of proceedings
in the above-entitled matter.

\s\ Kathryn M. French                    June 22, 2022

KATHRYN M. FRENCH, RPR, CCR                    DATE
Official Reporter