THE O'MARA LAW FIRM, P.C.
DAVID C. OMARA
(Nevada Bar No. 8599)
311 East Liberty Street
Reno, NV 89501
P: (775) 323-1321
F: (775) 323-4082
E: david@omaralaw.net

THE DiGUISEPPE LAW FIRM, P.C.
RAYMOND M. DiGUISEPPE*
116 N. Howe Street, Suite A
Southport, NC 28461
P: 910-713-8804
E: law.rmd@gmail.com
*Admitted Pro Hac Vice

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

ROGER PALMER, *et al.*,

Plaintiffs,

v.

STEPHEN SISOLAK, in his official capacity as Governor of Nevada, *et al.*,

Defendants.

Case No.:  3:21-cv-00268

**PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON LIMITED REMAND**

**Judge: Hon. Miranda Du**
**Date:  TBD**
**Time:  TBD**

## PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCUSIONS OF LAW

### I.    Introduction

Plaintiffs submit the following points and authorities in support of their proposed findings of fact and conclusions of law in connection with the limited remand from the Ninth Circuit ordering that this Court consider and make findings concerning certain questions about the nature and effect of the laws being challenged under the Second Amendment in this case. As Plaintiffs' analysis demonstrates, all the relevant findings of fact and conclusions of law must be resolved in favor of Plaintiffs, compelling reversal of the previous order that dismissed the Complaint under Rule 12(b)(6). Moreover, because it is clear that Defendants cannot carry the burden necessary to justify the laws at issue, they should be barred from any further enforcement of the unconstitutional prohibitions being imposed against protected conduct and property, and the laws should be preliminarily enjoined pending resolution of the merits of Plaintiffs' inevitably successful claim.

## II.     Procedural and Factual Background

**A.     The Constitutional Challenge to Nevada's "Ghost Gun" Ban Under AB 286**

Plaintiffs initiated this action over three years ago, on June 10, 2021—days after the Nevada's Governor Stephen Sisolak signed AB 286 into law on June 7, 2021—through their Complaint seeking declaratory and injunctive relief against this law. Dkt. No. 1 ("Compl."). As alleged in the Complaint, AB 286 amended Chapter 202 of the Nevada Revised Statutes to:

(1) Ban "unfinished frames or receivers"—broadly defined to encompass virtually all conceivable forms and types of non-firearm precursor parts used in the self-manufacture of firearms (hereafter "Non-Firearm Objects" or "NFOs"),[1] by prohibiting ordinary law-abiding Nevadans from possessing, purchasing, transporting, or receiving any NFOs used to machine, print, or otherwise self-manufacture firearms, and prohibiting the sale or transfer of any NFOs to such individuals, unless the NFO "is required by federal law to be imprinted with a serial number issued by a firearms importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number" (AB 286, §§ 3(1)(a)-(b)) & 3.5(1)(a)-(b));

(2) Ban ordinary law-abiding Nevadans from manufacturing, causing to be manufactured, assembling, or causing to be assembled any firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law,[2] unless the firearm "[h]as been rendered permanently inoperable," is "an antique firearm," or has been "determined to be a collector's item," "curio," or "relic" pursuant to federal law (hereafter "self-manufactured firearm" or "SMF") (AB 286, § 4(1)(a)-(c)); and

(3) Ban ordinary law-abiding Nevadans from possessing, selling, offering to sell,

---

[1]     Section 6 of AB 286 defines "unfinished frame or receiver" as follows:

> a blank, a casting or a machined body that is intended to be turned into the frame or lower receiver of a firearm with additional machining and which has been formed or machined to the point at which most of the major machining operations have been completed to turn the blank, casting or machined body into a frame or lower receiver of a firearm even if the fire-control cavity area of the blank, casting or machined body is still completely solid and unmachined."

[2]     "Manufacture" for purposes of these prohibitions is broadly defined as "to fabricate, make, form, produce or construct by manual labor or machinery," and "assemble" is similarly defined broadly to mean "to fit together component parts." N.R.S. § 202.3635(3)(a)-(b).

1   transferring, purchasing, transporting, or receiving any firearm that is not imprinted with a serial

2   number issued by a firearms importer or manufacturer in accordance with federal law, unless the

3   firearm has been rendered permanently inoperable, was manufactured before 1969, is "an antique

4   firearm," or has been "determined to be a collector's item," "curio," or "relic" pursuant to federal

5   law (AB 286, § 5(1)(b)-(b)).

6   Compl. ¶3.

7          The Complaint alleged that, in net effect, the prohibitions of the challenged scheme (the

8   "Bans") "impose a blanket prohibition against a broad class of protected arms in common use for

9   self-defense and other lawful purposes by ordinary law-abiding citizens," including "all modern

10  operable firearms of any type (all handguns and all long guns) *in addition* to component parts

11  integral to their manufacture which lack " 'a serial number issued by a firearms importer or

12  manufacturer.' " Compl. ¶127. To that end, the Bans "mandate[] that all ordinary law-abiding

13  citizens *dispossess* themselves of all such firearms, related components, and NFOs on or before

14  January 1, 2022," prohibit "all such individuals from possessing or using them on and after that

15  date," and immediately prohibit "any further sales or transfers of 'unfinished frames or receivers'

16  involving these individuals" and "any further self-manufacturing of firearms." *Id.*

17         The Complaint challenged the Bans as violating the Second Amendment and Fifth

18  Amendment rights of ordinary law-abiding Nevadans. It asserted that "[t]he Second Amendment

19  guarantees ordinary law-abiding citizens the right to acquire, possess, use, and self-manufacture

20  all firearms in common use for self-defense and other lawful purposes." Compl. at ¶128. Yet, the

21  Bans "prohibit[] law-abiding citizens from acquiring materials and supplies necessary to self-

22  manufacture, construct, and/or assemble constitutionally protected arms of designs and functions,"

23  which are "commonly possessed and used for self-defense and other lawful purposes in the vast

24  majority of states." *Id.* at ¶¶ 135, 137. "[T]the State simply bans all conduct and possession in *toto*,

25  forcing all law-abiding people to purchase pre-manufactured commercial firearms." *Id.* at ¶ 37.

26  Further, the Bans "mandate that all ordinary law-abiding Nevadans dispossess themselves of all

27  unserialized 'unfinished frames or receivers' (and the many other NFOs that fall within the Bans'

28  sweepingly broad definition of this term) as well as all unserialized firearms," *id.* at ¶¶53, 158, but

"provide[] no form of compensation whatsoever," *id.* at ¶150, in violation of fundamental due process under both the United States Constitution and the Nevada Constitution, *id.* at ¶¶54-56.

**B.     The Impact on Plaintiffs**

  *1.     Roger Palmer*

  As alleged in the Complaint, Plaintiff Roger Palmer ("Palmer") is a responsible, peaceable resident of Clark County, Nevada, not disqualified from exercising his Second Amendment right to possess arms and ammunition. Compl. ¶¶75-76. Palmer holds a Nevada Concealed Carry Permit and is a retired law enforcement officer who has also served as a firearms instructor, concealed carry instructor, state security guard instructor, and private investigator. *Id.* at ¶¶77-78. He is a member of Plaintiff Firearms Policy Coalition, Inc. ("FPC"). *Id.* at ¶¶79, 81. Palmer owned and possessed before the Bans multiple SMFs, both handguns and rifles, that he previously self-manufactured lawfully with NFOs, one or more of which fall within the definition of the prohibited "unfinished frames or receivers." *Id.* at ¶82. Because these firearms were self-manufactured, the completed firearms necessarily lack "a serial number issued by a firearms importer or manufacturer," thus falling within the prohibition against all modern, operable SMFs. *Id.*

  Palmer also owned and possessed multiple uncompleted NFOs and firearm building kits, which he lawfully acquired before enactment of the Bans, one or more of which fall within the definition of the prohibited "unfinished frames or receivers." Compl. ¶83. Palmer's lawfully self-manufactured, unserialized firearms are of a type commonly possessed by law-abiding citizens for lawful purposes today; specifically, handguns and AR-15 rifles manufactured with precursor NFOs. *Id.* at ¶84. Nonetheless, Palmer was mandated to dispossess himself of the unserialized NFOs and SMFs (or render them "permanently inoperable") no later than January 1, 2022, lest he face criminal prosecution under Sections 3 and 5 of AB 286. *Id.* at ¶85.

  Palmer desires to continue to own and possess his lawfully self-manufactured unserialized firearms and NFOs for self-defense and other lawful purposes. Compl. ¶85. He also desires to acquire additional NFOs commonly used in the self-manufacturing of firearms for self-defense and other lawful purposes, including those that fall within the definition of "unfinished frames or receivers," and he desires to self-manufacture additional operable firearms for self-defense and

other lawful purposes. *Id.* at ¶87. However, under the Bans that Defendants are actively enforcing and will continue to enforce unless enjoined by this Court, Palmer is prohibited from purchasing or otherwise acquiring any such NFOs, from self-manufacturing any operable unserialized firearms, and from ever again possessing, purchasing, transporting, or receiving any such firearms or NFOs. *Id.* He reasonably fears criminal sanction for any attempt to do so. *Id.* at ¶¶84, 87.

### 2. Chad Moxley

As further alleged in the Complaint, Plaintiff Chad Moxley ("Moxley") is a responsible, peaceable resident of Douglas County, Nevada, not disqualified from exercising his Second Amendment right to possess firearms and ammunition. Compl. ¶¶91-92. Moxley is a retired firefighter and a member of FPC. *Id.* at ¶¶93-94. He currently holds a valid Federal Firearms License ("FFL") and a Nevada Concealed Carry Permit. *Id.* at ¶95. Moxley lawfully conducts sales of firearms and constituent firearm parts at local gun shows through his sole proprietorship, Strategic Supplies. *Id.* at ¶96. On average, before the Bans, he attended two gun shows per month and sold between five and forty unfinished receiver kits that now fall within the definition of prohibited "unfinished frames or receivers." *Id.* at ¶97. Before the enactment of the Bans, Moxley had planned and made arrangements to attend at least six more gun shows, at which he would have made available for sale and sold firearm components now prohibited under the Bans. *Id.* at ¶98.

Moxley desires to continue making available for sale and would make available for sale to ordinary law-abiding citizens the unserialized firearms, component parts, and other NFOs targeted by the Bans. Compl. ¶99. Based on this threat of criminal prosecution by and through the Bans that Defendants are actively enforcing, Moxley is now abstaining from and must continue to abstain from any attempt to sell or transfer any "unfinished frames or receivers" (and all other NFOs that fall within this broad definition) to any ordinary, law-abiding citizen. *Id.* at ¶100.

Further, like Palmer, Moxley lawfully owned and possessed multiple firearms, both handguns and rifles, that he previously self-manufactured lawfully with unserialized component parts, NFO kits, precursor AR-15 lower receivers, and/or other NFOs, one or more of which fall within the now-prohibited "unfinished frames or receivers." Compl. ¶101. These lawfully self-manufactured firearms are of a type commonly possessed by law-abiding citizens for self-defense

and other lawful purposes today. *Id.* at ¶102. However, because these firearms were self-manufactured, the completed firearms lack necessarily lack "a serial number issued by a firearms importer or manufacturer," thus falling within the Bans' prohibition against all modern, operable SMFs. *Id.* Consequently, Moxley was mandated to dispossess himself of all SMFs (or render them "permanently inoperable") by January 1, 2022, or face criminal prosecution. *Id.* at ¶103. He desires to continue to own and possess his lawfully self-manufactured unserialized firearms for self-defense and other lawful purposes, and not sell or otherwise dispose of them, but he reasonably fears criminal sanction in light of the dispossession mandate under the Bans. *Id.* at ¶104. Moxley also desires to self-manufacture additional operable firearms for self-defense and other lawful purposes. Compl. ¶105. However, he is prohibited from doing so, and he is prohibited from ever again possessing, purchasing, transporting, or receiving any such firearms or NFOs required to self-manufacture such arms, for self-defense and other lawful purposes. *Id.* at ¶106.

Individual Plaintiffs Palmer and Moxley brought the action on behalf of themselves, and as representatives of the class of similarly situated Nevada-resident FPC members who have been forced to dispossess themselves of the firearms and constituent firearm parts prohibited by the Bans, who are banned from lawfully possessing or using any other such firearms and constituent parts, and who are banned from self-manufacturing any such firearms. Compl. ¶107. Further, as a seller of now-banned NFOs, Moxley brought this action on behalf of his customers who seek to purchase NFOs for lawful purposes but are prohibited from doing so under the Bans. *Id.*

### 3.    FPC

For its part, as alleged in the Complaint, FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education, outreach, and other programs defending and promoting the People's rights—especially the fundamental, individual Second Amendment right to keep and bear arms. Compl. ¶111. FPC represents and brought this action on behalf of its Nevada-resident members—who include Plaintiffs Palmer and Moxely and other gun owners, prospective gun owners, and self-manufacturers, as well as retailers of NFOs, precursor parts, and firearms. *Id.* at ¶113. Many of FPC's Nevada-resident members lawfully acquired unserialized firearm components that are

1   commonly possessed by law-abiding citizens in the exercise of their right to self-manufacture such

2   firearms for self-defense and other lawful purposes. *Id.* at ¶115. However, those Nevada-resident

3   members were mandated to dispossess themselves of their NFOs and SMFs no later than January

4   1, 2022, or face criminal prosecution under the Bans. *Id.* at ¶116.

5       Further, many of FPC's Nevada resident members desire to continue to own and possess

6   their NFOs and SMFs for lawful purposes, and to not sell or otherwise dispose of them, but they

7   reasonably fear criminal sanction in light of the dispossession mandate under the Bans. Compl.

8   ¶117. Many of FPC's Nevada-resident members desire to acquire additional NFOs otherwise

9   commonly available for purchase and used in the self-manufacturing of firearms for self-defense

10  and other lawful purposes, including those that fall within the definition of "unfinished frames or

11  receivers," and they further desire to self-manufacture additional operable firearms for self-defense

12  or other lawful purposes. *Id.* at ¶118. However, they are prohibited from doing so under the Bans.

13  *Id.* Consequently, FPC reasonably fears the prosecution of its Nevada-resident members by and

14  through Defendants' administration, implementation, and enforcement of the Bans. *Id.* at ¶120.

15  **C.    Motion for Preliminary Injunction**

16      Plaintiffs moved for an order preliminarily enjoining the Bans on June 18, 2021. Dkt. No.

17  26. In their opposition, Defendants did not dispute the allegations that they individually and/or

18  collectively are enforcing the Bans and thus have the power to cease enforcement of the challenged

19  laws, regulations, policies, and customs so as to provide the relief Plaintiffs seek herein. *See*

20  Compl. ¶¶ 20-23 (alleging that Defendants Stephen Sisolak, Aaron Ford, George Togliatti, and

21  Mindy McKay are wholly or partially responsible in their respective capacities for overseeing,

22  implementing, and enforcing the Bans). Defendants also did not dispute the effects and impacts of

23  the Bans as asserted in the Complaint and instead defended the nature and scope of the Bans as

24  nevertheless constitutional firearm regulations consistent with the Second Amendment. Dkt No.

25  31 at 7-8, 12 (acknowledging that AB 286 "bans the possession and sale of unfinished receivers

26  that lack serial numbers," as well as other unserialized firearm "components," "bans the act of

27  assembling an unserialized firearm—that is, the act of using an unfinished receiver kit to create a

28  ghost gun," and "bans possession of unserialized firearms (i.e. ghost guns)"); *id.* at 13 (arguing

1   that "AB 286 is a valid law prohibiting two types of personal property—ghost guns and

2   unserialized receivers" and thus no compensation is required for the deprivation). On July 26,

3   2021, this Court denied any preliminary relief against the Bans. Applying "intermediate scrutiny"

4   under the two-step interest-balancing test since rejected, the Court held that Defendants had

5   "sufficiently shown that the government's objectives in enacting A.B. 286 are substantial and

6   important" and AB 286 was "a reasonable fit for achieving" those objectives. Dkt. No. 51 at 8-9.

7   **D.      Dismissal of the Complaint**

8            Defendants filed a motion to dismiss the Complaint for failure to state a plausible claim for

9   relief. Dkt. No. 34. In advancing this motion, Defendants again did not dispute the effects and

10  impacts of the Bans as asserted in the Complaint and instead argued that the Bans as enforced are

11  nevertheless constitutional firearm regulations consistent with the Second Amendment. Dkt No.

12  34 at 6, 10-11 (again acknowledging that AB 286 "bans the possession and sale of unfinished

13  receivers that lack serial numbers," as well as other unserialized firearm "components," "bans the

14  act of assembling an unserialized firearm—that is, the act of using an unfinished receiver kit to

15  create a ghost gun," and "bans possession of unserialized firearms (i.e. ghost guns)," but arguing

16  that no compensation is due for the deprivation of property rights because "AB 286 is a valid law").

17           This Court ultimately granted the motion on March 29, 2022. Dkt. No. 65. Again applying

18  a means-end test under intermediate scrutiny, the Court reasoned that "the government's objectives

19  in enacting A.B. 286 are undeniably substantial and important," that Plaintiffs had "failed to plead

20  that A.B. 286 is not a reasonable fit for the state's important interest of ensuring public safety,"

21  and thus Plaintiffs' Second Amendment claim failed as a matter of law. *Id.* at 10-11. The Court

22  further agreed with Defendants that "the government does not need to compensate Plaintiffs when

23  A.B. 286 prohibits a type of personal property via a valid law." *Id.* at 12-15. On March 30, 2022,

24  the clerk of the district court entered the final judgment on the docket dismissing Plaintiffs'

25  Complaint. Dkt. No. 66. Plaintiffs timely appealed the judgment and order.

26  **E.      Appellate Proceedings and Remand**

27           While the appeal was pending, the United States Supreme Court decided *New York State*

28  *Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022), rejecting the means-end interest

balancing previously applied to Second Amendment claims by the Ninth Circuit and other courts.

In their appellate briefing, Defendants continued to concede the broad impacts of AB 286: that it

outright "bans unserialized firearms, no matter their provenance," "mak[ing] it illegal" for ordinary

law-abiding Nevadans to do anything with them or with any "unfinished" frames and receivers—

i.e., possess, transfer, transport, receive, manufacture, or assemble any such arm or constituent

part—and mandating the dispossession of all such arms and parts by January 1, 2022. CA9 Dkt.

No. 20 (Ans. Brf.) at 8. They acknowledged that the only firearms and constituent parts now legal

in Nevada are "*pre*-serialized" firearms and unfinished frames and receivers—i.e., those NFOs

*already* "imprinted with a serial number issued by a firearms importer or manufacturer in

accordance with federal law"—absent narrow exceptions unavailable to Plaintiffs. *Id.* at 18-19.

Instead, they continued to argue that the Bans were constitutional even under *Bruen*, despite the

nature and scope of their impact, and that the dismissal should be affirmed or, in the alternative,

the matter remanded to permit further discovery concerning the relevant history. *Id.* at 13-18.

On May 26, 2023, a panel of the Ninth Circuit issued an order remanding the matter "solely

to develop the historical and factual record" for purposes of the *Bruen* analysis. CA9 Dkt. No. 37.

In particular, the panel directed the Court to make findings as to the following questions:

> (1) whether A.B. 286 conforms to "this Nation's historical tradition of
> firearm regulation," *Bruen*, 142 S. Ct. at 2126;
>
> (2) whether it is possible in Nevada to lawfully add a serial number to a self-
> manufactured unserialized firearm and/or unfinished frame or receiver, and
> if so, how and under what circumstances;
>
> (3) whether it is possible in Nevada to lawfully obtain serialized self-
> manufacturing and/or self-assembly firearm kits, and if so, how and under
> what circumstances; and
>
> (4) what kind of self-manufacturing Plaintiffs want to engage in. [n.1: For
> instance, have Plaintiffs ever created a firearm without using a premade
> self-assembly kit, and if so, do they plan to continue to do so? If their
> interest is only in continuing to use kits, how "unfinished" must these kits
> be in order to satisfy Plaintiffs' desire for self-manufacturing?].

*Id.* at 2-3 & n.1. The Court was given "leave to make additional findings as to other factual issues

it believes are relevant, under *Bruen*, to Plaintiffs' Second Amendment claims." *Id.* at 3. The

1   magistrate set a schedule for discovery and submission of the proposed findings and conclusions.

2          **III.    Controlling Legal Framework**

3        *Bruen* unequivocally rejected all manner of means-end, interest-balancing in the Second

4   Amendment context: courts are not to engage in a " 'judge-empowering interest-balancing inquiry

5   that asks whether the statute burdens a protected interest in a way or to an extent that is out of

6   proportion to the statute's salutary effects upon other important governmental interests.' " *Bruen*,

7   597 U.S. at 22 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 634 (2008)) (internal

8   quotation marks omitted). "When the Second Amendment's plain text covers an individual's

9   conduct, the Constitution presumptively protects that conduct. The government must then justify

10  its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm

11  regulation." *Id.* at 24. "Only then may a court conclude that the individual's conduct falls outside

12  the Second Amendment's unqualified command." *Id.* (internal quotations omitted).

13  **A.    The Plain Text Unquestionably Covers the Targeted Conduct and Property.**

14       The textual analysis under *Bruen* "focus[es] on the 'normal and ordinary' meaning of the

15  Second Amendment's language." *Bruen*, 597 U.S. at 20 (quoting *Heller*, 554 U.S. at 576-77). By

16  its plain language, the Second Amendment secures for the people "an individual right to keep and

17  bear arms" as "a fundamental constitutional right guaranteed to the people," *Heller*, 554 U.S. at

18  595, through the Fourteenth Amendment, *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010).

19  "The very enumeration of the right takes out of the hands of government—even the Third Branch

20  of Government—the power to decide on a case-by-case basis whether the right is *really worth*

21  insisting upon." *Heller*, 554 U.S. at 634. The Second Amendment's "reference to 'arms' does not

22  apply 'only [to] those arms in existence in the 18th century.' " *Bruen* at 597 U.S. at 28 (quoting

23  *Heller*, 554 U.S. at 582). " 'Just as the First Amendment protects modern forms of

24  communications, and the Fourth Amendment applies to modern forms of search, the Second

25  Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that

26  were not in existence at the time of the founding.' " *Id*. (citations omitted).

27       The Second Amendment protects ancillary rights necessary to the exercise of the individual

28  right to "possess a firearm for self-defense" including " 'the ability to acquire arms.' " *Teixeira v.*

*County of Alameda*, 873 F.3d 670, 677–78 (9th Cir. 2017) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)); *Drummond v. Robinson Township*, 9 F.4th 217, 227 (3d Cir. 2021) (quoting *Ezell* at 704 (italics added) (This " 'implies a corresponding *right to acquire* and maintain proficiency' with common weapons."). Certainly nothing within the plain text of the Second Amendment *limits* the manner of arms acquisition—i.e., limiting it to the purchase or acquisition from a third party. In fact, "the right to keep and bear arms implies a corresponding right to manufacture arms." *Rigby v. Jennings*, 630 F.Supp.3d 602, 615 (D. Del. 2022); *see also Teixeira* 873 F.3d at 679 (quoting *Andrews v. State*, 50 Tenn. 165, 178 (1871)) (the right "to keep" arms "necessarily involves" the right to " 'keep them in a state of efficiency for use' " and " 'to keep them in repair,' " which implies the right to *self*-repair). This right to self-manufacture "wouldn't mean much" without the right to own, possess, and use the items and materials necessary to engage in such activity—and, of course, the right to own, possess, and use any firearms ultimately produced with such NFOs which are themselves protected by the Second Amendment.

In *B & L Productions v. Newsom*, 104 F.4th 108 (9th Cir. 2024), a panel of the Ninth Circuit addressed the textual analysis in the context of determining a constitutional challenge to certain statutes that prohibit the purchase of a firearm at gun shows held on state property. *Id.* at 117-18. The plaintiff did not dispute that attendees of such shows "can peruse such offers, leave the premises, and immediately order their desired goods from the vendor" or from one of several other gun retailers on private property in the same vicinity. *Id.* at 119. The panel acknowledged the general principle that the right to *acquire* firearms is an "ancillary right" under the Second Amendment. *Id.* at 118. The panel reasoned that this right is violated when it is "meaningfully constrained," such as when "a statute '*impedes* … residents from acquiring firearms.' " *Id.* at 118 (quoting *Teixeira v. County of Alameda*, 873 F.3d 670, 678, 680 (9th Cir. 2017)) (emphasis added). However, the plaintiff "essentially *concede[d]* that the Challenged Statutes do not 'meaningfully constrain' any individual's ability to keep and bear arms." *Id.* at 110 (emphasis added). For this reason, the panel held "[t]he Challenged Statutes therefore do not implicate the plain text of the Second Amendment." *Id.* at 110. Here, at the outset, this case concerns the ability to acquire NFOs necessary to self-manufacture arms and the right to possess and use SMFs, not the ability to make

*commercial* acquisitions. In any event, Plaintiffs concede nothing here; rather, it is Defendants who make the concession of significance—that the Bans outlaw essentially the full scope of conduct and property necessary to engage in self-manufacturing arms in common use for lawful purposes and in possessing or using any such arms for those purposes. There is not and cannot be any dispute that the Bans "*impede*" Nevadans "from acquiring firearms" for lawful purposes.

Because the Second Amendment's plain text covers the conduct at issue, "the Constitution presumptively protects that conduct," and the burden shifts to the State to "demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

**B.** **Defendants Cannot and Have Not Even Tried to Carry Their Burden to Demonstrate the Bans Are Consistent with the Nation's Tradition of Firearm Regulation.**

The Bans' prohibitions and dispossession mandates against NFOs used to self-manufacture arms in common use for lawful purposes and against the possession and use of such SMFs are in no way consistent with this Nation's tradition of firearm regulation, and thus they cannot stand.

**1.** **AB 286's Ban Against NFOs Unconstitutionally Infringes the Right to Self-Manufacture Firearms for Lawful Purposes.**

This Nation has no history or tradition of regulating—much less *banning*—the self-manufacturing of firearms for lawful purposes, as it is undisputed that the first such regulations appeared in very recent years, long after the relevant historical period. *Bruen*, 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–635 (" 'Constitutional rights are enshrined with the scope they were understood to have when the people adopted them.' "); *id.* at 37 ("[W]e have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."). "Our citizens have always been free to make, vend, and export arms. It is the constant occupation and livelihood of some of them." Letter from Sec'y of State Thomas Jefferson to George Hammond, British Ambassador to the U.S., (May 15, 1793), in 7 The Writings Of Thomas Jefferson 325, 326 (Paul Ford ed., 1904). "Since the earliest colonial days, Americans have been busily manufacturing and repairing arms." Joseph Greenlee, *The American Tradition of Self-Made Arms*, St. Mary's Law Journal, Vol. 54 (2023), No. 1, Art. 2, at 36. "Meanwhile, restrictions on self-made arms have been

1  rare throughout American history." *Id.* In fact, "[a]ll restrictions on arms built for personal use
2  have emerged within the last decade, and from only a few states." *Id.*

3      The colonists in the first permanent English settlements had the express right to import
4  arms and the items and materials necessary to make them. For example, King James I in 1606
5  granted the "Southern Colony" (Virginia) the right to import from Great Britain "the Goods,
6  Chattels, Armour, Munition, and Furniture, needful to be used by them, for their said Apparel,
7  Food, Defence or otherwise," and the 1620 Charter of New England granted colonists the right "to
8  take, load, carry, and transport in . . . Shipping, Armour, Weapons, Ordinances, Munition, Powder,
9  Shott, Victuals, and all Manner of Cloathing, Implements, Furniture, …and all other Things
10 necessary for the said Plantation, and for their Use and Defense, and for Trade with the People
11 there." 7 Federal and State Constitutions: Colonial Charters, and Other Organic Laws of the States,
12 Territories, and Colonies Now or Heretofore Forming the United States of America 1834–35,
13 3787–88 (Francis Thorpe ed., 1909). "The influence of the gunsmith and the production of firearms
14 on nearly every aspect of colonial endeavor in North America cannot be overstated, and that
15 pervasive influence continuously escalated following the colonial era." M. L. Brown*, Firearms in
16 Colonial America: The Impact on History and Technology 1492-1792, at 149 (1980).

17     During the Revolutionary War, many colonies relied on and incentivized anyone willing
18 and able to work as gunsmiths to produce arms. *See e.g.*, Journal of the Maryland Convention July
19 26 – August 14, 1775, at 64–65 (William Hand Browne ed., 1892) (in 1775, Maryland's Provincial
20 Convention sought to engage in gunsmithing all those "concerned in carrying on that business");
21 8 Documents and Records Relating to the State of New-Hampshire During the Period of the
22 American Revolution, From 1776 to 1783, at 15–16 (Nathaniel Bouton ed., 1874) (in 1776, the
23 New Hampshire House of Representatives passed a resolution to pay each person who "made" a
24 firearm to certain specifications); 5 American Archives, Fourth Series, 1418 (Peter Force ed.,
25 1844) (in 1776, New York's Provincial Congress solicited proposals from "any Person or Persons
26 who are willing to engage in manufacturing good Muskets, or the Locks, Barrels, or any necessary
27 parts thereof"); 5 American Archives, Fourth Series, 1338 (Peter Force ed. 1844) (also in 1776,
28 North Carolina Provincial Congress solicited "all Gunsmiths, and other mechanicks, who have

been accustomed to make, or assist in making Muskets," who would be furnished, "at the expense of this Colony, with tools, implements and utensils, and materials for carrying on the said work").

Thus, the only tradition we find in the historical annals is one that *promoted and encouraged* the self-manufacturing of arms—certainly nothing that *restricted much less banned* such activity, as Defendants must show to carry their burden. *See United States v. Rahimi*, 602 U.S. __, 144 S. Ct. 1889, 1898 (2024) (quoting *Bruen*, 597 U.S. at 29) ("A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.' ").

### 2. AB 286's Ban Against SMFs Unconstitutionally Infringes the Right to Possess Constitutionally Protected Arms.

It is settled that government may only ban weapons that are both dangerous *and* unusual, *i.e.*, weapons that are *not* in common use. *Heller*, 554 U.S. at 627; *see also Caetano v. Massachusetts*, 577 U.S. 411, 417 (2016) (Alito, J., concurring) ("A weapon may not be banned unless it is *both* dangerous *and* unusual."). An arm is not "unusual" so as to fall outside the ambit of this protection so long as it is "commonly possessed by law-abiding citizens for lawful purposes *today*." *Id*. at 420 (Alito, J., concurring); *see also Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015) (If "the banned weapons are commonly owned . . . then they are not unusual."). Thus, the Second Amendment right necessarily encompasses firearms "typically possessed by law-abiding citizens for lawful purposes . . . ." *Heller*, 554 U.S. at 625; *see also* Mark W. Smith*, What part of "in common use" don't you understand?: How courts have defied Heller in Arms-Ban-Cases—Again, Per Curiam,* Harv. J.L. & Pub. Pol'y (Sept. 27, 2023), https://bit.ly/4avsZ6j. That is, "the Second Amendment protects the possession and use of weapons that are " 'in common use at the time.' " *Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627).

*Heller* and *Bruen* establish the historical rule of decision for all arms-ban cases: arms that are "in common use" are absolutely protected and cannot be banned. Because "common use" is part of the historical test, the State bears the burden to show the banned arms are *not* in common use for any attempt to justify the ban. *See Bruen*, 597 U.S. at 21 (quoting *Heller*, 554 U.S. at 627) ("we found it 'fairly supported by the historical tradition of prohibiting the carrying of 'dangerous

1  and unusual weapons' that the Second Amendment protects the possession and use of weapons
2  that are 'in common use at the time.' "). If the government cannot make that showing because the
3  firearms at issue are in common use, the analysis is complete and law cannot stand, because the
4  Supreme Court precedent has already established that the *only* way the government can "justify its
5  regulation . . . [as] consistent with this Nation's historical tradition" is by demonstrating that the
6  banned arms are "dangerous and unusual," *Bruen*, 597 U.S. at 24, and this precedent is binding.
7  There can be no dispute that the SMFs at issue—semiautomatic handguns and AR-15 style rifles,
8  which Plaintiffs seek to possess but which they are prohibited from possessing and using under
9  the Bans—are in "typically possessed by law-abiding citizens for lawful purposes."

10      A model-by-model evidentiary showing that the countless firearms targeted by the Bans
11  are in common use is plainly not required by *Heller* or *Bruen*. In fact, *Heller* and *Bruen* affirm that
12  the textual analysis itself looks only at whether the *category* of weapons is protected as "arms."
13  *Bruen*, 597 U.S. at 2; *Heller*, 554 U.S. at 629 ("handguns are the most popular weapon chosen by
14  Americans for self-defense in the home"). With the sweeping scope of the laws targeting not only
15  completed firearms but the core precursor parts necessary to manufacture virtually *any* firearm—
16  all "unfinished" frames and receivers, including any "blank," "casting," or "machined body"
17  intended for manufacturing or assembly—Defendants cannot credibly contest that AB 286 bans
18  arms "in common use today" because it *necessarily* does. With that, the constitutional inquiry is
19  complete since the historical record supports only restrictions on "dangerous and unusual arms."

20      Moreover, the legislative facts demonstrate that, unquestionably, handguns are in common
21  use for lawful purposes, having been recognized as "the most popular weapon chosen by
22  Americans for self-defense in the home." *Heller*, 554 U.S. at 629.[3] Similarly, there cannot be and

---

24  [3]    Legislative facts " 'are those which have relevance to legal reasoning and the lawmaking
25  process, whether in the formulation of a legal principle or ruling by a judge or court or in the
enactment of a legislative body.' " Adv. Com. Notes to Fed. R. Evid. 201 (quoting Thayer,
26  Preliminary Treatise on Evidence 279-280 (1898)). "That is, legislative facts are not limited to
information introduced through a formal evidentiary process or facts that are indisputable, but
27  include 'non-evidence facts' necessarily incidental to the reasoning process—matters that judges
and juries reasonably believe and assume to be true 'with competent judgment and efficiency' 'as
28  part of their necessary mental outfit.' " *Id.* "Adjudicative facts" by contrast are developed in
discovery or "determined in trials." *Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012).

1  has not been any dispute that semiautomatic AR-15-style rifles are commonly owned for lawful

2  purposes. *Miller v. Bonta*, 699 F.Supp.3d 956, 1007 (S.D. Cal. 2023) (noting that data suggest

3  more than 24.4 million Americans own AR-15-type rifles, but even accepting the State's assertion

4  that the number is 7.9 million, that is "still a large number of citizens choosing to own AR-15 type

5  firearms," especially when "200,000 owners of stun guns was all it took" for stun guns in *Caetano*);

6  *Staples v. United States*, 511 U.S. 600, 612 (1994) (identifying the AR-15 as a type of

7  semiautomatic firearms that "traditionally ha[d] been widely accepted as lawful possessions"); *see

8  also Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039, 1042 (2015) (Thomas, J., dissenting

9  from denial of certiorari) (noting that "[r]oughly 5 million Americans" own "AR-style

10  semiautomatic rifles" and "the overwhelming majority . . . do so for lawful purposes").

11      That is the end of the analysis for Nevada's ban against the targeted SMFs, and it must be

12  stricken as unconstitutional because Defendants cannot show and have not even attempted to show

13  that privately made firearms are both "dangerous and unusual."

14  **D.**    **Defendants' Anticipated Evidence Can Only Further Bolster Plaintiffs' Claim.**

15      The foregoing analysis demonstrating the clear lack of the necessary historical support for

16  the Bans against self-manufacturing with NFOs and the possession and use of SMFs alone resolves

17  the matter, by demonstrating that Plaintiffs have stated a plausible claim for relief and that they

18  are indeed entitled to a preliminary injunction given the claim's inevitable likelihood of success.

19  However, Plaintiffs anticipate that Defendants will submit in support of their proposed findings of

20  fact and conclusions of law the materials they developed and served on Plaintiffs during the

21  discovery phase: a declaration and related exhibits from Brian DeLay, designated as a historical

22  expert for the State, and responses to a set of written interrogatories to Plaintiffs. Because the

23  current briefing schedule does not call for the submission of responsive briefs, Plaintiffs will

24  address these materials in this brief solely for purposes of preserving an opportunity to do so.

25      **1.**    **DeLay's Declaration Rests on Improper Conclusions and Opinions.**

26      The primary question in a proper resolution of this case is the first one raised by the Ninth

27  Circuit panel—"whether A.B. 286 conforms to 'this Nation's historical tradition of firearm

28  regulation.' " CA9 Dkt. No. 37 at 2 (quoting *Bruen*, 597 U.S. at 17). That question presents purely

a legal issue properly resolved through legislative facts of the nature already cited above. *See Heller*, 554 U.S. at 628-29 (supporting the conclusion that handguns are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family" by citing to a social science paper cited for the same point in another judicial opinion (i.e., *Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007)); *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring) (supporting the conclusion that stun guns "are widely owned and accepted as a legitimate means of self-defense across the country" by quoting a statement in a state court opinion (*People v. Yanna*, 297 Mich. App. 137, 144 (2012), in turn supported by a citation to a law review article, that "hundreds of thousands" of stun guns had been sold to private citizens). Indeed, because the ultimate question of whether the law "is consistent with this Nation's historical tradition of firearm regulation" is a legal one, "expert testimony" on the matter would constitute an "improper "legal conclusion, an opinion on an ultimate issue of law." *Nationwide Transport Finance v. Cass Information Systems, Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008); *Crow Tribe of Indians*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Expert testimony is not proper for issues of law.").

This is the first major problem with the declaration of Brian DeLay on which Nevada relies: the supposed "historical analysis" is littered with improper legal conclusions and opinions *arguing* for a specific result on the ultimate question. *See e.g.*, DeLay Dec. ¶7 (characterizing his own declaration as "argu[ing] that A.B. 286 is consistent with the American tradition of firearms regulation"); *id.* at ¶72 (arguing that because AB 286 is "consistent" with America's "tradition of firearm regulation," "it should satisfy *Bruen's* history and tradition test"); *id.* at ¶121 ("In no sense are the entrepreneurs who sell parts and kits or their customers part of a historic tradition of 'self-made arms' that should shield them from the serialization requirements…"); *id.* at ¶123 ("These laws are consistent with our nation's history of firearms regulation … Treating ghost guns like any other firearm should be found constitutional under *Bruen's* history and tradition framework.").

**2.      DeLay's Declaration Fundamentally Distorts the Relevant Law and Facts.**

Beyond the blatant impropriety of these conclusions and opinions, DeLay's declaration fundamentally distorts the law and facts relevant to a determination of the issues.

DeLay spends much of his declaration battling the history of self-manufacturing by private

1   citizens during the colonial and reconstruction eras, all so he can argue on behalf of the State that

2   Plaintiffs have failed to carry a supposedly pivotal bear of theirs to prove a tradition of self-

3   manufacturing by private citizens during this period. DeLay Dec. ¶¶14, 23-70. But DeLay is just

4   slaying strawman here: the burden is on the *government* to prove a tradition of *regulation*—i.e.,

5   restrictions relevantly similar to the Bans—during the relevant time period. And while Plaintiffs

6   have no burden here, the evidence speaks for itself in showing that ordinary citizens commonly

7   engaged in the manufacturing of firearms, as detailed above in section III.B.1.[4] Even DeLay

8   concedes at one point that "[g]unsmiths are easy enough to find in the archives of individual

9   colonies, and routinely advertised their services in colonial newspapers." DeLay Dec. ¶ 37.

10       DeLay claims that AB seeks to address a "dramatic technological change" that has

11   provoked "unprecedented societal consequences," consistent with the trend of governments

12   responding with legislation designed to address dangers or risks posed by developments in

13   weapons technology or innovation from the time of the Founding through the present day. DeLay

14   Dec. ¶¶72, 113-116, 119-121. This is another distortion: The Supreme Court's Second Amendment

15   doctrine *embraces* relevant technological change to *ensure the protection* of modern arms in

16   common use even if they may differ considerably from arms of old. Indeed, in explaining why

17   "unprecedented societal concerns or dramatic technological changes may require a more nuanced

18   approach," the court cited its recognition in *Heller* that "the Second Amendment's historically

19   fixed meaning applies to new circumstances" and specifically that, "even though the Second

20   Amendment's definition of 'arms' is fixed according to its historical understanding, that general

21   definition covers modern instruments that facilitate armed self-defense." *Bruen*, 597 U.S. at 28.

22   The Court explained in no uncertain terms that "[w]hen confronting such present-day firearms

23   regulations," the essential task is the same: "reasoning by analogy—a commonplace task for any

24

25   _____

26   [4]      DeLay also attempts to distort the general paradigm by characterizing the rights and
     interests of private citizens in firearms during the time of the Founding and Reconstruction as
27   "collective," "rather than individualist," DeLay Dec. ¶¶76, 83, 89, 92, 110, a claim that the anti-
     gun lobby lost resoundingly in *Heller*. 554 U.S. at 579 ("the right of the people" in the Second
28   Amendment's operative clause "unambiguously refer[s] to individual rights, not 'collective'
     rights, or rights that may be exercised only through participation in some corporate body").

lawyer or judge"—to determine if the proffered analogue is "relevantly similar" based on "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 28-29.

DeLay emphasizes the potential dangers from the misuse or abuse of self-manufactured arms. DeLay Dec. ¶¶10-11. The pertinent inquiry is not whether "untraceable firearms are at times used by criminals" but instead "whether the prohibited untraceable firearms and unfinished firearm components are 'not typically possessed by law-abiding citizens for lawful purposes.'" *Rigby*, 630 F. Supp. 3d at 614 (quoting *Heller*, 554 U.S. at 625). Of course, *all* firearms possess such potential—as they must in order to serve their core purpose of facilitating *armed* self-defense— and *Heller's* primary analysis of the Second Amendment already took account for the main concerns about the misuse of firearms in society. *See* 554 U.S. at 636 ("We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many *amici* who believe that prohibition of handgun ownership is a solution."). *Bruen* reaffirmed the point: "[A]s Members of the Court have already explained, '[t]he right to keep and bear arms . . . is not the only constitutional right that has controversial public safety implications.'" *Bruen*, 597 U.S. at 17 n.3 (quoting *McDonald v. Chicago*, 561 U.S. 742, 783 (2010)). In fact, justifying the Bans based on interests in combating such risks runs afoul of the clear mandate that courts must not engage in an "interest-balancing inquiry" that weighs the proportionality of the asserted governmental interests against the burdens imposed on individual rights. *Id.* at 22.

DeLay further claims that the whole point of this case is to "avoid the serialization requirements" that are "essential to solving gun crime." DeLay Dec. ¶121. Not so. As Defendants own concessions about the breadth of the Bans illustrate, law-abiding Nevadans have not even been provided an opportunity to *self*-manufacture firearms subject to a serialization requirement because people may only lawfully self-manufacture firearms with *pre*-serialized components purchased at retail, i.e., with pre-*manufactured* components.

In a similar vein, DeLay claims that AB 286 closes a "loophole" in the federal regime for "ghost guns" which otherwise is, was, or should be intended to capture such firearms. DeLay Dec. ¶¶6, 122. Wrong. The federal government has never blocked the ability of law-abiding citizens to self-manufacture firearms for personal use. In, fact, in its most recent rulemaking,

the ATF repeatedly emphasized that, regardless of any rule changes designed to bring certain "unfinished" frames or receivers within the general definition of its "firearm" regulations, it has not and will not regulate self-manufacturing for personal use—there are no serialization, recordkeeping, background checks, or other conditions imposed on law-abiding citizens engaged in doing so. Definition of "Frame or Receiver" and Identification of Firearms, 87 Fed. Reg. 24652 et seq. (Apr. 26, 2022) (codified at 27 CFR 447-49); *id.* at 24750 ("This rule does not require unlicensed PMF ["privately made firearm"] owners to do anything to their firearms maintained solely for personal use."); *id.* at 24653, 24665, 24699, 24676, 24690, 24706, 24719 (same). ATF has even defended the constitutionality of its rules on this ground. *Id.* at 24676.

Ultimately, DeLay points to no regulations—much less any tapestry of laws that could form a "tradition"—prohibiting the self-manufacture of firearms or prohibiting firearms in common use for lawful purposes, i.e., those not both dangerous *and* unusual, because no such regulations or traditions existed. DeLay Dec. ¶¶94-95, 98-101 (citing historical laws aimed at disarming Native Americans, "political opponents," and "loyalists" deemed a threat to the developing Nation, as well as colonial laws regulating the carry, brandishing, or discharge of certain weapons). Even if any of the cited regulations targeted firearms that *were* considered "dangerous and unusual" during the relevant time period, that could not justify the regulations on the arms at issue here because they *are* indisputably "in common use *today*" and thus are *not* dangerous and unusual. *See Bruen*, 597 U.S. at 47 (even if the colonial laws to which New York cited as purported analogues "prohibited the carrying of handguns because they were considered 'dangerous and unusual weapons' in the 1690s, they provide no justification for laws restricting the public carry of weapons that are unquestionably in common use today").

Therefore, Defendants' anticipated evidence can only bolster Plaintiffs' position by underscoring that Defendants cannot—and have not even attempted to—carry their burden of showing the Bans are at all consistent with this Nation's historical tradition of firearm regulation.

### IV.   Proposed Findings of Fact and Conclusions of Law

As noted, the question of focus in the remand order of the Ninth Circuit panel is the first one: "whether A.B. 286 conforms to this Nation's historical tradition of firearm regulation." The

answer to that question is clear, as discussed above. The fourth question—"what kind of self-manufacturing Plaintiffs want to engage in?"—is related to the first question as a factual underpinning in that what they desire to do and what they would do *but for* the prohibitions under the Ban defines the nature of the conduct they contend is protected under the Second Amendment—i.e., lawfully acquire, possess, and use NFOs (and, for Moxley, to make NFOs available for lawful sale to his customers) for purposes of self-manufacturing arms in common use for self-defense and other lawful purposes, in particular semiautomatic handguns and AR-15 style rifles, and to then possess and use such arms for those purposes, as stated in the Complaint.[5]

The two remaining questions, however, concern what law-abiding Nevadans could do with the Bans *in place* and thus the *alternatives* for self-manufacturing the State may have left open—i.e., whether it is possible in Nevada "to lawfully add a serial number to a self-manufactured unserialized firearm and/or unfinished frame or receiver," or "to obtain serialized self-manufacturing and/or self-assembly firearm kits, and if so, how and under what circumstances." CA9 Dkt. No. 37 at 2-3. But asking what Plaintiffs may be able to do *notwithstanding* the Bans is looking through the wrong end of the sight-glass. The government must justify eliminating the channels for the exercise of the right it has cut off; it cannot simply point to the existence of the channels it has not cut off (yet) and say other options exist. *Heller* made this clear in rejecting the District of Columbia's claim that "it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed," saying that was "no answer" in attempting to justify the handgun ban. 554 U.S. at 629. It is no answer to the Bans here either. Instead, as in *Heller*, it is enough to compel the striking down of this regime that the Bans target arms that are "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625.

Further, Defendants, as the parties responsible for the enforcement of the Bans, have already answered these other questions through their concessions in this litigation that have readily acknowledged the full breadth and impact of the Bans as articulated in the Complaint, as

---

[5]     Plaintiffs reiterate these desires and intentions in their responses to Defendants' written interrogatories. *See e.g.,* responses to Interrogatories Nos. 5, 6, and 7.

1  Defendants' strategy from the start has not been to deny the effects of the Ban but to contend that

2  the Bans are constitutional *despite* the extreme prohibitions they impose. In particular, Defendants'

3  concession that the Bans outlaw everything except "*pre*-serialized" firearms and unfinished frames

4  and receivers—i.e., those NFOs *already* "imprinted with a serial number issued by a firearms

5  importer or manufacturer in accordance with federal law" necessarily means that ordinary law-

6  abiding citizens must purchase such products *pre*-manufactured and thus cannot *self*-manufacture

7  firearms using any NFOs not already manufactured with a serial number by a third party.

8       Plaintiffs' responses to Defendants' written interrogatories can only confirm the lack of

9  any dispute that the Bans have cut off any viable path to lawful *self*-manufacturing in Nevada. *See*

10  *e.g.*, Plaintiffs' responses to Defendants' Interrogatory Nos. 1 & 3 ("Defendants, who are charged

11  with enforcing the challenged provisions of AB 286, themselves have taken the position in their

12  publicly filed documents in this case that, in light of AB 286, the *only* firearms and constituent

13  parts now legal in Nevada are '*pre*-serialized' firearms and unfinished frames and receivers…");

14  *id.* (CA9 quoting Dkt. No. 20 (Ans. Brf.) at 18-19) ("Defendants themselves characterize the effect

15  of the law at issue as permitting ordinary, law-abiding Nevadans to self-manufacture firearms only

16  'as long as they start with a *serialized* receiver.' "); *id.* (Defendants have conceded that AB 286

17  "provid[es] no mechanism for ordinary, law-abiding citizens Nevadans to comply with

18  background-check and recordkeeping requirements as a condition to lawfully self-manufacturing

19  a firearm or as a condition to keeping one lawfully self-manufactured under the prior law.").

20       Accordingly, Plaintiffs propose the following findings of fact and conclusions of law:

21       1.    The plain text of the Second Amendment covers the conduct in which Plaintiffs

22  seek to engage and in which they would engage but for the Bans—to acquire, possess, and use

23  NFOs (and, for Moxley and those similarly situated Nevada-resident members of FPC, to make

24  NFOs available for lawful sale to law-abiding customers) for purposes of self-manufacturing arms

25  in common use for self-defense and other lawful purposes, in particular semiautomatic handgun

26  and AR-15 style rifles, and to then possess and use such arms for those purposes;

27       2.    At no point during the relevant historical period were ordinary, law-abiding citizens

28  prohibited on pain of criminal sanction from acquiring, possessing, or using any NFOs to self-

1   manufacture firearms in common use for self-defense or other lawful purposes;

2        3.     At no point during the relevant historical period were ordinary, law-abiding citizens

3   prohibited on pain of criminal sanction from acquiring, possessing, or using for self-defense or

4   other lawful purposes firearms that they had self-manufactured with NFOs;

5        4.     When " 'apply[ing] faithfully the balance struck by the founding generation to

6   modern circumstances,' " the Bans are not " 'relevantly similar' to laws that our tradition is

7   understood to permit" based on "[w]hy and how the regulation burdens the [Second Amendment]

8   right." *Rahimi*, 144 S. Ct. at 1898 (quoting *Bruen*, 597 U.S. at 29);

9        5.     The Bans are therefore not "consistent with the Nation's historical tradition of

10  firearm regulation.' " *Rahimi*, 144 S. Ct. at 1896 (quoting *Bruen*, 597 U.S. at 24);

11       6.     Because Nevada cannot carry its burden here, the Bans are unconstitutional under

12  the Second Amendment. *See Bruen*, 597 U.S. at 34 ("Only if respondents carry that burden can

13  they show that the pre-existing right codified in the Second Amendment, and made applicable to

14  the States through the Fourteenth, does not protect petitioners' proposed course of conduct.");

15       7.     Plaintiffs have accordingly stated a plausible case for relief, compelling reversal of

16  the previous dismissal of their Second Amendment claim under Rule 12(b)(6). *See Butcher v. City

17  of Marysville*, 398 F.Supp.3d 715, 722 (E.D. Cal. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662,

18  678 (2009)) ("Rule 12(b)(6)'s plausibility standard 'is not akin to a probability requirement, but

19  asks for more than a sheer possibility that a defendant has acted unlawfully.' "); and

20       8.     Because Defendants cannot carry their burden of proof that the Bans are consistent

21  with the Nation's historical tradition of firearm regulation, Plaintiffs are entitled to a preliminary

22  injunction against any further enforcement of the Bans pending resolution of the merits.[6]

23

24

25  ───────────────────

    [6]     While the focus of this remand order is the Second Amendment claim, as previously noted,
26  Defendants' contention that the dispossession mandate is constitutional under the Fifth
    Amendment despite the lack of any compensation rests on their contention that the dispossession
27  is being mandated in accordance with an otherwise "valid law prohibiting two types of personal
    property—ghost guns and unserialized receivers." Dkt No. 31 at 13. For the reasons stated herein
28  and in Plaintiffs' previous briefing on this subject, this is not a "valid law" and Plaintiffs are
    accordingly entitled to the same relief on the Takings claim.

1    Respectfully submitted,

2

3    Dated: August 21, 2024                          Dated: August 21, 2024

4    THE O'MARA LAW FIRM, P.C.                        THE DiGUISEPPE LAW FIRM, P.C.

5    /s/ David C. O'Mara                              /s/ Raymond M. DiGuiseppe
6    DAVID C. O'MARA, ESQ.                            RAYMOND M. DiGUISEPPE
     311 E. Liberty Street                            116 N. Howe Street, Suite A
7    Reno, NV 89501                                   Southport, NC 28461
     Tel: 775.323.1321                                910.713.8804
8    david@omaralaw.net                               Law.rmd@gmail.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I am an employee of The O'Mara Law Firm, P.C. and on this date, the foregoing document was filed electronically *via* the Court's ECF system which provided notification of such filing to counsel of record for all parties.

Dated: August 21, 2024

_____/s/ Bryan Snyder_____
BRYAN SNYDER

1

## INDEX OF EXHIBITS

2

| Exh No. | Description | Pages |
|---------|-------------|-------|
| 1 | [Proposed] Findings of Fact and Conclusions of Law on Limited Remand | 2 |

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

POINTS AND AUTHORITIES IN SUPPORT OF PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW