AARON D. FORD
Attorney General
 JESSICA E. WHELAN (Bar No. 14781)
Deputy Solicitor General
 IVA K. TODOROVA (Bar No. 15827)
 Deputy Solicitor General
Office of the Attorney General
State of Nevada
1 State of Nevada Way, Suite 100Las Vegas, NV 89119
(702) 486-3420 (phone)
(702) 486-3773 (fax)
jwhelan@ag.nv.gov
itodorova@ag.nv.gov

*Attorneys for State Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ROGER PALMER; CHAD MOXLEY; and FIREARMS POLICY COALITION, INC.<br><br>Plaintiffs,<br><br>vs.<br><br>STEPHEN SISOLAK, Governor of Nevada; AARON FORD, Attorney General of Nevada; GEORGE TOGLIATTI, Director of the Nevada Department of Public Safety; MINDY MCKAY, Administrator of the Records, Communications, and Compliance, Division of the Nevada, Department of Public Safety;<br><br>Defendants. | Case No.  3:21-cv-00268-MMD-WGC<br><br>**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON LIMITED REMAND** |

State Defendants Stephen Sisolak, Aaron Ford, George Togliatti and Mindy McKay,

by and through their counsel, hereby submit their Proposed Findings of Fact and

Conclusions of Law on Limited Remand from the Ninth Circuit.

. . .

. . .

. . .

. . .

# I.    BACKGROUND

On June 10, 2021, Plaintiffs[1] filed their Complaint for Declaratory, Injunctive, or Other Relief, challenging the constitutionality of Nevada Assembly Bill 286 ("A.B. 286"), signed into law on June 7, 2021. (ECF No. 1 ("Complaint") at 2, ¶¶ 1–3). On July 6, 2021, Defendants moved to dismiss this action pursuant under Rule 12(b)(6) for failure to state a claim. (ECF No. 34 ("Motion").) On March 29, 2022, the Court issued its order granting Defendants' Motion. (ECF No. 65.) Therein, the Court applied the two-step inquiry laid out by the Ninth Circuit in *Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) (en banc)[2], to evaluate Plaintiffs' Second Amendment claim. Specifically, the Court analyzed "(1) whether the challenged law burdens conduct protected by the Second Amendment" and (2), if so, what is "the appropriate level of scrutiny" and how does it apply to the challenged law. (ECF No. 65 at 5.)

Thereafter, Plaintiffs appealed to the Ninth Circuit. (*See* ECF No. 67.) While the action was pending before the Ninth Circuit, the United States Supreme Court abrogated the two-step framework applied by this Court. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 591 U.S. 1, 142 S. Ct. 2111 (2022). The *Bruen* test is as follows:

> [W]hen the Second Amendment's plain text covers the individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 142 S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961).)

---

[1] Roger Palmer, Chad Moxley, and the Firearms Policy Coalition, Inc. ("FPC") (collectively, "Plaintiffs".)

[2] The *Young* case applied the framework set forth by the United States Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chi.*, 561 U.S. 742 (2010).

The Ninth Circuit thus remanded the case back to this Court for the limited purpose to make findings as to:

> whether A.B. 286 conforms to 'this Nation's historical tradition of firearm regulation,' *Bruen*, 142 S. Ct. at 2126; (2) whether it is possible in Nevada to lawfully add a serial number to a self-manufactured unserialized firearm and/or unfinished frame or receiver, and if so, how and under what circumstances; (3) whether it is possible in Nevada to lawfully obtain serialized self-manufacturing and/or self-assembly firearm kits, and if so, how and under what circumstances; and (4) what kind of self-manufacturing Plaintiffs want to engage in.

(ECF No. 72 (footnote omitted).) The Ninth Circuit panel otherwise retained jurisdiction over this case.

On December 21, 2023, this Court held a status conference to determine how to proceed in light of the Ninth Circuit's remand order. (ECF No. 82.) At that time, the Court set deadlines for fact discovery, expert discovery, and for the parties to submit proposed findings of fact and conclusions of law. (*Id.*)

Because this Court has been instructed to make findings only with respect to the four items outlined above from the Ninth Circuit's Order remanding this case, the Court does not elaborate further on the factual or procedural background of this case, instead adopting the background elucidated in its prior Order granting Defendants' Motion to Dismiss. (*See* ECF No. 65 at 2–3.)

## II.   Findings of Fact

### A.   A.B. 286 and this Nation's Historical Tradition of Firearm Regulation.

As noted above, for a law that presumptively implicates the Second Amendment to be constitutional, the *Bruen* test requires the government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126 (citation omitted.) To that end, Defendants retained an expert witness, Professor Brian DeLay, to opine on the historical regulation of firearms in early America. (*See* **Exhibit 1**) Plaintiffs have not submitted any expert report, either initially or to rebut Professor DeLay's opinions.

This Court finds persuasive the following opinions from Professor DeLay's report:

(1)    A.B. 286 is consistent with the American tradition of firearms regulation focused on public safety; and

(2)    Ghost guns are new to American history such that the lack of regulation of ghost guns should not be taken as the founders' implicit approval of such firearms. (**Ex. 1** at 4.) Each of these points is discussed further in turn below.

1.    **There Exists an American Tradition of Firearms Regulation Focused on Public Safety.**

This Court begins its analysis of the history and tradition of firearms regulation in this nation before and at the time of our nation's founding. *See Bruen*, 142 S. Ct. at 2132 ("Following the course charted by *Heller*, we will consider whether 'historical precedent' from before, during, and even after the founding evinces a comparable tradition of regulation." (citation omitted).) Although *Bruen* cautioned that "English common law 'is not to be taken in all respects to be that of America," 142 S. Ct. at 2139, the Supreme Court's recent decision in *United States v. Rahimi* relied in part on English common law to establish a historical tradition of disarming individuals who pose a credible threat to the physical safety of another, -- U.S. --, 144 S. Ct. 1889, 1899 (2024).) Thus, this Court likewise looks to English common law, where relevant, as the beginning of this nation's historical tradition of firearms regulation.

a.    **Early Colonial Regulation.**

Early colonial laws restricting firearms possession were undoubtedly informed by English common law providing for the disarming of those who posed a threat to public safety, as defined by the relevant authorities at the time. English common law, for example, disarmed Catholics, insurgents, "disaffected persons," and other judged "dangerous to the peace of the kingdom." (**Ex. 1** at 59, ¶ 98 (citing Joseph G. S. Greenlee, *The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms* 20, Wyoming L. Rev., 257–61 (2020).) In the seventeenth century, the Massachusetts Bay Colony disarmed seventy-six supporters of religious dissident Anne Hutchinson, who was

convicted of sedition for criticizing the colony's clergy for its legalistic interpretation of the Bible. *See Greenlee*, 20 Wyoming L. Rev. at 263. Similarly, Maryland, Virginia, and Pennsylvania all passed laws to disarm Catholics during the Seven Years' War, which was seen as a conflict between Catholicism and Protestantism. (*Id.* at 263–64.)

### b.    Revolutionary Era Regulation.

In the early years of the American Revolution as the Patriots gained power, they began to disarm those they perceived as a threat to public safety—Loyalists that posed a threat to independence. (**Ex. 1** at 60, ¶ 99.) For example, the colony of New York, whose residents were primarily Loyalists or those hoping to remain neutral in the conflict with Britian, was affected by several disarmaments. (*Id.* (citing Thomas Verenna, *Disarming the Disaffected*, Journal of the American Revolution (Aug. 26, 2014), https://allthingsliberty.com/2014/08/disarming-the-disaffected/). In 1775, Patriots in Brookhaven, New York resolved to disarm anyone who dared "deny the authority of the Continental or of this Congress, or the Committee of Safety, or the Committees of the respective Counties, Cities, Towns, Manors, Precincts, or Districts in this Colony." (Verenna, *Disarming the Disaffected*.) In January 1776, the Continental Congress ordered several hundred-armed militiamen into Queen's County in New York to disarm loyalists. (*Id.*) George Washington ordered General Charles Lee to disarm everyone in Long Island "whose conduct, and declarations have render'd them justly suspected of Designs unfriendly to the Views of Congress." (*Id.*) General Philip Schuyler disarmed "malignants"—mostly Scotch Highlanders loyal to the king—in the Hudson Valley, and in March of 1776, Congress concluded that nearly the entire population of Staten Island consisted of "avowed Foes" and ordered a general disarmament there. (*Id.*)

Like Patriot leaders in New York, Patriots in Connecticut, North Carolina, Delaware, Georgia, New Hampshire, New Jersey, South Carolina, Pennsylvania, Massachusetts, Maryland, and Virgina likewise disarmed Loyalists. (**Ex. 1** at 61–62, ¶ 100 (citations omitted).)

On March 14, 1776, the Continental Congress called for a general ban on gun ownership among Loyalists, recommending to all individual colonies that they immediately "cause all persons to be disarmed within their respective colonies, who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies." (**Ex. 1** at 61, ¶ 100 (quoting *See* Congressional Resolutions of Tuesday, Jan. 2, 1776, *in* United States Continental Congress, Journals of the Continental Congress, 1774–1789, Edited from the Original Records in the Library of Congress, Vol. 4 205 (Worthington Chauncey Ford ed., 1904).)

The reasons behind disarming these individuals were multifaceted. As noted by Professor DeLay in his Declaration,

> There were two primary motivations for the Founding Fathers and likeminded Americans to orchestrate a nationwide disarmament campaign against white political opponents. First, loyalists could of course use their weapons to resist the insurgency and fight for the king. Second, patriot forces were perilously under-armed and needed whatever guns they could find. This is the reason that George Washington argued for a broad confiscation program in at least one Pennsylvania county, targeting not only those actively fighting for the crown, but also those who "claimed the Right of remaining Neuter." Washington insisted that "we ought not to hesitate a Moment in taking their arms, which will be so much wanted in furnishing the new Levies." **There is a striking flexibility in these revolutionary-era disarmaments**, in other words. They were undertaken preemptively, targeted not so much at people who had taken up arms against the newly cohering political authority but rather at people who might decide to do so in the future. And they could be undertaken both to preemptively disempower political opponents and out of a very practical imperative to arm insurgent forces.

(**Ex. 1** at 62, ¶ 101 (footnote omitted).)

### c. Post-Revolutionary War Regulation.

In the post-Revolutionary period, lawmakers continued to pass hundreds of laws that directly or indirectly regulated firearms to further public safety interests, as those public safety interests developed. (**Ex. 1** at 56, ¶ 94.) Several examples are listed below:

- Virginia regulated the carrying of certain weapons. (*See, e.g.*, An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35 (1786),

*available at* https://firearmslaw.duke.edu/laws/1786-va-laws-35-ch-49-an-act-forbidding-and-punishing-affrays (last visited August 14, 2024).)

- Massachusetts regulated the brandishing of particular weapons. (*See, e.g.*, An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, 1786 Mass. Sess. Laws (1786), *available at* https://firearmslaw.duke.edu/laws/1786-mass-sess-laws-an-act-to-prevent-routs-riots-and-tumultuous-assemblies-and-the-evil-consequences-thereof/ (last visited August 14, 2024).)

- Massachusetts responded to the 1786 tax uprising that came to be known as "Shay's Rebellion" by passing a law disarming not only persons who take up arms against the state, but also those "who have given or may hereafter give them counsel, aid, comfort or support, voluntarily, with intent to encourage the opposition to the government." (*See* Massachusetts Act of Feb. 16, 1787, ch. VI, 1787 Mass Acts 555 (1787), *available at* https://firearmslaw.duke.edu/laws/act-of-feb-16-1787-ch-vi-1787-mass-acts-555/ (last visited August 14, 2024).)

- New York regulated the discharge of weapons at sensitive times. (*See, e.g.*, An Act to Prevent Firing of Guns and Other Firearms within this State, on Certain Days Therein Mentioned, ch. 81, 1784–1785 N.Y. Laws 152 (1785), *available at* https://firearmslaw.duke.edu/laws/n-y-laws-ch-81-thomas-greenleaf-1792-law-passed-1785 (last visited August 14, 2024).)

- Ohio regulated the discharge of weapons in sensitive places. (*See* "An Act for Suppressing and Prohibiting Every Species of Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in Furtherance Thereof, ch. 13, § 4, 1788–1801 Ohio Laws 42 (1788), *available at* https://firearmslaw.duke.edu/laws/1788-1801-ohio-laws-42-an-act-for-suppressing-and-prohibiting-every-species-of-gaming-for-money-or-

other-property-and-for-making-void-all-contracts-and-payments-made-in-furtherance-thereof-ch (last visited August 14, 2024).)

- Ohio also passed a law imposing sentence enhancements for crimes committed with arms. (*See, e.g.*, the 1788 Ohio Laws 20, A Law Respecting Crimes and Punishments…, ch. 6, 1788_1801 Ohio Laws 20 (1788), *available at* https://firearmslaw.duke.edu/laws/1788-1801-ohio-laws-20-a-law-respecting-crimes-and-punishments-ch-6 (last visited August 14, 2024).)

These laws, passed in the decade before the ratification of the Second Amendment, reflect the colonies' desire to regulate firearm uses in a manner to protect the public safety; similar to today's concealed carry and time, place, and manner restrictions. (*See* **Ex. 1** at 57, ¶ 94.)

### d. Founding Era Regulation.

At and around the time of this nation's founding, levels of gun ownership were high, while levels of gun-related violence against fellow subjects were low. (**Ex. 1** at 57, ¶ 95; 49, ¶ 81.) The low levels of gun-related violence were related in large part to the technological limitations of muzzle-loading flintlock firearms.[3] (*Id.*) This difference between gun culture in early America and gun culture today notwithstanding, there remained in early America a rich regulatory tradition in pursuit of public safety as defined by authorities at the time. (*Id.* at 56, ¶ 93.) Several major changes shifted the focus of public safety concerns from disarming dissidents that posed a threat to the independence of their fellow colonists to regulating the actual firearms and other dangerous weapons themselves. (*Id.* at 68, ¶ 113.) Among these changes were "dramatic population increases and rapid urbanization; the

---

[3] For example, such weapons "were notoriously inaccurate at range, liable to misfire, and had to be muzzle-loaded with gunpowder and ball before every shot, either by pouring ammunition direct into the barrel or packing in a pre-made paper cartridge loaded with powder and ball." (**Ex. 1** at 48–49, ¶ 80. (citation omitted).) "Moreover, such guns were seldom kept loaded and at the ready for any extended period because black powder corroded iron barrels so quickly." (*Id.* at 49, ¶ 80.)

industrial revolution and the mass-production of weapons in the United States; and unprecedented advances in firearms technology that made guns increasingly dangerous." (*Id.*) Or, in the language of *Bruen*, there began to be "dramatic technological changes" in how firearms were made and how they operated, provoking "unprecedented societal concerns" in a growing and urbanizing United States. *See Bruen*, 142 S. Ct. at 2132.

One of the main technological advances in the early nineteenth century was the advent of percussion cap ignition. (**Ex. 1** at 69, ¶ 114.) Manufacturers no longer needed to rely on cumbersome hammer-vices, flints, and priming pans filled with loose powder. (*Id.*) Instead, arms designers began to make practical weapons using multiple rotating barrels or rotating breeches for the first time. (*Id.* (citing Herbert G. Houze, Samuel Colt: Arms, Art, and Invention 24 (2006).) Around the same time, large-scale production became possible due to advances in automatic milling machines as well as metallurgy and machine tooling. (**Ex. 1** at 69, ¶ 114.) As a result, manufacturers could build complex arms from nearly identical component parts at greater speed and less cost than ever before. (*Id.*) "By the 1820s, American manufacturers were beginning to mass-produce single-shot, percussion-cap pistols. By the 1830s, handheld 'revolvers' (with a rotating, multi-chambered breech) and 'pepperboxes' (with multiple barrels rotating around an axis) started entering the market." (*Id.* (citing William Hardy McNeill, The Pursuit of Power: Technology, Armed Force, and Society Since A.D. 1000 233-34 (1982) and Merritt Roe Smith, Harpers Ferry Armory and the New Technology: The Challenge of Change 219-51(1977).)

These technological advancements led to an influx of efficient, concealable firearms in early America, generating unprecedented societal concerns. (**Ex. 1** at 69, ¶ 115.) In response to rising threats to public safety from the increase in gun violence that resulted, lawmakers across the country sought to regulate conceal carry. (*Id.* at 69–70, ¶ 115.) More

than thirty such laws were enacted between the ratification of the Second Amendment in 1791 and the ratification of the Fourteenth Amendment in 1868.[4]

### e.   Post-Civil War Regulation.

Due in large part to the U.S. Civil War, the domestic arms industry saw a massive increase in its productive capacity in the mid-late nineteenth century and a large and permanent increase in the number of firearms in the country. (**Ex. 1** at 70, ¶ 116.) State and municipal lawmakers reacted to the resulting public safety concerns by accelerating the scale and pace of regulation. *See e.g.*, Brennan Gardner Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836–1900*, 121 Southwestern Hist. Q 284 (2017); Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study Symposium: The 2nd Amendment at the Supreme Court: '700 Years of History' and the Modern Effects of Guns in Public*, 55 U.C. Davis L. Rev. 2603 (2022); Brennan Gardner Rivas, *Perspective:| In the Past, Americans Confronted Gun Violence by Taking Action*, Washington Post (June 3, 2022), *available at* https://www.washingtonpost.com/outlook/2022/06/03/past-americans-confronted-gun-violence-by-taking-action/. A search of the Duke Repository of Historical Gun Laws, a reliable source that is consistently updated with new research, revealed 379 regulations on carrying weapons enacted between 1865 and 1900.[5]

---

[4] See, e.g., 1862 Colo. Sess. Laws 56, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1; An Act to Prevent Persons in this Commonwealth from wearing Concealed Arms, Except in Certain Cases (1813) § 1 (Ky.); 1864 Mont. Laws 355, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1; 1853 N.M. Laws 406, An Act Prohibiting The Carrying Of Weapons Concealed Or Otherwise, § 25; An Act to prevent the carrying of concealed weapons, (1838) (Va.). For a full compilation of concealed carry laws passed during this period, see Mark Frassetto, *Firearms and Weapons Legislation up to the Early 20th Century* (Jan. 15, 2013), at 20–24, *available at* https://ssrn.com/abstract=2200991 (last accessed August 14, 2024).

[5] https://firearmslaw.duke.edu/repository-of-historical-gun-laws/advanced-search, searching for the category "carrying weapons" between 1865-1900 (search performed August 16, 2024). Notably, Professor DeLay's identical search performed Jan. 27, 2024, resulted in 285 regulations. (**Ex. 1** at 71, ¶ 116 and n.233.) This indicates that, as additional regulations are uncovered and added to the Repository, the historical tradition of regulation will prove to be even more robust than currently believed.

1

#### f.  Twentieth-Century Regulation.

Twentieth-century lawmakers have maintained and extended the nation's historic tradition of regulating firearms in the name of public safety, particularly with respect to concealed carry laws.[6] However, additional technological advances again bred additional regulation in the name of public safety. Specifically, the innovations of self-loading mechanisms, smokeless powder, and detachable magazines made it possible for gunmakers to introduce radically new types of firearms. (**Ex. 1** at 73, ¶ 119) Semi-automatic pistols and automatic and semi-automatic rifles became increasingly popular in the U.S. civilian market in the early twentieth century. (*Id.* at 73–74, ¶ 119 (citing Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 Calif. L. Rev. __ (forthcoming 2025), at 40-42).)

Landmark legislation following these technological innovations includes the National Firearms Act of 1934; the 1968 Gun Control Act (establishing serialization requirements); the 1986 Firearm Owners' Protection Act (banning the transfer or possession of machine guns); the 1993 Brady Handgun Violence Protection Act (mandating background checks); and the 1994 Federal Assault Weapons Ban (since lapsed). (**Ex. 1** at 74–75, ¶ 121.) Each of these pieces of legislation introduced restrictions or affirmative requirements on gun manufacturers, sellers, and/or owners in reaction to technological advancements and in furtherance of public safety.

#### g.  Ghost Gun Regulation Today.

The 1968 Gun Control Act requires that licensed importers and licensed manufacturers to imprint a serial number on the frame or receiver of any weapon they import or manufacture. 18 U.S.C. § 923(i). There exists, however, an exemption for "hobbyists" who make their own firearms for personal use. (**Ex. 1** at 5, ¶ 9.) Over the past fifteen years or so, advances in polymers, small-batch parts manufacturing, compact control milling devices, 3D-printing and computer-aided design (CAD) files have led to a

---

[6] A search of the Duke Repository of Historical Gun Laws, available at https://firearmslaw.duke.edu/repository-of-historical-gun-laws/advanced-search, for the category "carrying weapons" between 1900-1935 revealed 184 results as of August 16, 2024.

boom in self-manufactured (or self-assembled) firearms, commonly known as ghost guns. (*Id.*) In essence, these technological advancements "have helped firearms entrepreneurs turn the GCA's hobbyist exception into a dynamic sub-industry." (*Id.*) "Their products enable unskilled buyers to easily assembly their own guns without professional assistance and often without specialized tools." (*Id.* (citing William J. Krouse, *Privately Made Firearms: A Growing Source of Unmarked, Untraceable 'Ghost Guns'?* Congressional Research Service Report IF11810, April 8, 2021).)

These technological advances, along with the increasing ease of internet sales of so-called ghost gun "kits," has made obtaining and assembling these weapons easier than ever. Michelle Rippy, *The Ghost Guns Haunting National Crime Statistics*, Federation of American Scientists (June 6, 2023) *available at* https://fas.org/publication/the-ghost-guns-haunting-national-crime-statistics/ (last visited August 16, 2024). Indeed, according to data reported to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), there have been over 37,000 ghost guns recovered since 2017, with a 1083% increase in recoveries from 2017–2021. (*Id.*) As these unserialized, untraceable weapons increasingly are used in violent crimes and pose a threat to public safety, state lawmakers have reacted by passing legislation to regulate the manufacture, possession, sale, and transfer of ghost guns.

To date, fifteen states have enacted laws regulating ghost guns: California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington.[7] Nevada's A.B. 286 is such a regulation.

*        *        *

In sum, there exists a rich historical tradition of regulation in this country to respond to public safety threats, as interpreted by the authorities of the time. The general pattern is that, as technology advances, new public safety threats arise, which are

---

[7] See Everytown Research & Policy, *Which states regulate ghost guns? available at* https://everytownresearch.org/rankings/law/ghost-guns-regulated/ (last visited August 16, 2024).

responded to by lawmakers through legislation. The regulation of ghost guns fits squarely within this rich historical tradition.

> ### 2. Early American Lawmakers Had No Need to Regulate Self-Manufactured Firearms, Given their Scarcity and Lack of Threat to Public Safety.

The fact that state and local lawmakers at and around the time of our nation's founding did not regulate self-manufactured arms does not alter the history and tradition of regulation in the name of public safety. Put simply, the evidence before this Court shows that today's method and level of firearm self-assembly is entirely new to American history; that the self-assembly of firearms by non-professionals was never a threat to public safety in the founding-era, and thus would not have been in the contemplation of founding-era lawmakers.

As an initial matter, there can be no doubt that there is a rich historical tradition of "arms-making" in the United States that "employed professionals with specialized skills in firearms production." (**Ex. 1** at 9, ¶ 15) In early America, only professional gunsmiths could make firearms, and even professional gunsmiths seldom made firearms from scratch. (*Id.* at 21–29, ¶¶ 36–48)

One "small[] cohort of gunsmiths" who did make their own firearms usually did so "with a mix of self-made components and imported locks and/or barrels." (*Id.* at 25, ¶ 43) The number of professional gunsmiths making their own firearms was so small not only because of the great skill it took to do so, but also because of the time and effort required. (*Id.* at 26, ¶ 45) With respect to the skill level required, unlike the parts kits available today from manufacturers such as Polymer80 and 80 Percent Arms, there were no parts kits in early America. (*Id.*) This is naturally because firearms at the time were not yet built with interchangeable parts. (*Id.*) Eighteenth-century firearm components were almost all made by hand. (*Id.*) Even gunmakers who imported locks and barrels, the two most complex components of an eighteenth-century firearm, needed a suite of professional skills, tools, and additional parts to produce a functioning weapon:

> A functional wooden stock would have to be made, a task requiring woodworking tools and expertise. Numerous additional parts would have to be made or purchased, including a butt-plate, side-plate, trigger, trigger guard, trigger plate, trigger pivot, escutcheon, ramrod, ramrod pipes, furniture-fastening cross-pins, and a variety of metal and wood screws.

(*Id.* (citing De Witt Bailey, Small Arms of the British Forces in America: 1664-1815 95–96 (2009).)

Another even smaller cohort of gunsmiths made their own firearms entirely from scratch. (**Ex. 1** at 27, ¶ 46) It was rare for colonial gunsmiths to make their own firearms from scratch because, "[u]nlike the European system characterized by complex division of labor, gun-makers in the colonies usually worked alone or in pairs in small shops." (*Id.*) Thus, "in addition to an unusually wide range of skills, such producers needed an unusually large collection of materials and tools." (*Id.*) They needed, for example,

> iron, copper, and steel; bellows, forges, anvils, and sledges; hammers and mallets of different shapes, materials, and sizes; a remarkable array of files (one eighteenth-century gunsmith's inventory includes twenty-nine types); rasps, saws, planes, hand- and table-vices, wrenches, swedges, screwdrivers, piers, pincers, tongs, drills, chisels, gouges, screw-plates, augers, drawing knives, and sandpaper; and mortars, pestles, and the necessary components for browning chemicals, among other necessities.

(*Id.* at 27–28, ¶ 46 (M. L. Brown, Firearms in Colonial America: The Impact on History and Technology: 1492-1792 244–57 (1980).)

In light of the specialized skill and wide range of tools and material needed, "it would have taken an early American gunsmith around a week of work to produce a basic, utilitarian longarm from scratch." (**Ex. 1** at 28, ¶ 47 (citing Merritt Roe Smith, Harpers Ferry Armory and the New Technology: The Challenge of Change 11 (1977).) A recent study shows that individual rifle-makers in southeastern Pennsylvania produced no more than thirty rifles a year. (**Ex. 1** at 28, ¶ 47 (citing Alexander Rose, American Rifle: A Biography 21 (2008).) John Partridge Bull of Deerfield, Massachusetts, a gunsmith who kept a detailed account book recording his work over two decades, focused almost exclusively on repairs. He made just three new guns during those twenty years.

(**Ex. 1** at 28, ¶ 47 (citing Susan McGowan, *Agreeable to His Genius: John Partridge Bull (1731-1813), Deerfield, Massachusetts* 5, 39–40, 74–75 (1988)) (unpublished M.A. thesis, Trinity College).)

Thus, very few colonial gunsmiths had the skill and ability to make their own firearms from scratch. Those that had the skill and ability spent much time and effort to make relatively few firearms. There simply is no comparison to the easy access, low level of skill, and speed at which today's amateur gunmakers can self-assemble ghost guns.

Finally, early American lawmakers had no reason to regulate amateur firearms-making because amateurs simply could not and did not make firearms. (*Id.*) To self-manufacture firearms (as opposed to today's self-assembly of firearms) took too much time and skill and too many tools and materials for the average colonists or early American to even attempt such an endeavor. Thus, the lack of regulation of self-assembly is not surprising and is certainly not evidence of a historical tradition of self-assembly of firearms. Self-assembly of firearms is undoubtedly a relatively new phenomenon in American gun culture.

**B.    It Is Possible in Nevada to Add a Serial Number to a Self-Manufactured Unserialized Firearm and/or Unfinished Frame or Receiver.**

As a starting point, NRS 202.363 provides that "[a] person shall not possess, purchase, transport or receive an unfinished frame or receiver unless" the person is either a firearms importer or manufacturer or "[t]he unfinished frame or receiver is required by federal law to be imprinted with a serial number by a firearms importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number." Nevada law thus looks to federal law for guidance on serialization of an unfinished frame or receiver. Likewise, NRS 202.3635 directs that, aside from several exceptions not relevant here, a firearm is to be imprinted with a serial number in accordance with federal law and any regulations adopted thereunder. *See* NRS 202.3635(1). Therefore, this Court looks to

federal law to determine if and how a serial number may lawfully be added to an unfinished frame or receiver.[8]

### 1. Serialization of a Firearm by a Federal Firearm Licensees.

27 CFR 478.92(a)(1) prescribes the method of serialization for firearms manufactured or imported by licensed manufacturers and licensed importers. Generally, federal firearm licensees ("FFLs"), are required to identify each firearm manufactured or imported by placement of the serial number, name of licensee, and city and State of their place of business on the frame or receiver. 27 CFR 478.92(a)(1)(i). Specifically, a frame or receiver must have an individual serial number and one of the following: (1) name of the FFL (or recognized abbreviation) and city and state (or recognized abbreviations) where the FFL maintains their business, or (2) name of FFL (or recognized abbreviation), and abbreviated FFL number (first three and last five digits with no dashes) as a serial number prefix, followed by a hyphen, then the assigned unique identification number. (*Id.*) The model, caliber or gauge, foreign manufacturer, and country of manufacture may be placed on the frame or receiver. 27 CFR 478.92(a)(1)(ii)(A)-(D). Lastly, the serial number be of the minimum size and depth, and not susceptible of being readily obliterated, altered, or removed. 27 CFR 478.92(a)(1)(i) and (v).

### 2. Serialization of Self-Manufactured or Privately Made Firearms.

As an initial matter, PMF is defined under 27 CFR 447.11 and 478.11 and includes a firearm made by a nonlicensee. More specifically, the regulations define PMF as follows:

> [a] firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced. The term

---

[8] This Court recognizes that whether an unfinished frame or receiver is included in the ATF's definition of "frame or receiver," and therefore included in the definition of "firearm" is an issue currently pending before the United States Supreme Court in *Garland v. VanDerStok*, Docket No. 23-852. As it currently stands, however, the Supreme Court has stayed the lower courts' judgments vacating ATF's Final Rule pending the Supreme Court's final judgment. *See Garland v. VanDerStok*, 144 S.Ct. 44 (2023). Therefore, this Court assumes in its analysis that an unfinished frame or receiver is treated identically to a "firearm" for purposes of serialization.

shall not include a firearm identified and registered in the National Firearms Registration and Transfer Record pursuant to chapter 53, title 26, United States Code, or any firearm manufactured or made before October 22, 1968 (unless remanufactured after that date).

27 CFR 478.11.

### a. Serialization of PMF Received into Inventory by Federal Firearm Licensees.

27 CFR 478.92(a)(2) echoes 27 CFR 478.92(a)(1)(i) and provides the acceptable method of serializing a PMF by an FFL who take the PMF into inventory. To that end, the regulations require placing the serial number "on a metal plate that is permanently embedded into a polymer frame or receiver, or other method approved by the Director." 27 CFR 478.92(a)(2). The serial number should begin with the licensee's abbreviated Federal firearm license number, "which is the first three and last five digits, as a prefix to a unique identification number, followed by a hyphen, *e.g.*, "12345678-[unique identification number]"". (*Id.*) The serial number must be placed in a manner otherwise in accordance with 27 CFR 478.92, including the requirements that the serial number be of the minimum size and depth, and not susceptible of being readily obliterated, altered, or removed. 27 CFR 478.92(a)(1)(i) and (v). The minimum depth of the serial number must be .003 inch with a print size no smaller than 1⁄16 inch. 27 CFR 478.92(a)(1)(v). The regulations further require the FFL to complete the markings no later than seven days upon receipt, or before the date of disposition, whichever is sooner. 27 CFR 478.92(a)(2).

In the event an FFL receives a PMF that is already marked by a nonlicensee, and the serial number meets the marking standards in 478.92, FFLs may adopt the unique serial (identification) number after placing their abbreviated license number first three and last five digits as a prefix to the number—followed by a hyphen, before the existing unique identification number. 27 CFR 478.92(a)(3)(iii)(D).

### b. Serialization of PMF by Non-Federal Firearm Licensees.

Under Nevada law, there is no express method by which a non-FFL may serialize a PMF or unfinished frame or receiver. Indeed, because NRS 202.3635 makes it illegal to

"manufacture or cause to be manufactured or assemble or cause to be assembled a firearm that is not imprinted with a serial number **issued by a firearms importer or manufacturer** in accordance with federal law"[9] and NRS 202.364 prohibits a person to "possess, sell, offer to sell, transfer, purchase, transport or receive a firearm that is not imprinted with a serial number issued by a firearms importer or manufacturer in accordance with federal law," Nevada law does not contemplate self-serialization of a PMF. NRS 202.3635(1) (emphasis added), NRS 202.364(1).

Nonetheless, A.B. 286 provided a grace period of about six months— until January 1, 2022—before most of its provisions became effective. NRS 202.3645. The grace period's purpose was to allow those who possessed PMFs time to sell them or move them out of the State. Senate Committee on the Judiciary, *AAB 286 Work Sessions Document 8* (2021), *available at* https://bit.ly/3Cn0nxA.

*     *     *

In answer to the Ninth Circuit's second question, this Court therefore finds that it is possible under Nevada law for a federal firearms licensee to add a serial number to an unserialized firearm and/or an unserialized frame or receiver.

## C.  It Is Possible in Nevada to Lawfully Obtain Serialized Self-Manufacturing and/or Self-Assembly Firearm Kits.

Given 27 CFR 478.92's serialization requirements and state's increased regulation of unserialized ghost guns, companies like Polymer80 have begun manufacturing and selling 80% gun-building kits. By way of a limited example, Polymer80's AFT kits[10]; Polymer80 Compat AFT PFC 9 9MM Serialized Pistol Build Kid[11]; and Polymer80 - PFC9

---

[9] As noted previously, under 27 CFR 4778.92, only a licensed importer or licensed manufacturer can engrave, cast, or stamp a serial number on a PMF.

[10] Polymer80 Compact AFT Kit, FDE, 15 Round Magazine (deltateamtactical.com)

[11] https://palmettostatearmory.com/polymer-80-compact-aft-pfc9-9mm-serialized-pistol-build-kit-fde-p80-pfc9-aft-fde.html

Serialized Compact Complete Pistol Frame[12] contain serialized parts. Likewise, some wholesalers like Davidson Defense offer on their website various serialized frames[13].

In answer to the Ninth Circuit's third question, this Court therefore finds that serialized firearm kits and/or frames and receivers are becoming more and more common and are readily available to purchase online.

### D.    Plaintiffs' Desired Self-Manufacturing Activities.

Plaintiffs' intentions regarding the type of self-manufacturing in which they wish to engage is drawn from both their Complaint, (ECF No. 1.) and their responses to interrogatories propounded by Defendants in limited discovery on remand, (**Exhibit 2**; **Exhibit 3**; **Exhibit 4**).

### 1.    Plaintiff Roger Palmer's Stated Intentions Regarding Self-Manufacturing

Roger Palmer holds a Nevada Concealed Carry Permit and is a retired law enforcement officer who has also served as a firearms instructor, concealed carry instructor, and a state security guard instructor. (*See* Complaint at 20, ¶¶ 77–78) Palmer is not a licensed firearms, manufacturer, importer, or dealer. (*Id*. at 20, ¶ 80.) Palmer claims that he owns and possessed, prior to A.B. 286's passage, multiple unserialized firearms, both handguns and rifles. (*Id*. at 20–21, ¶ 82) Palmer alleges that he previously self-manufactured these firearms lawfully by using unserialized component parts, including Polymer803 NFOs, one or more of which fall within the new definition of and prohibition against unserialized "unfinished frames or receivers" under A.B. 286. (*Id*.) More specifically, in his Response to Defendants' First Interrogatories, Palmer listed the following NFOs and firearm building kits that he lawfully acquired prior to A.B. 286's enactment: "AR15 blanks, polymer handgun blanks, AR10 blanks, 1911 unfinished receivers, and AR15 polymer/plastic lowers . . ." (**Ex. 2** at 5)

---

[12]   https://www.omegamanufacturinginc.com/polymer80-pfc9-frame-black.html
[13]   https://www.armorally.com/shop/polymer80-pf45-serialized-pistol-frame-kit/

Palmer alleges that he desires to acquire additional NFOs, including those that fall within the definition of "unfinished frames or receivers, commonly used in the self-manufacturing of firearms for self-defense and other lawful purposes," and he desires to self-manufacture additional operable firearms for self-defense and other lawful purposes. (Complaint at 22, ¶ 87) Palmer appears to elaborate on the "other lawful purposes" for which he wishes to self-manufacture firearms in his response to Defendants' Interrogatory No. 7

> It is not about a cost saving measure or concerns about a firearm being tracked. The opportunity to make something and it to be yours is what matters. Teaching others how to build, assemble, troubleshoot, and operate a firearm for lawful purposes cannot be compared to going and buying a pre-made weapon. Self-manufacturing allows a person to custom make a firearm and allows that person to also fully understand how it functions, thus making that person more knowledgeable about what they possess and how to safely operate it for lawful purposes.

(*See* **Ex. 2** at 7) This Court therefore finds that Plaintiff Palmer wishes to engage in self-manufacturing for self-defense, hobby purposes (i.e., "to make something and it to be yours"), and to teach others how to build, assemble, troubleshoot and operate a firearm.

### 2. Plaintiff Chad Moxley Stated Intentions Regarding Self-Manufacturing

Plaintiff Chad Moxley holds a valid Federal Firearms License and Nevada Concealed Carry Permit. (*See* Complaint at 23, ¶ 95 (emphasis added).) Moxley conducts sales of firearms and constituent firearm parts at local gun shows through his sole proprietorship, Strategic Supplies, in compliance with all applicable state and federal laws and regulations. (*Id*. at 23, ¶ 96) Moxley alleges he attended two gun shows per month before A.B. 286's passage and sold between five and forty unfinished receiver kits that would now be prohibited by A.B. 286. (*Id*. at 23, ¶ 97) Moxley further alleges that he desires to continue making available for sale and would make available for sale to ordinary law-abiding citizens the unserialized firearms, component parts, and other NFOs. (*Id*. at 23–24, ¶ 99) In his responses to Defendants' First Set of Interrogatories, however, Moxley states his intentions differently:

> I enjoy the hobby of self-manufacturing personal firearms that may be utilized for self-defense or other lawful recreational activities. I enjoy the recreational shooting of rifles, pistols, and shotguns and would like to continue my hobby with these types of self-manufactured firearms.

(**Ex. 3** at 7.) This Court therefore finds that Plaintiff Moxley wishes to engage in self-manufacturing for both sale of ghost guns and/or component parts, as well as for hobby and recreational purposes.

### 3.    Plaintiff Firearms Policy Coalition, Inc.'s Stated Intentions Regarding Self-Manufacturing

Plaintiff Firearm Policy Coalition ("FPC") alleges that it represents its Nevada resident members—who include gun owners, prospective gun owners, self-manufacturers, retailers of NFOs, parts, and firearms, and others—and brought the action underlying the instant appeal on behalf of its Nevada resident members, including the named individual Plaintiffs. (*See* Complaint at 26, ¶ 113) FPC claims that many of its Nevada resident members lawfully acquired unserialized firearm components that are commonly possessed by law-abiding citizens in the exercise of their right to self-manufacture such firearms for self-defense and other lawful purposes. (*Id*. at 26–27, ¶ 115) FPC contends that many of FPC's Nevada resident members desire to continue to own and possess their firearm components for lawful purposes, and to not sell or otherwise dispose of them. (*Id*. at 27, ¶ 117) Additionally, FPC contends that many of FPC's Nevada resident members also desire to acquire additional NFOs and to self-manufacture additional operable firearms for self-defense or other lawful purposes. (*Id*. ¶ 118)

Without further elaboration on what "other lawful purposes" FPC's Nevada resident members wish to engage in, this Court finds that, while FPC itself does not state an intention to self-manufacture firearms, it represents members who wish to self-manufacture for self-defense purposes.

1

### III.  Conclusions of Law

2

1.     There exists a rich historical tradition in this nation of regulating gun

3
possession and ownership when such possession and ownership poses a threat to public

4
safety, as defined by authorities at the relevant time. The historical evidence shows that

5
as circumstances changed and technology advanced, lawmakers have reacted with

6
regulation, restrictions, and even disarmament. A.B. 286 fits squarely into this historical

7
tradition and does not violate the Second Amendment.

8

2.     The lack of regulation of self-manufactured firearms in early America is not

9
persuasive evidence that A.B. 286 is inconsistent with the American tradition of firearms

10
regulation. The evidence shows that private self-manufactured arms were uncommon in

11
colonial America. This is due to the time, skill, and effort it took to self-manufacture

12
firearms, the lack of interchangeable parts, and the number of tools and materials needed.

13
Further, self-manufactured arms did not pose a threat to public safety as the authorities

14
at the time viewed it. Rather, the state itself, representing a new nation subject to

15
numerous outside threats, encouraged arms production, disarming only those who posed

16
a threat

17

3.     to the sovereignty of the nation and its people.[14] This history shows only that

18
it was not within the contemplation of founding-era lawmakers to regulate self-

19
manufactured arms as their prevalence was low and they posed no threat to public safety.

20

4.     It is not possible under Nevada law for an individual who is not a federal

21
firearms licensee to have a serial number added to an unserialized firearm and/or

22
unserialized frame or receiver. It is possible under Nevada law for a federal firearms

23
licensee to add a serial number to an unserialized firearm and/or an unserialized frame or

24
receiver. This lessens any burden on Nevadans' Second Amendment rights.

25

26

27
[14] One could imagine, however, that if a self-manufacturing gunsmith fell into the

28
categories of someone who posed a threat to public safety, e.g., a loyalist at the time of the Revolution, then lawmakers would have had no qualms with disarming him, despite his engagement in self-manufacturing.

5.    Serialized firearm kits and/or frames and receivers are becoming more common and are readily available to purchase online. This lessens any burden on Nevadans' Second Amendment rights.

6.    Plaintiff Palmer wishes to engage in self-manufacturing or self-assembly for self-defense, hobby purposes, and to teach others how to build, assemble, troubleshoot and operate a firearm. Plaintiff Palmer, as a non-federal firearms licensee, would be restricted from such activities under A.B. 286. Plaintiff Moxley wishes to engage in self-manufacturing or self-assembly for both sale of ghost guns and/or component parts, as well as for hobby and recreational purposes. As a federal firearms licensee, Plaintiff Moxley would not be restricted under A.B. 286 from self-assembly for sale, hobby, or recreational purposes, so long as he complied with the law's serialization requirement. While FPC itself does not state an intention to self-manufacture or self-assemble firearms, it represents members who wish to self-manufacture or self-assemble for self-defense purposes. If those members are not federal firearms licensees, they are restricted from self-manufacture or self-assembly under A.B. 286. If those members are federal firearms licensees, they are not restricted from doing so as long as they comply with A.B. 286's serialization requirements.

## IV.    Conclusion

For the foregoing reasons, this Court hereby reaffirms its March 29, 2022 Order granting Defendants' Motion to Dismiss. (ECF No. 65.) The parties shall notify the Clerk of the Ninth Circuit, in accordance with the Ninth Circuit's May 26, 2023 Order, (ECF No. 72), that this Court has made the above findings.

DATED this 21st day of August 2024.

AARON D. FORD
Attorney General

By: _/s/_____
    Jessica E. Whelan (Bar No. 14781)
    Deputy Solicitor General
    Iva K. Todorova (Bar No. 15827)
    Deputy Attorney General
    *Attorneys for State Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court by using the electronic filing system on the 21st day of August 2024.  I further certify that the participants in this case are registered electronic filing systems users and will be served electronically.

/s/ _____
An employee of the
Office of the Nevada Attorney General

**INDEX OF EXHIBITS**

| EXHIBIT NO. | EXHIBIT DESCRIPTION | BATES NUMBER |
|---|---|---|
| 1. | Defendants' Initial Expert Designations Pursuant to Fed. R. Civ. P. 26(a)(2) | NEV 001-0107 |
| 2. | Response to Defendant' First Interrogatories to Plaintiff Roger Palmer | NEV 108-114 |
| 3. | Response to Defendants' First Interrogatories to Plaintiff Chad Moxley | NEV 115-121 |
| 4. | Response to Defendants' First Interrogatories to Plaintiff Firearms Policy Coalition, Inc. | NEV 122-126 |