UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

ROGER PALMER, *et al.*,

                                    Plaintiffs,

        v.

STEPHEN SISOLAK, *et al.*,

                                    Defendants.

Case No. 3:21-cv-00268-MMD-CSD

FINDINGS OF FACT

## I.   SUMMARY

Plaintiffs Roger Palmer, Chad Moxley, and Firearms Policy Coalition, Inc. ("FPC") filed this lawsuit challenging sections of Nevada Assembly Bill 286 ("A.B. 286") as violating their rights under the Second Amendment and the Fifth Amendment's Takings clause.[1] (ECF Nos. 1, 65 at 1.) The Court found A.B. 286 did not violate these constitutional rights and dismissed the case. (ECF No. 65.) Plaintiffs appealed. (ECF No. 67.) This case is currently before the Court on a limited remand from the United States Court of Appeals for the Ninth Circuit to make factual findings responsive to enumerated questions articulated by the Ninth Circuit. (ECF No. 72 (the "Order").) The Court makes the requested factual findings below after describing the pertinent background and why it mostly adopts Defendants' proposed factual findings.

## II.   BACKGROUND

In its Order, the Ninth Circuit remanded to the Court, "solely to develop the historical and factual record." (*Id.* at 2.) The Court recited the findings the Ninth Circuit would like it

---

[1]Defendants are Stephen Sisolak, Aaron Ford, George Togliatti, and Mindy McKay. (ECF No. 84 at 1.)

1  to make in a prior order, which the Court incorporates by reference here. (ECF No. 73 at

2  1.) The Ninth Circuit gave the Court permission to allow appropriate discovery and

3  specified that the Court had discretion to enter orders to make the findings the Ninth Circuit

4  would like it to make. (ECF No. 72 at 3.) However, "[s]ubject to this limited remand order,

5  this panel retains jurisdiction over the case." (*Id.*)

6    The Court subsequently ordered the parties to propose a series of steps to make

7  the Ninth Circuit's requested factual findings. (ECF No. 73 at 2.) The parties jointly

8  proposed fact discovery, expert discovery, briefing from the parties where both sides

9  would propose a set of findings based on the record developed, and an optional hearing

10  if the Court chose to hold one.[2] (ECF No. 79.) The parties then jointly requested a status

11  conference. (ECF No. 80.)

12    United States Magistrate Judge Craig S. Denney granted the parties' request

13  (ECF No. 81) and held a status conference during which he set fact and expert discovery

14  deadlines and set a deadline for the parties to file proposed findings of fact and

15  conclusions of law (ECF No. 82). The parties then stipulated to extend their deadline to

16  file proposed findings by about a month so they could address *United States v. Rahimi*,

17  602 U.S. ----, 144 S. Ct. 1889 (2024) and its impact, if any, on their proposed findings.

18  (ECF No. 84.) Judge Denney granted that stipulation (ECF No. 85), and the parties timely

19  filed their proposed findings (ECF Nos. 86, 87).

20  **III.   DISCUSSION**

21    Both sides included proposed conclusions of law in their proposed findings (ECF

22  Nos. 86 at 23-23, 86-1, 87 at 22-23), and indeed, nearly all of Plaintiffs' filing consists of

23  an argument as to why the Court should find A.B. 286 unconstitutional now and enjoin its

24  enforcement (ECF No. 86). But the Court is limited by the Ninth Circuit's "remand in

25  situations where the scope of the remand is clear." *United States v. Thrasher*, 483 F.3d

---

27    [2]The Court declines to hold a hearing before issuing these findings as it finds the
issues clearly presented in the papers and a hearing otherwise unnecessary. *See* LR 78-

28  1 ("All motions may be considered and decided with or without a hearing.").

977, 982 (9th Cir. 2007) (noting this rule applies in civil and criminal cases and finding the district court did not err by refusing to consider a new argument because the appellate court had remanded to resolve a critical, disputed fact). This is one of those situations. The Ninth Circuit specified that this is a limited remand so that the Court could make factual findings. (ECF No. 72.) The Court accordingly finds it would be inappropriate to make any conclusions of law.

Moreover, because of the limited nature of the remand, the Court lacks authority to declare A.B. 286 unconstitutional at this juncture or enter a preliminary injunction against its enforcement—as Plaintiffs request. (ECF No. 86 at 23.) *Cf. Mujica v. AirScan Inc.*, 771 F.3d 580, 590 (9th Cir. 2014) (finding that the Ninth Circuit retained jurisdiction over a case where it had entered a limited remand for the district court to make specific factual findings; *United States v. Pimentel*, 34 F.3d 799, 800 (9th Cir. 1994) ("In light of this clear evidence that the scope of our remand was limited to the single sentencing issue raised in Pimentel's prior appeal, the district court was without authority to reexamine any other sentencing issues on remand."). This renders much of Plaintiffs' proposed findings—which are not proposed findings but instead merits arguments—beside the point for the time being. (ECF No. 86 at 10-17.) Plaintiffs further spend a couple of pages arguing against the implicit premise of some of the Ninth Circuit's questions (*id.* at 21-22), but those arguments are best directed to the Ninth Circuit once it has the Court's findings of fact to consider.

When it comes to proposed findings of fact, Plaintiffs only present two: that ordinary, law-abiding citizens were not prevented from (1) making or (2) using their own firearms by any criminal law during the relevant historical period. (*Id.* at 22-23.) But Plaintiffs proffer no evidence to support these claims. In contrast, and as further elaborated below, Defendants presented an expert report from Professor Brian DeLay (ECF No. 87-1 at 9-11), who presents compelling discussion of the historical tradition of regulating both types of firearms and who could possess them for public safety reasons supported by historical

1    evidence (*see generally id.*). Prof. DeLay's report at least conflicts with Plaintiffs'

2    conclusory assertions that people were never prohibited from making and using their own

3    firearms during the relevant historical period—because they were, for example, if they

4    were Catholic and living in Pennsylvania during the Seven Years War. (*Id.* at 66 (quoting

5    in pertinent part Joseph G.S. Greenlee, *The Historical Justification for Prohibiting*

6    *Dangerous Persons from Possessing Arms*, 20 Wyo. L. Rev. 249, 263 (2020) ("In 1759,

7    Pennsylvania also disarmed Catholics.")).) And Prof. DeLay includes many other

8    examples in his report. In sum, the Court rejects Plaintiffs' two proposed findings of fact

9    as inaccurate.

10         The Court also notes that Judge Denney gave the parties more time to revise their

11   findings after considering *Rahimi*, 144 S. Ct. 1889 (ECF No. 85), but the only way that

12   Plaintiffs appear to have adapted their findings considering *Rahimi* is quoting through it to

13   *Bruen*, to make the conclusory argument that A.B. 286 is not relevantly similar to any laws

14   that 'our tradition is understood to permit' and thus A.B. 286 is not consistent with the

15   Nation's tradition of firearms regulation (ECF No. 86 at 23). It accordingly does not appear

16   that Plaintiffs used their time to meaningfully address *Rahimi*. In contrast, Defendants'

17   proposed findings supported by Prof. DeLay's expert report strike the Court as broadly

18   responsive to *Rahimi* because they show how A.B. 286 is analogous to founding-era laws

19   that disarmed people considered dangerous, imposed time, place, and manner restrictions

20   on the use of firearms, and banned weapons considered particularly dangerous—all in the

21   name of public safety. And indeed, "[f]rom the earliest days of the common law, firearm

22   regulations have included provisions barring people from misusing weapons to harm or

23   menace others." *Rahimi*, 144 S. Ct. at 1899. Unserialized, untraceable weapons

24   increasingly are used in violent crimes and thus pose a threat to public safety. *See*

25   Michelle Rippy, *The Ghost Guns Haunting National Crime Statistics*, Federation of

26   American Scientists (June 6, 2023), https://perma.cc/R54E-L97J. Thus, *Rahimi* seems to

27   allow for a looser fit by analogy than *Bruen* that could render laws such as A.B. 286

28

1   constitutional because it was enacted in the interest of public safety and in response to

2   technological developments in firearms assembly. Defendants' proposed findings are

3   better adapted to the post-*Rahimi* jurisprudential landscape than Plaintiffs' conclusory

4   ones.

5           For all of these reasons, the Court primarily adopts Defendants' proposed factual

6   findings and correspondingly rejects Plaintiffs'.

7   **IV.    FINDINGS OF FACT**

8           The Court makes the following findings of fact as directed in the Order: (A) A.B.

9   286's consistency with this Nation's historical tradition of firearm regulations; (B) the

10   circumstances under which someone in Nevada could legally add a serial number to an

11   unserialized firearm; (C) the possibility of obtaining serialized firearm assembly kits in

12   Nevada; and (D) the kind of self-manufacturing of firearms Plaintiffs are interested in.

13           **A. A.B. 286 and this Nation's Historical Tradition of Firearm Regulation**

14           1.      For a law that presumptively implicates the Second Amendment to be

15   constitutional, the *Bruen* test requires the government to "demonstrate that the regulation

16   is consistent with this Nation's historical tradition of firearm regulation." *New York State*

17   *Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022) (citation omitted). To that end,

18   Defendants retained an expert witness, Prof. DeLay, to opine on the historical regulation

19   of firearms in early America. (Attached as Exhibit ("Ex.") 1[3].) Despite being given time and

20   the ability to do so, Plaintiffs have not submitted any expert report, either initially or to rebut

21   Prof. DeLay's opinions.

22           2.      The Court finds persuasive the following opinions from Prof. DeLay's report:

23   (1) A.B. 286 is consistent with the American tradition of firearms regulation focused on

24   public safety; and (2) Ghost guns are new to American history such that the lack of

25   regulation of ghost guns should not be taken as the founders' implicit approval of such

26   firearms. (Ex. 1 at 11-12.) Each of these points is discussed in further detail below.

27   ───────────────────

28           [3]Ex. 1 is docketed as ECF No. 87-1.

1

### 1. The American Tradition of Firearms Regulation Focused on Public Safety

2    3.    The Court begins its analysis of the history and tradition of firearms

3  regulation in this nation before and at the time of our nation's founding. *See Bruen*, 597

4  U.S. at 27 ("Following the course charted by *Heller*, we will consider whether 'historical

5  precedent' from before, during, and even after the founding evinces a comparable tradition

6  of regulation." (citation omitted).) Although *Bruen* cautioned that "English common law 'is

7  not to be taken in all respects to be that of America," 597 U.S. at 39, the Supreme Court's

8  recent decision in *Rahimi* relied in part on English common law to establish a historical

9  tradition of disarming individuals who pose a credible threat to the physical safety of

10  another, *see* 144 S. Ct. at 1899. Thus, the Court likewise looks to English common law,

11  where relevant, as the beginning of this Nation's historical tradition of firearms regulation.

12    ### a. Early Colonial Regulation

13    4.    Early colonial laws restricting firearms possession were undoubtedly

14  informed by English common law providing for the disarming of those who posed a threat

15  to public safety, as defined by the relevant authorities at the time. English common law,

16  for example, disarmed Catholics, insurgents, "disaffected persons," and other judged

17  "dangerous to the peace of the kingdom." (Ex. 1 at 66 (citing Greenlee, 20 Wyoming L.

18  Rev. at 257-61).) In the seventeenth century, the Massachusetts Bay Colony disarmed

19  seventy-six supporters of religious dissident Anne Hutchinson, who was convicted of

20  sedition for criticizing the colony's clergy for its legalistic interpretation of the Bible. *See*

21  *Greenlee*, 20 Wyoming L. Rev. at 263. Similarly, Maryland, Virginia, and Pennsylvania all

22  passed laws to disarm Catholics during the Seven Years' War, which was seen as a

23  conflict between Catholicism and Protestantism. *See id.* at 263-64.

24    ### b. Revolutionary Era Regulation

25    5.    In the early years of the American Revolution, as the Patriots gained power,

26  they began to disarm those they perceived as a threat to public safety—Loyalists that

27  posed a threat to independence. (Ex. 1 at 66.) For example, the colony of New York,

28

whose residents were primarily Loyalists or those hoping to remain neutral in the conflict with Britian, was affected by several disarmaments. (*Id.* (citing Thomas Verenna, *Disarming the Disaffected*, Journal of the American Revolution (Aug. 26, 2014), https://perma.cc/NV5C-L4WJ). In 1775, Patriots in Brookhaven, New York resolved to disarm anyone who dared "deny the authority of the Continental or of this Congress, or the Committee of Safety, or the Committees of the respective Counties, Cities, Towns, Manors, Precincts, or Districts in this Colony." Verenna, *Disarming the Disaffected*. In January 1776, the Continental Congress ordered several hundred-armed militiamen into Queen's County in New York to disarm loyalists. *See id.* George Washington ordered General Charles Lee to disarm everyone in Long Island "whose conduct, and declarations have render'd them justly suspected of Designs unfriendly to the Views of Congress." *Id.* General Philip Schuyler disarmed "malignants"—mostly Scotch Highlanders loyal to the king—in the Hudson Valley, and in March of 1776, Congress concluded that nearly the entire population of Staten Island consisted of "avowed Foes" and ordered a general disarmament there. *Id.*

6.     Like Patriot leaders in New York, Patriots in Connecticut, North Carolina, Delaware, Georgia, New Hampshire, New Jersey, South Carolina, Pennsylvania, Massachusetts, Maryland, and Virgina likewise disarmed Loyalists. (Ex. 1 at 68-69 (citations omitted).)

7.     On March 14, 1776, the Continental Congress called for a general ban on gun ownership among Loyalists, recommending to all individual colonies that they immediately "cause all persons to be disarmed within their respective colonies, who are notoriously disaffected to the cause of America, or who have not associated, and shall refuse to associate, to defend, by arms, these United Colonies." (Ex. 1 at 67 (quoting Congressional Resolutions of Tuesday, Jan. 2, 1776, *in* United States Continental Congress, Journals of the Continental Congress, 1774-1789, Edited from the Original Records in the Library of Congress, Vol. 4 205 (Worthington Chauncey Ford ed., 1904).)

8.     The reasons behind disarming these individuals were multifaceted. As noted by Professor DeLay in his Declaration,

> There were two primary motivations for the Founding Fathers and likeminded Americans to orchestrate a nationwide disarmament campaign against white political opponents. First, loyalists could of course use their weapons to resist the insurgency and fight for the king. Second, patriot forces were perilously under-armed and needed whatever guns they could find. This is the reason that George Washington argued for a broad confiscation program in at least one Pennsylvania county, targeting not only those actively fighting for the crown, but also those who "claimed the Right of remaining Neuter." Washington insisted that "we ought not to hesitate a Moment in taking their arms, which will be so much wanted in furnishing the new Levies." There is a striking flexibility in these revolutionary-era disarmaments, in other words. They were undertaken preemptively, targeted not so much at people who had taken up arms against the newly cohering political authority but rather at people who might decide to do so in the future. And they could be undertaken both to preemptively disempower political opponents and out of a very practical imperative to arm insurgent forces.

(Ex. 1 at 68 (footnote omitted).)

### c.     Post-Revolutionary War Regulation

9.     In the post-Revolutionary period, lawmakers continued to pass hundreds of laws that directly or indirectly regulated firearms to further public safety interests, as those public safety interests developed. (*Id.* at 63.) Several examples are listed below.

- Virginia regulated the carrying of certain weapons. *See, e.g.*, An Act Forbidding and Punishing Affrays, ch. 49, 1786 Va. Acts 35 (1786), https://perma.cc/8FVT-C4KL.

- Massachusetts regulated the brandishing of particular weapons. *See, e.g.*, An Act to Prevent Routs, Riots, and Tumultuous assemblies, and the Evil Consequences Thereof, 1786 Mass. Sess. Laws (1786), https://perma.cc/6ZMJ-F89K.

- Massachusetts responded to the 1786 tax uprising that came to be known as "Shay's Rebellion" by passing a law disarming not only persons who take up arms against the state, but also those "who have given or may hereafter give them counsel, aid, comfort or support, voluntarily, with intent to encourage the opposition

to the government." *See* Massachusetts Act of Feb. 16, 1787, ch. VI, 1787 Mass Acts 555 (1787), https://perma.cc/TE7P-XWYH.

- New York regulated the discharge of weapons at sensitive times. *See, e.g.*, "An Act to Prevent Firing of Guns and Other Firearms within this State, on Certain Days Therein Mentioned," ch. 81, 1784-1785 N.Y. Laws 152 (1785), https://perma.cc/AX34-96Q5.

- Ohio regulated the discharge of weapons in sensitive places. *See* "An Act for Suppressing and Prohibiting Every Species of Gaming for Money or Other Property, and for Making Void All Contracts and Payments Made in Furtherance Thereof," ch. 13, § 4, 1788-1801 Ohio Laws 42 (1788), https://perma.cc/9M6M-854A.

- Ohio also passed a law imposing sentence enhancements for crimes committed with arms. *See, e.g.*, the 1788 Ohio Laws 20, A Law Respecting Crimes and Punishments…, ch. 6, 1788_1801 Ohio Laws 20 (1788), https://perma.cc/873D-YHZR.

10.    These laws, passed in the decade before the ratification of the Second Amendment, reflect the colonies' desire to regulate firearm uses in a manner to protect the public safety; like today's concealed carry and time, place, and manner restrictions. (Ex. 1 at 64.)

### d.    Founding Era Regulation

11.    At and around the time of this nation's founding, levels of gun ownership were high, while levels of gun-related violence against fellow subjects were low. (*Id.* at 53, 56.) The low levels of gun-related violence were related in large part to the technological limitations of muzzle-loading flintlock firearms.[4] (*Id.* at 64.) This difference between gun

---

[4]For example, such weapons "were notoriously inaccurate at range, liable to misfire, and had to be muzzle-loaded with gunpowder and ball before every shot, either by pouring ammunition direct into the barrel or packing in a pre-made paper cartridge loaded with powder and ball." (Ex. 1 at 56 (citation omitted).) "Moreover, such guns were

culture in early America and gun culture today notwithstanding, there remained in early America a rich regulatory tradition in pursuit of public safety as defined by authorities at the time. (*Id.* at 63.) Several major changes shifted the focus of public safety concerns from disarming dissidents that posed a threat to the independence of their fellow colonists to regulating the actual firearms and other dangerous weapons themselves. (*Id.* at 76.) Among these changes were "dramatic population increases and rapid urbanization; the industrial revolution and the mass-production of weapons in the United States; and unprecedented advances in firearms technology that made guns increasingly dangerous." (*Id.* at 74-75.) Or, in the language of *Bruen*, there began to be "dramatic technological changes" in how firearms were made and how they operated, provoking "unprecedented societal concerns" in a growing and urbanizing United States. *See Bruen*, 597 U.S. at 27.

12.     One of the main technological advances in the early nineteenth century was the advent of percussion cap ignition. (Ex. 1 at 75.) Manufacturers no longer needed to rely on cumbersome hammer-vices, flints, and priming pans filled with loose powder. (*Id.*) Instead, arms designers began to make practical weapons using multiple rotating barrels or rotating breeches for the first time. (*Id.* (citing Herbert G. Houze, *Samuel Colt: Arms, Art, and Invention* 24 (2006).) Around the same time, large-scale production became possible due to advances in automatic milling machines as well as metallurgy and machine tooling. (Ex. 1 at 75.) As a result, manufacturers could build complex arms from nearly identical component parts at greater speed and less cost than ever before. (*Id.* at 75-76.) "By the 1820s, American manufacturers were beginning to mass-produce single-shot, percussion-cap pistols. By the 1830s, handheld 'revolvers' (with a rotating, multichambered breech) and 'pepperboxes' (with multiple barrels rotating around an axis) started entering the market." (*Id.* at 76 (citing William Hardy McNeill, *The Pursuit of Power: Technology, Armed Force, and Society Since A.D. 1000* 233-34 (1982) and Merritt Roe

_____

seldom kept loaded and at the ready for any extended period because black powder corroded iron barrels so quickly." (*Id.*)

Smith, *Harpers Ferry Armory and the New Technology: The Challenge of Change* 219-51(1977)).)

13.    These technological advancements led to an influx of efficient, concealable firearms in early America, generating unprecedented societal concerns. (Ex. 1 at 76.) In response to rising threats to public safety from the increase in gun violence that resulted, lawmakers across the country sought to regulate conceal carry. (*Id.*) More than thirty such laws were enacted between the ratification of the Second Amendment in 1791 and the ratification of the Fourteenth Amendment in 1868.[5]

### e.    Post-Civil War Regulation

14.    Due in large part to the U.S. Civil War, the domestic arms industry saw a massive increase in its productive capacity in the mid-late nineteenth century and a large and permanent increase in the number of firearms in the country. (*Id.* at 76-77.) State and municipal lawmakers reacted to the resulting public safety concerns by accelerating the scale and pace of regulation. *See e.g.*, Brennan Gardner Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas*, 1836-1900, 121 Southwestern Hist. Q 284 (2017); Brennan Gardner Rivas, *Enforcement of Public Carry Restrictions: Texas as a Case Study Symposium: The 2nd Amendment at the Supreme Court: '700 Years of History' and the Modern Effects of Guns in Public*, 55 U.C. Davis L. Rev. 2603 (2022). Indeed, Professor DeLay's search performed Jan. 27, 2024, of the Duke Repository of Historical Gun Laws, a reliable source that is consistently updated with new

---

[5]*See, e.g.*, 1862 Colo. Sess. Laws 56, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1; An Act to Prevent Persons in this Commonwealth from wearing Concealed Arms, Except in Certain Cases (1813) § 1 (Ky.); 1864 Mont. Laws 355, An Act To Prevent The Carrying Of Concealed Deadly Weapons In The Cities And Towns Of This Territory, § 1; 1853 N.M. Laws 406, An Act Prohibiting The Carrying Of Weapons Concealed Or Otherwise, § 25; An Act to prevent the carrying of concealed weapons, (1838) (Va.). For a full compilation of concealed carry laws passed during this period, see Mark Frassetto, *Firearms and Weapons Legislation up to the Early 20th Century* (Jan. 15, 2013), at 20-24, https://perma.cc/54JL-AFMX.

research, resulted in 285 regulations on carrying weapons enacted between 1865 and 1900. (Ex. 1 at 77 and n.233.)

### f.    Twentieth-Century Regulation

15.    Twentieth-century lawmakers maintained and extended the Nation's historic tradition of regulating firearms in the name of public safety, particularly with respect to concealed carry laws. However, additional technological advances again bred additional regulation in the name of public safety. Specifically, the innovations of self-loading mechanisms, smokeless powder, and detachable magazines made it possible for gunmakers to introduce radically new types of firearms. (*Id.* at 79-80.) Semiautomatic pistols and automatic and semi-automatic rifles became increasingly popular in the U.S. civilian market in the early twentieth century. (*Id.* at 80 (citing Brian DeLay, *The Myth of Continuity in American Gun Culture*, 113 Calif. L. Rev. __ (forthcoming 2025), at 40-42).)

16.    Landmark legislation following these technological innovations includes the National Firearms Act of 1934; the 1968 Gun Control Act (establishing serialization requirements); the 1986 Firearm Owners' Protection Act (banning the transfer or possession of machine guns); the 1993 Brady Handgun Violence Protection Act (mandating background checks); and the 1994 Federal Assault Weapons Ban (since lapsed). (Ex. 1 at 80-81.) Each of these pieces of legislation introduced restrictions or affirmative requirements on gun manufacturers, sellers, and/or owners in reaction to technological advancements and in furtherance of public safety.

### g.    Ghost Gun Regulation Today

17.    The 1968 Gun Control Act requires that licensed importers and licensed manufacturers imprint a serial number on the frame or receiver of any weapon they import or manufacture. *See* 18 U.S.C. § 923(i). There exists, however, an exemption for "hobbyists" who make their own firearms for personal use. (Ex. 1 at 13.) Over the past fifteen years or so, advances in polymers, small-batch parts manufacturing, compact control milling devices, 3D-printing, and computer-aided design ("CAD") files have led to

a boom in self-manufactured (or self-assembled) firearms, commonly known as ghost guns. (*Id.*) In essence, these technological advancements "have helped firearms entrepreneurs turn the GCA's hobbyist exception into a dynamic sub-industry." (*Id.*) "Their products enable unskilled buyers to easily assembly their own guns without professional assistance and often without specialized tools." (*Id.* (citing William J. Krouse, *Privately Made Firearms: A Growing Source of Unmarked, Untraceable 'Ghost Guns'?* Congressional Research Service Report IF11810, April 8, 2021).)

18.     These technological advances, along with the increasing ease of internet sales of so-called ghost gun "kits," has made obtaining and assembling these weapons easier. *See* Rippy, *The Ghost Guns Haunting National Crime Statistics*, https://perma.cc/R54E-L97J. Indeed, according to data reported to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), there have been over 37,000 ghost guns recovered since 2017, with a 1083% increase in recoveries from 2017-2021. *See id.* As these unserialized, untraceable weapons increasingly are used in violent crimes and pose a threat to public safety, state lawmakers have reacted by passing legislation to regulate the manufacture, possession, sale, and transfer of ghost guns.

19.     To date, fifteen states have enacted laws regulating ghost guns: California, Colorado, Connecticut, Delaware, Hawaii, Illinois, Maryland, Massachusetts, Nevada, New Jersey, New York, Oregon, Rhode Island, Vermont, and Washington.[6] Nevada's A.B. 286 is such a regulation.

20.     In sum, there exists a rich historical tradition of regulation in this country to respond to public safety threats, as interpreted by the authorities of the time. The general pattern is that, as technology advances, new public safety threats arise, which are responded to by lawmakers through legislation. The regulation of ghost guns fits squarely within this rich historical tradition.

---

[6]*See* Everytown Research & Policy, *Which states regulate ghost guns?*, https://perma.cc/SAS4-2JMK.

1

### 2. The Need to Regulate Self-Manufactured Firearms in Early America

2    21.    The fact that state and local lawmakers at and around the time of our nation's

3 founding did not regulate self-manufactured arms does not alter the history and tradition

4 of regulation in the name of public safety. Put simply, the evidence before the Court shows

5 that today's method and level of firearm self-assembly is entirely new to American history;

6 that the self-assembly of firearms by non-professionals was never a threat to public safety

7 in the founding era, and thus would not have been in the contemplation of founding-era

8 lawmakers.

9    22.    As an initial matter, there can be no doubt that there is a rich historical

10 tradition of "arms-making" in the United States that "employed professionals with

11 specialized skills in firearms production." (Ex. 1 at 17) In early America, only professional

12 gunsmiths could make firearms, and even professional gunsmiths seldom made firearms

13 from scratch. (*Id.* at 51.)

14    23.    One "small[] cohort of gunsmiths" who did make their own firearms usually

15 did so "with a mix of self-made components and imported locks and/or barrels." (*Id.* at 31.)

16 The number of professional gunsmiths making their own firearms was so small not only

17 because of the great skill it took to do so, but also because of the time and effort required.

18 (*Id.* at 35-36.) With respect to the skill level required, unlike the parts kits available today

19 from manufacturers such as Polymer80 and 80 Percent Arms, there were no parts kits in

20 early America. (*Id.* at 34.) This is naturally because firearms at the time were not yet built

21 with interchangeable parts. (*Id.*) Eighteenth-century firearm components were almost all

22 made by hand. (*Id.* at 35.) Even gunmakers who imported locks and barrels, the two most

23 complex components of an eighteenth-century firearm, needed a suite of professional

24 skills, tools, and additional parts to produce a functioning weapon:

25    A functional wooden stock would have to be made, a task requiring woodworking tools and expertise. Numerous additional parts would have to

26 be made or purchased, including a butt-plate, side-plate, trigger, trigger guard, trigger plate, trigger pivot, escutcheon, ramrod, ramrod pipes,

27 furniture-fastening cross-pins, and a variety of metal and wood screws.

28

(*Id.* at 34 (citing De Witt Bailey, *Small Arms of the British Forces in America: 1664-1815* 95-96 (2009).)

24.     Another even smaller cohort of gunsmiths made their own firearms entirely from scratch. (Ex. 1 at 35.) It was rare for colonial gunsmiths to make their own firearms from scratch because, "[u]nlike the European system characterized by complex division of labor, gun-makers in the colonies usually worked alone or in pairs in small shops." (*Id.*) Thus, "in addition to an unusually wide range of skills, such producers needed an unusually large collection of materials and tools." (*Id.*) They needed, for example,

> iron, copper, and steel; bellows, forges, anvils, and sledges; hammers and mallets of different shapes, materials, and sizes; a remarkable array of files (one eighteenth-century gunsmith's inventory includes twenty-nine types); rasps, saws, planes, hand and table-vices, wrenches, swedges, screwdrivers, piers, pincers, tongs, drills, chisels, gouges, screw-plates, augers, drawing knives, and sandpaper; and mortars, pestles, and the necessary components for browning chemicals, among other necessities.

(*Id.* at 35 (citing M. L. Brown, *Firearms in Colonial America: The Impact on History and Technology: 1492-1792* 244-57 (1980).)

25.     Considering the specialized skill and wide range of tools and material needed, "it would have taken an early American gunsmith around a week of work to produce a basic, utilitarian longarm from scratch." (Ex. 1 at 36 (citing Merritt Roe Smith, *Harpers Ferry Armory and the New Technology: The Challenge of Change* 11 (1977).) A recent study shows that individual rifle-makers in southeastern Pennsylvania produced no more than thirty rifles a year. (Ex. 1 at 36 (citing Alexander Rose, *American Rifle: A Biography* 21 (2008).) John Partridge Bull of Deerfield, Massachusetts, a gunsmith who kept a detailed account book recording his work over two decades, focused almost exclusively on repairs. He made just three new guns during those twenty years. (Ex. 1 at 36 (citing Susan McGowan, *Agreeable to His Genius: John Partridge Bull (1731-1813), Deerfield, Massachusetts* 5, 39-40, 74-75 (1988)) (unpublished M.A. thesis, Trinity College).)

///

26.     Thus, very few colonial gunsmiths had the skill and ability to make their own firearms from scratch. Those that had the skill and ability spent much time and effort to make relatively few firearms. There simply is no comparison to the easy access, low level of skill, and speed at which today's amateur gunmakers can self-assemble ghost guns.

27.     Finally, early American lawmakers had no reason to regulate amateur firearms making because amateurs simply could not and did not make firearms. To self-manufacture firearms (as opposed to today's self-assembly of firearms) took too much time and skill and too many tools and materials for the average colonists or early American to even attempt such an endeavor. Thus, the lack of regulation of self-assembly is not surprising and is certainly not evidence of a historical tradition of self-assembly of firearms. Self-assembly of firearms is a relatively new phenomenon in American gun culture.

**B.  Adding a Serial Number to a Self-Manufactured, Unserialized Firearm and/or Unfinished Frame or Receiver in Nevada**

28.     As a starting point, NRS § 202.363 provides that "[a] person shall not possess, purchase, transport or receive an unfinished frame or receiver unless" the person is either a firearms importer or manufacturer or "[t]he unfinished frame or receiver is required by federal law to be imprinted with a serial number by a firearms importer or manufacturer and the unfinished frame or receiver has been imprinted with the serial number." Nevada law thus looks to federal law for guidance on serialization of an unfinished frame or receiver. Likewise, NRS § 202.3635 directs that, aside from several exceptions not relevant here, a firearm is to be imprinted with a serial number in accordance with federal law and any regulations adopted thereunder. *See* NRS § 202.3635(1). Therefore, the Court looks to federal law to determine if and how a serial number may lawfully be added to an unfinished frame or receiver.[7]

---

[7]The Court recognizes that whether an unfinished frame or receiver is included in the ATF's definition of "frame or receiver," and therefore included in the definition of "firearm" is an issue currently pending before the United States Supreme Court in *Garland v. VanDerStok*, Docket No. 23-852. As it currently stands, however, the Supreme Court

### 1.      Serialization of a Firearm by a Federal Firearm Licensees

29.     27 CFR 478.92(a)(1) prescribes the method of serialization for firearms manufactured or imported by licensed manufacturers and licensed importers. Generally, federal firearm licensees ("FFLs"), are required to identify each firearm manufactured or imported by placement of the serial number, name of licensee, and city and State of their place of business on the frame or receiver. *See* 27 CFR 478.92(a)(1)(i). Specifically, a frame or receiver must have an individual serial number and one of the following: (1) name of the FFL (or recognized abbreviation) and city and state (or recognized abbreviations) where the FFL maintains their business; or (2) name of FFL (or recognized abbreviation), and abbreviated FFL number (first three and last five digits with no dashes) as a serial number prefix, followed by a hyphen, then the assigned unique identification number. *See id.* The model, caliber or gauge, foreign manufacturer, and country of manufacture may be placed on the frame or receiver. *See* 27 CFR 478.92(a)(1)(ii)(A)-(D). Lastly, the serial number must be of the minimum size and depth, and not susceptible of being readily obliterated, altered, or removed. *See* 27 CFR 478.92(a)(1)(i) and (v).

### 2.      Serialization of Self-Manufactured or Privately Made Firearms

30.     As an initial matter, a privately made firearm ("PMF") is defined under 27 CFR 447.11 and 478.11 and includes a firearm made by a nonlicensee. More specifically, the regulations define PMF as follows:

> [a] firearm, including a frame or receiver, completed, assembled, or otherwise produced by a person other than a licensed manufacturer, and without a serial number placed by a licensed manufacturer at the time the firearm was produced. The term shall not include a firearm identified and registered in the National Firearms Registration and Transfer Record pursuant to chapter 53, title 26, United States Code, or any firearm manufactured or made before October 22, 1968 (unless remanufactured after that date).

has stayed the lower courts' judgments vacating ATF's Final Rule pending the Supreme Court's final judgment. *See Garland v. VanDerStok*, 144 S.Ct. 44 (2023). Therefore, the Court assumes in its analysis that an unfinished frame or receiver is treated identically to a "firearm" for purposes of serialization.

27 CFR 478.11.

### a. Serialization of PMF received into inventory by Federal Firearm Licensees

31.     27 CFR 478.92(a)(2) echoes 27 CFR 478.92(a)(1)(i) and provides the acceptable method of serializing a PMF by an FFL who take the PMF into inventory. To that end, the regulations require placing the serial number "on a metal plate that is permanently embedded into a polymer frame or receiver, or other method approved by the Director." 27 CFR 478.92(a)(2). The serial number should begin with the licensee's abbreviated Federal firearm license number, "which is the first three and last five digits, as a prefix to a unique identification number, followed by a hyphen, e.g., "'12345678-[unique identification number]'". *Id.* The serial number must be placed in a manner otherwise in accordance with 27 CFR 478.92, including the requirements that the serial number be of the minimum size and depth, and not susceptible of being readily obliterated, altered, or removed. *See* 27 CFR 478.92(a)(1)(i) and (v). The minimum depth of the serial number must be .003 inch with a print size no smaller than 1/16 inch. *See* 27 CFR 478.92(a)(1)(v). The regulations further require the FFL to complete the markings no later than seven days upon receipt, or before the date of disposition, whichever is sooner. *See* 27 CFR 478.92(a)(2).

32.     In the event an FFL receives a PMF that is already marked by a nonlicensee, and the serial number meets the marking standards in 478.92, FFLs may adopt the unique serial (identification) number after placing their abbreviated license number first three and last five digits as a prefix to the number—followed by a hyphen, before the existing unique identification number. *See* 27 CFR 478.92(a)(3)(iii)(D).

### b. Serialization of PMF by Non-Federal Firearm Licensees

33.     Under Nevada law, there is no express method by which a non-FFL may serialize a PMF or unfinished frame or receiver. Indeed, because NRS § 202.3635 makes it illegal to "manufacture or cause to be manufactured or assemble or cause to be assembled a firearm that is not imprinted with a serial number issued by a firearms

1    importer or manufacturer in accordance with federal law"[8] and NRS § 202.364 prohibits a

2    person to "possess, sell, offer to sell, transfer, purchase, transport or receive a firearm that

3    is not imprinted with a serial number issued by a firearms importer or manufacturer in

4    accordance with federal law," Nevada law does not contemplate self-serialization of a

5    PMF. *See* NRS § 202.3635(1); NRS § 202.364(1).

6        34.    Nonetheless, A.B. 286 provided a grace period of about six months—until

7    January 1, 2022—before most of its provisions became effective. *See* NRS § 202.3645.

8    The grace period's purpose was to allow those who possessed PMFs time to sell them or

9    move them out of the State. *See* Senate Committee on the Judiciary, AAB 286 Work

10   Sessions Document 8 (2021), https://perma.cc/GG5K-SDER.

11       35.    To answer the Ninth Circuit's second question, the Court therefore finds that

12   it is possible under Nevada law for a federal firearms licensee to add a serial number to

13   an unserialized firearm and/or an unserialized frame or receiver.

14

15
### C. Possibility in Nevada of Lawfully Obtaining Serialized Self- Manufacturing and/or Self-Assembly Firearm Kits

16       36.    Given 27 CFR 478.92's serialization requirements and states' increased

17   regulation of unserialized ghost guns, companies like Polymer80 have begun

18   manufacturing and selling 80% gun-building kits. By way of a limited example,

19   Polymer80's AFT kits; Polymer80 Compact AFT PFC 9 9MM Serialized Pistol Build Kit;

20   and Polymer80 - PFC9 Serialized Compact Complete Pistol Frame contain serialized

21   parts. Likewise, some wholesalers like Davidson Defense offer on their website various

22   serialized frames.

23       37.    To answer the Ninth Circuit's third question, the Court therefore finds that

24   serialized firearm kits and/or frames and receivers are becoming more common and are

25   available to purchase online.

26

27       ───────────────────

28       [8]As noted previously, under 27 CFR 4778.92, only a licensed importer or licensed manufacturer can engrave, cast, or stamp a serial number on a PMF.

1

**D. Plaintiffs' Desired Self-Manufacturing Activities**

2      38.     Plaintiffs' intentions regarding the type of self-manufacturing in which they

3   wish to engage is drawn from both their Complaint (ECF No. 1), and their responses to

4   interrogatories propounded by Defendants in limited discovery on remand. (*See* Ex. 2; Ex.

5   3; Ex. 4.[9])

6                          **1.    Roger Palmer**

7      39.     Roger Palmer holds a Nevada Concealed Carry Permit and is a retired law

8   enforcement officer who has also served as a firearms instructor, concealed carry

9   instructor, and a state security guard instructor. (ECF No. 1 at 20.) Palmer is not a licensed

10  firearms, manufacturer, importer, or dealer. (*Id.* at 20.) Palmer claims that he owns and

11  possessed, prior to A.B. 286's passage, multiple unserialized firearms, both handguns and

12  rifles. (*Id.* at 20-21.) Palmer alleges that he previously self-manufactured these firearms

13  lawfully by using unserialized component parts, including Polymer803 NFOs (non-firearm

14  objects), one or more of which fall within the new definition of and prohibition against

15  unserialized "unfinished frames or receivers" under A.B. 286. (*Id.*) More specifically, in his

16  Response to Defendants' First Interrogatories, Palmer listed the following NFOs and

17  firearm building kits that he lawfully acquired prior to A.B. 286's enactment: "AR15 blanks,

18  polymer handgun blanks, AR10 blanks, 1911 unfinished receivers, and AR15

19  polymer/plastic lowers . . ." (Ex. 2 at 6.)

20     40.     Palmer alleges that he desires to acquire additional NFOs, including those

21  that fall within the definition of "unfinished frames or receivers, commonly used in the self-

22  manufacturing of firearms for self-defense and other lawful purposes," and he desires to

23  self-manufacture additional operable firearms for self-defense and other lawful purposes.

24  (ECF No. 1 at 22.) Palmer appears to elaborate on the "other lawful purposes" for which

25

26

27

28           [9]These exhibits are docketed as ECF Nos. 87-2, 87-3 and 87-4.

he wishes to self-manufacture firearms in his response to Defendants' Interrogatory No. 7:

> It is not about a cost saving measure or concerns about a firearm being tracked. The opportunity to make something and it to be yours is what matters. Teaching others how to build, assemble, troubleshoot, and operate a firearm for lawful purposes cannot be compared to going and buying a pre-made weapon. Self-manufacturing allows a person to custom make a firearm and allows that person to also fully understand how it functions, thus making that person more knowledgeable about what they possess and how to safely operate it for lawful purposes.

(*See* Ex. 2 at 8.) The Court therefore finds that Plaintiff Palmer wishes to engage in self-manufacturing for self-defense, hobby purposes (i.e., "to make something and it to be yours"), and to teach others how to build, assemble, troubleshoot, and operate a firearm.

### 2.    Chad Moxley

41.    Plaintiff Chad Moxley holds a valid Federal Firearms License and Nevada Concealed Carry Permit. (ECF No. 1 at 23.) Moxley conducts sales of firearms and constituent firearm parts at local gun shows through his sole proprietorship, Strategic Supplies, in compliance with all applicable state and federal laws and regulations. (*Id.*) Moxley alleges he attended two gun shows per month before A.B. 286's passage and sold between five and forty unfinished receiver kits that would now be prohibited by A.B. 286. (*Id.*) Moxley further alleges that he desires to continue making available for sale and would make available for sale to ordinary law-abiding citizens unserialized firearms, component parts, and other NFOs. (*Id.* at 23-24.) In his responses to Defendants' First Set of Interrogatories, however, Moxley states his intentions differently:

> I enjoy the hobby of self-manufacturing personal firearms that may be utilized for self-defense or other lawful recreational activities. I enjoy the recreational shooting of rifles, pistols, and shotguns and would like to continue my hobby with these types of self-manufactured firearms.

(Ex. 3 at 7.) The Court therefore finds that Plaintiff Moxley wishes to engage in self-manufacturing for both the sale of ghost guns and/or component parts, as well as for hobby and recreational purposes.

### 3.   FPC

42.   Plaintiff FPC alleges that it represents its Nevada resident members—who include gun owners, prospective gun owners, self-manufacturers, retailers of NFOs, parts, and firearms, and others—and filed this action on behalf of its Nevada resident members, including the named individual Plaintiffs. (ECF No. 1 at 26.) FPC claims that many of its Nevada resident members lawfully acquired unserialized firearm components that are commonly possessed by law-abiding citizens in the exercise of their right to self-manufacture such firearms for self-defense and other lawful purposes. (*Id.* at 26-27.) FPC contends that many of FPC's Nevada resident members desire to continue to own and possess their firearm components for lawful purposes, and to not sell or otherwise dispose of them. (*Id.* at 27.) Additionally, FPC contends that many of FPC's Nevada resident members also desire to acquire additional NFOs and to self-manufacture additional operable firearms for self-defense or other lawful purposes. (*Id.*)

43.   Without further elaboration on what "other lawful purposes" FPC's Nevada resident members wish to engage in, the Court finds that, while FPC itself does not state an intention to self-manufacture firearms, it represents members who wish to self-manufacture for self-defense purposes.

## V.   CONCLUSION

For the reasons discussed herein, the Court primarily adopts Defendants' proposed findings (ECF No. 87) and rejects Plaintiffs' proposed findings (ECF No. 86).

Per the Ninth Circuit's Order, it is therefore ordered that the parties must notify the Ninth Circuit Clerk of these findings.

The Clerk of Court is further directed to close this case pending the outcome of the appeal.

DATED THIS 7th Day of October 2024.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE